NIELSEN MERKSAMER
  PARRINELLO GROSS & LEONI LLP
  Christopher E. Skinnell, Esq. (S.B. No. 227093)
  Hilary J. Gibson, Esq. (S.B. No. 287862)
2350 Kerner Boulevard, Suite 250
San Rafael, California 94901
Telephone: (415) 389-6800
Facsimile: (415) 388-6874
Email: cskinnell@nmgovlaw.com
Email: hgibson@nmgovlaw.com

*Attorneys for Plaintiff/Petitioners*
CALIFORNIA APARTMENT
ASSOCIATION, STEPHEN LIN,
RAKESH and TRIPTI JAIN, ALISON
MITCHELL, MICHAEL HAGERTY, &
H. ALEX and DANNIE ALVAREZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA APARTMENT ASSOCIATION, STEPHEN LIN, RAKESH and TRIPTI JAIN, ALISON MITCHELL, MICHAEL HAGERTY, & H. ALEX and DANNIE ALVAREZ,<br><br>  *Plaintiffs and Petitioners*,<br><br>vs.<br><br>COUNTY OF ALAMEDA, BOARD OF SUPERVISORS OF THE COUNTY OF ALAMEDA, and DOES 1-25,<br><br>  *Defendants and Respondents*. | Case No. 3:22-cv-02705-LB<br><br>**PLAINTIFFS' NOTICE OF MOTION & MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT ON FACIAL CLAIMS**<br><br>**[FED. R. CIV. PROC. 56]**<br><br>DATE: September 29, 2022<br>TIME: 9:30 a.m.<br>DEPT: Courtroom B, 15th Floor<br>JUDGE: Hon. Laurel Beeler<br><br>(Related to Case 3:22-cv-01274-LB, *Williams v. County of Alameda, et al.*) |

**NOTICE OF MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that on September 29, 2022, at 9:30 a.m., or as soon thereafter as the parties may be heard, the Plaintiffs in this action will move this Court, at the United States Courthouse located at 450 Golden Gate Avenue, San Francisco, California, 94102, Courtroom #B, 15th Floor, for summary judgment or partial summary judgment on all the facial causes of action stated by the Complaint on file in this action.

This motion is based on the following documents: this Notice of Motion and the attached Points & Authorities; the Complaint and Answer on file herein (ECF Nos. 1 and 18); the Declaration of Tom Bannon in Support of Plaintiffs' Motion for Summary Judgment ("Bannon Decl."), filed herewith; the Declaration of Stephen Lin, filed herewith ("Lin Decl."); the Declaration of Alison Mitchell, filed herewith ("Mitchell Decl."); the Declaration of Michael Hagerty, filed herewith ("Hagerty Decl."); the Declaration of H. Alex Alvarez, filed herewith ("Alvarez Decl."); Plaintiffs' Request for Judicial Notice in Support of Plaintiffs' Motion for Summary Judgment, filed herewith ("Plaintiffs' MSJ RJN"); and all the other papers, documents, or exhibits on file or to be filed in this action, and the argument to be made at the hearing on the motion.

Respectfully submitted,

Dated: July 18, 2022

NIELSEN MERKSAMER
PARRINELLO GROSS & LEONI LLP

By: _____
Christopher E. Skinnell

*Attorneys for Plaintiffs*
CALIFORNIA APARTMENT
ASSOCIATION, STEPHEN LIN,
RAKESH and TRIPTI JAIN, ALISON
MITCHELL, MICHAEL HAGERTY, &
H. ALEX and DANNIE ALVAREZ

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ..................................................................................... 11

II.   LEGAL STANDARD GOVERNING SUMMARY JUDGMENT ........................ 12

III.  UNDISPUTED FACTS SUPPORTING SUMMARY JUDGMENT ................... 12

    A.    Background ................................................................................... 12

    B.    Plaintiffs' Standing ...................................................................... 16

        1.    The California Apartment Association............................................ 16

        2.    The Individual Plaintiffs.................................................................. 17

IV.   THE MORATORIUM WORKS A PHYSICAL TAKING OF PROPERTY ........ 18

    A.    Applicable Legal Standard ......................................................... 19

    B.    Invasion of the Right to Exclude ............................................... 20

    C.    Invasion of the Right to Possess/Occupy for Personal Use ..................... 24

    D.    Detrimental Impact on the Right to Dispose ........................................... 25

V.    ALAMEDA COUNTY'S CONTINUED MAINTENANCE OF THE
      MORATORIUM UNCONSTITUTIONALLY IMPAIRS CONTRACTS ........... 25

    A.    Applicable Legal Standard ......................................................... 25

    B.    The County's Moratorium Ordinance Substantially Impairs
        Lease Agreements Throughout the County ............................................. 27

    C.    The Justification for the Maintaining the Draconian Restrictions
        Imposed by the Moratorium Is Far Weaker Than It Was in 2020 ......... 27

    D.    The Moratorium Is Not Tailored Appropriately to Its Purpose.............. 28

    E.    The Ninth Circuit's *Apartment Association* Decision Cannot
        Save Alameda County's Moratorium ...................................................... 31

VI.   INSOFAR AS THE MORATORIUM PROHIBITS EVICTIONS
      UNDER THE ELLIS ACT, IT IS PREEMPTED BY CALIFORNIA
      STATE LAW ........................................................................................ 32

A.    The Ellis Act Preempts Local Eviction Controls that Prohibit Landlords from Removing Rental Units from the Marketplace ............ 33

B.    The County's Moratorium Purports to Prohibit Landlords from Removing Rental Units from the Marketplace ....................................... 33

C.    Governor Newsom Did Not Waive the Application of the Ellis Act as Part of His Emergency Orders, and There Is No Other Authority for the County to Ignore Preemptive State Law ................... 35

VII.    CONCLUSION .................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*335-7 LLC v. City of N.Y.,*
   524 F. Supp. 3d 316 (S.D.N.Y. 2021)................................................................24

*Ala. Ass'n of Realtors v. HHS,*
   141 S. Ct. 2485 (2021) ..........................................................................23, 27

*Albarran v. New Form, Inc. (In re Barboza),*
   545 F.3d 702 (9th Cir. 2008) ....................................................................12

*Allied Structural Steel Co. v. Spannaus,*
   438 U.S. 234 (1978)................................................................................26

*Apartment Ass'n of L.A. Cty., Inc. v. City of L.A.,*
   500 F. Supp. 3d 1088 (C.D. Cal. 2020) ..............................................31, 32

*Apartment Ass'n of L.A. Cty. v. City of L.A.,*
   10 F.4th 905 (9th Cir. 2021) ........................................................27, 31, 32

*Auracle Homes, LLC v. Lamont,*
   478 F. Supp. 3d 199 (D. Conn. 2020) .......................................................21

*Bakanauskas v. Urdan,*
   206 Cal. App. 3d 621 (1988) .....................................................................24

*Baptiste v. Kennealy,*
   490 F. Supp. 3d 353 (D. Mass. 2020)..................................................21, 23

*Birkenfeld v. Berkeley,*
   17 Cal. 3d 129 (1976) ..............................................................................13

*Calvary Chapel Dayton Valley v. Sisolak,*
   140 S. Ct. 2603 (2020)..............................................................................29

*Cedar Point Nursery v. Hassid,*
   141 S. Ct. 2063 (2021) ...................................................................19, 20, 21

*Childs v. Eltinge,*
   29 Cal. App. 3d 843 (1973)......................................................................12

*City of Santa Monica v. Yarmark,*
   203 Cal. App. 3d 153 (1988)....................................................................33

*El Papel LLC v. Durkan,*
   2021 U.S. Dist. LEXIS 181390 (W.D. Wash. Sep. 15, 2021) ....................................21

*Elmsford Apartment Assocs., LLC v. Cuomo,*
   469 F. Supp. 3d 148 (S.D.N.Y. 2020)........................................................................21

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,*
   459 U.S. 400 (1983)........................................................................................25, 26, 29

*Farhoud v. Brown,*
   2022 U.S. Dist. LEXIS 20033 (D. Or. Feb. 3, 2022)..................................................21

*Fragomeno v. Ins. Co. of the W.,*
   207 Cal. App. 3d 822 (1989)......................................................................................22

*Gallo v. District of Columbia,*
   2022 U.S. Dist. LEXIS 109644 (D.D.C. June 21, 2022)............................................21

*Harmon v. Markus,*
   412 Fed. Appx. 420 (2d Cir. 2011) ............................................................................24

*Heights Apartments, LLC v. Walz,*
   30 F.4th 720 (8th Cir. 2022), *reh'g en banc denied at*
   2022 U.S. App. LEXIS 16863 (8th Cir. June 16, 2022) ..................................*passim*

*Home Bldg. & Loan Ass'n v. Blaisdell,*
   290 U.S. 398 (1934) .......................................................................................26, 28, 31

*Horne v. Dep't of Agric.,*
   135 S. Ct. 2419 (2015) ................................................................................................19

*Jevons v. Inslee,*
   561 F. Supp. 3d 1082 (E.D. Wash. 2021)...................................................................20

*Johnson v. City and County of San Francisco,*
   137 Cal. App. 4th 7 (2008) .........................................................................................33

*Kaiser Aetna v. United States,*
   444 U.S. 164 (1979) .............................................................................................19, 20

*L.A. Lincoln Place Inv'rs v. City of L.A.,*
   54 Cal. App. 4th 53 (1997) .........................................................................................33

*Landeros v. Pankey,*
   39 Cal. App. 4th 1167 (1995) .....................................................................................29

*Loretto v. Teleprompter Manhattan CATV Corp.,*
   458 U.S. 419 (1982) ................................................................... *passim*

*Neb. v. Wyo.,*
   507 U.S. 584 (1993) ........................................................................... 12

*Pennell v. San Jose,*
   485 U.S. 1 (1988) .............................................................................. 22

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
   141 S. Ct. 63 (2020) .......................................................................... 29

*Ross v. City of Berkeley,*
   655 F. Supp. 820 (N.D. Cal. 1987) ..................................................... 24

*S. Cal. Rental Hous. Ass'n v. Cty. of San Diego,*
   550 F. Supp. 3d 853 (S.D. Cal. 2021) ........................................... 17, 20

*S.F. Apartment Ass'n v. City & Cty. of S.F.,*
   3 Cal. App. 5th 463 (2016) ..................................................... 17, 33, 35

*Sherwin-Williams Co. v. City of Los Angeles,*
   4 Cal. 4th 893 (1993) ......................................................................... 33

*Small Property Owners of San Francisco Institute v. City and County of
San Francisco,*
   22 Cal. App. 5th 77 (2018) ........................................................... 32, 33

*Spinks v. Equity Residential Briarwood Apartments,*
   171 Cal. App. 4th 1004 (2009) ........................................................... 22

*Sveen v. Melin,*
   138 S. Ct. 1815 (2018) ....................................................................... 26

*United States Trust Co. v. New Jersey,*
   431 U.S. 1 (1977) ......................................................................... 26, 28

*W. Union Tel. Co. v. Hansen & Rowland Corp.,*
   166 F.2d 258 (9th Cir. 1948) .............................................................. 22

*W. B. Worthen Co. v. Kavanaugh,*
   295 U.S. 56 (1935) ...................................................................... 27, 30

*Yee v. City of Escondido,*
   503 U.S. 519 (1992) ........................................................... 21, 22, 23, 24

**Constitutional Authorities**

U.S. Const. amend. V (takings clause) ............................................................. 18, 22

U.S. Const. amend. XIV (due process) ................................................................ 18

U.S. Const. art. I, § 10 (contracts clause) ..................................................... 25, 26

**Statutes**

15 U.S.C. § 9058c(d)(1)(A) .................................................................................. 32

42 U.S.C. § 1983 ................................................................................................. 25

Alameda County's Eviction Moratorium Ordinance ...................................... *passim*

    Alameda County Code, ch. 6.120 .............................................................. 14

    Alameda County Code § 6.120.030 ..................................................... 14, 33

    Alameda County Code § 6.120.030(D) ....................................................... 14

    Alameda County Code § 6.120.030(F) ................................................. 14, 34

    Alameda County Code § 6.120.040 ..................................................... 14, 34

    Alameda County Code § 6.120.040(D) ....................................................... 14

    Alameda County Code § 6.120.110 ............................................................ 14

    Alameda County Code § 6.120.090(B) ................................................. 14, 23

    Alameda County Code § 6.120.090(D) ................................................. 14, 23

    Alameda County Ord. No. O-2020-23 ....................................................... 13

    Alameda County Ord. No. O-2020-32 ....................................................... 13

    Alameda County Reso. No. R-2020-91 ...................................................... 14

Assembly Bill 832 (2021-2022 Reg. Sess.),
    2021 Cal. Stats., ch. 27 ................................................................... 15, 16

Assembly Bill 2179 (2021-2022 Reg. Sess.),
    2022 Cal. Stats., ch. 13 ........................................................................ 16

Assembly Bill 3088 (2019-2020 Reg. Sess.),
    2020 Cal. Stats., ch. 37 .................................................................. 15 16, 30

Cal. Civ. Code § 1946.2 ..................................................................... 16, 30

Cal. Code Civ. Proc. §§ 1159 *et seq.* ............................................. 12

Cal. Code Civ. Proc. § 1161 ............................................................ 13, 20

Cal. Code Civ. Proc. § 1161(2) ........................................................ 30

Cal. Code Civ. Proc. § 1161(3) ........................................................ 30

COVID-19 Tenant Relief Act of 2020, Cal. Code Civ. Proc. §§
    1179.01–1179.07 ............................................................................ 15, 30

    Cal. Code Civ. Proc. § 1179.02.5 ................................................ 16

    Cal. Code Civ. Proc. § 1179.03 .................................................... 15, 16

    Cal. Code Civ. Proc. § 1179.03(g)(1)(B) ...................................... 28, 30

    Cal. Code Civ. Proc. § 1179.03.5(a)(3) ........................................ 16, 30

COVID-19 Rental Housing Recovery Act, Cal. Code Civ. Proc. §§
    1179.08–1179.15 ............................................................................ 15

    Cal. Code Civ. Proc. § 1179.11(a) ................................................ 16

    Cal. Code Civ. Proc. § 1179.11(a)(4) ............................................ 16

    Cal. Code Civ. Proc. § 1179.11(c) ................................................ 16

    Cal. Code Civ. Proc. § 1179.11(c)(2) ............................................ 16

Cal. Health & Saf. Code § 50897.1(b) .............................................. 30, 32

Ellis Act, Cal. Govt. Code § 7060 *et seq.* ...................................... 12, 32

Los Angeles Muni. Code § 49.99.2 ................................................... 32

New York's Rent Stabilization Law ................................................... 25

Senate Bill 91 (2021-2022 Reg. Sess.),
    2021 Cal. Stats., ch. 2, § 17 .......................................................... 15

**Other Authorities**

Alameda Cnty. Pub. Health Dep't, "Alameda County Is Aligned with
    the State's Beyond the Blueprint Framework" (June 14, 2021).................. 15, 28

Alameda Cnty. Pub. Health Dep't, "Seven Bay Area Jurisdictions
    Order Residents to Stay Home" (Mar. 16, 2020) .................................................. 28

Cal. Executive Order N-28-20 (Mar. 19, 2020) ............................................ 13, 16, 35

Cal. Executive Order N-33-20 (Mar. 19, 2020) ........................................................ 28

Cal. Executive Order N-71-20 (June 30, 2020) ............................................. 15, 28, 35

Cal. R. Ct., Appx., Emergency Rule 1(e) ................................................................. 15

Fed. R. Civ. Proc. 56(c)(2) ...................................................................................... 12

1  **I.      <u>INTRODUCTION</u>.**

2        This case arises out of Alameda County's continued imposition of a near-total

3  ban on evictions within the County, for virtually any reason (the "Moratorium").

4  Originally adopted in response to the COVID-19 pandemic, the County continues to

5  maintain its sweeping, draconian ban more than two years later, despite dramatically

6  improved circumstances, when vaccinations are widely available, "shelter-in-place" is

7  no longer the order of the day, schools and other business have long-since been

8  allowed to operate virtually without restriction, and when the State of California's

9  more tailored tenant protection laws have been fully phased out.

10       Nor is there any apparent end in sight. The Moratorium is designed to last

11  until the day—still in the future and unspecified—that the County Board of

12  Supervisors deigns to declare an end to the local state of emergency.

13       In contrast to applicable state law, the County's Moratorium has relieved

14  tenants of eviction for failing to pay rent for the last two years and counting

15  regardless of whether the tenant could afford to make the rent payments; it has not

16  required even partial payment of rent during that period, unlike state law; and, also

17  unlike state law, the Moratorium even prohibits landlords from evicting tenants who

18  breach material terms of their lease, commit nuisance, waste or fraud, or who violate

19  the law. Nor can landlords regain these rental units for their own use, to stop the

20  bleeding. (Landlords, of course, are not freed of their continuing obligations—financial

21  or otherwise—in connection with these rental units.)

22       The individual Plaintiffs herein are all Alameda County landlords who have

23  been and still are prevented from evicting tenants who (among other things) are

24  seriously delinquent on their rent to the tune of tens of thousands of dollars. Plaintiffs

25  have no recourse to prevent substantial ongoing, month-by-month financial losses.

26  Plaintiff California Apartment Association ("CAA") represents a host of other

27  landlords in Alameda County in similar circumstances.

28       For nearly two-and-a-half years and counting, the County has forced these

1  landlords to dedicate their property to the accomplishment of the County's purposes,

2  largely at their own expense. Whatever the justification for doing so in the early

3  months of the pandemic, at this point enough is more than enough. The continued

4  maintenance of the County's blanket Moratorium, and the cumulative impacts it

5  continues to sanction, despite dramatically improved circumstances, amount to a

6  taking of Plaintiffs' property; operate as an unconstitutional impairment of contracts;

7  and—to the extent it prevents landlords from removing units from the rental

8  market—it violates the states Ellis Act, Cal. Govt. Code § 7060 *et seq*. Relief from this

9  Court is therefore needed to protect the rights of all landlords in Alameda County.

10  **II.   LEGAL STANDARD GOVERNING SUMMARY JUDGMENT.**

11      "Summary judgment is appropriate when it is demonstrated that there exists

12  no genuine issue as to any material fact, and that the moving party is entitled to

13  judgment as a matter of law." *Neb. v. Wyo.*, 507 U.S. 584, 590 (1993). *See also* Fed. R.

14  Civ. Proc. 56(c)(2). "In response to a properly submitted summary judgment motion,

15  the burden shifts to the opposing party to set forth specific facts showing that there is

16  a genuine issue for trial." *Albarran v. New Form, Inc. (In re Barboza)*, 545 F.3d 702,

17  707 (9th Cir. 2008). "The nonmoving party 'may not rely on denials in the pleadings

18  but must produce specific evidence, through affidavits or admissible discovery

19  material, to show that the dispute exists.'" *Id*.

20  **III.   UNDISPUTED FACTS SUPPORTING SUMMARY JUDGMENT.**

21      **A.   Background.**

22      Since 1872, landlords in California have had a statutory right under the state's

23  unlawful detainer law, Cal. Code Civ. Proc. §§ 1159 *et seq.*, to pursue a summary

24  proceeding to evict tenants who fail to pay their rent or who engage in material

25  breaches of their leases. "The rights and remedies afforded a landlord by the statutory

26  provisions are given in lieu of his common law rights and remedies which included the

27  right to enter and expel the tenant by force." *Childs v. Eltinge*, 29 Cal. App. 3d 843,

28  853 (1973). And while the courts have held that local governments may place

---

1    reasonable limits on evictions—limiting the amount of rent that can be charged or

2    imposing "just cause" for eviction laws, *Birkenfeld v. Berkeley*, 17 Cal. 3d 129 (1976)—

3    both the courts and the Legislature have carefully protected the interests of property

4    owners in collecting lawful rents and in enforcing lawful lease terms, especially by

5    evicting tenants who did not pay their lawful rent or who violated their leases, *see,*

6    *e.g., id.* (striking down local laws that interfered with unlawful detainer statutes).

7        In March 2020, however, in response to the COVID-19 pandemic, Governor

8    Newsom declared a State of Emergency in California. On March 16, 2020, Governor

9    Newsom issued an executive order, which, in relevant part, permitted local

10   governments to temporarily limit landlords' ability to evict tenants for nonpayment of

11   rent due to the COVID-19 crisis, though only to the extent the tenants' inability to

12   pay was attributable to negative financial impacts caused by the COVID-19 pandemic

13   itself. In pertinent part, that order provided:

> [T]he statutory cause of action for unlawful detainer, Code of Civil Procedure
> section 1161 et seq., and any other statutory cause of action that could be used
> to evict or otherwise eject a residential . . . renter . . . is suspended only as
> applied to any tenancy . . . to which a local government has imposed a
> limitation on eviction pursuant to this paragraph 2 [relating to inability to pay
> rent because of COVID-19 financial distress], and only to the extent of the
> limitation imposed by the local government. [¶] Nothing in this Order shall
> relieve a renter of the obligation to pay rent, nor restrict a housing provider's
> ability to recover rent due.

20   Cal. Executive Order ("EO") N-28-20 (Mar. 16, 2020), ¶ 2, *see* RJN, Ex. 7.

21       On April 21, 2020, acting pursuant to this authority, the Alameda County's

22   Board of Supervisors adopted the ordinance at issue here, Urgency Ordinance No. O-

23   2020-23 (RJN, Ex. 15), which purports to impose a moratorium on virtually all

24   evictions in Alameda County, for any reason.[1] The Moratorium prohibits "all

25   evictions from residential units in the unincorporated and incorporated areas of the

---

[1] The language in the urgency ordinance was made a permanent part of the
County's Code of Ordinances on June 23, 2020. Ordinance No. O-2020-32 (RJN, Ex.
17); ACCO, ch. 6.120 (RJN, Ex. 14).

county" subject to very few exceptions. Alameda County Code of Ordinances ("ACCO," RJN, Ex. 14) § 6.120.030. These exceptions are (1) Ellis Act withdrawals; (2) government orders requiring the unit to be vacated; or (3) "the resident poses an imminent threat to health or safety." ACCO § 6.120.030(F). However, even these narrow exceptions apparently do not apply when the tenant claims a financial hardship due to the COVID-19 pandemic. ACCO § 6.120.040. The County's Moratorium provides that it is an "absolute defense" to an unlawful detainer action brought during its term. ACCO §§ 6.120.030(D), 6.120.040(D). By its terms, the Moratorium applies countywide—in incorporated and unincorporated areas alike—except that cities are permitted to provide even more stringent protections for renters. ACCO § 6.120.110. The Moratorium also provides that any rent a tenant fails to pay during the declared state of emergency can never be the basis of an eviction, even if the tenant refuses to pay after the state of emergency has ended. ACCO § 6.120.090(B) & (D).

Also, by its terms, the Moratorium expires sixty days "after the expiration of the local health emergency," ACCO § 6.120.030, and the County Board has declared that the local emergency shall remain in effect indefinitely—"until the [Board] determines that the emergency no longer exists." Reso. No. R-2020-91 (RJN, Ex. 15).

The Moratorium remains in effect today, more than two years after the state of emergency was declared, and no end date has been announced, *see* Answer (ECF No. 18), ¶ 24. If it still remains in effect when this motion is due to be heard, landlords in Alameda County will have been precluded from evicting tenants for nonpayment of rent, or for ordinary just cause, for two-and-a-half years.

Whatever the rationale for imposing the Moratorium in the early months of the pandemic, it cannot be disputed—indeed, the County expressly admits—"that the Bay Area has seen significant improvement in circumstances relating to the pandemic since March of 2020 and has a relatively high rate of vaccinations. The County also admits that there are fewer restrictions on business and lower unemployment rates

compared to the immediate economic impacts of the pandemic in early 2020." Answer (ECF No. 18), ¶74. The California state courts' temporary moratorium on unlawful detainer actions was repealed effective September 1, *2020*, Cal. R. Ct., Appx., Emergency Rule 1(e). That was almost two years ago. The provision of Governor Newsom's March  2020 executive order permitting local governments to temporarily limit COVID-19-related nonpayment evictions expired a month later, on September 30, 2020. *See* EO N-71-20 (June 30, 2020), ¶ 3 (RJN, Ex. 9). State and County "stay-at-home" orders, which initially closed nonessential businesses and restricted them on an ongoing basis were repealed more than a year ago, and businesses and schools are fully reopened.[2]

Even California's statutory limits on pandemic-related evictions, the "COVID-19 Tenant Relief Act," Cal. Code Civ. Proc. §§ 1179.01–1179.07, and the "COVID-19 Rental Housing Recovery Act," Cal. Code Civ. Proc. §§ 1179.08–1179.15, which were *far* more tailored than Alameda County's Moratorium, have been phased out over the course of the past two years. Beginning September 1, 2020, and until September 30, 2021, landlords in other counties could evict tenants who failed to pay at least 25 percent of their rent during that period.[3] Beginning October 1, 2021, other counties' landlords regained the ability to evict tenants for *any* nonpayment of rent, provided that the landlord verified that he or she submitted an application for rental assistance through the State or applicable local program on behalf of the tenant and (1) it was denied, or (2) the tenant did not cooperate in completing the application with specified

---

[2] *See* Alameda Cnty. Pub. Health Dep't, "Alameda County Is Aligned with the State's Beyond the Blueprint Framework" (June 14, 2021) (RJN, Ex. 3) ("Alameda County is rescinding its Shelter-in-Place Order…").

[3] *See* Assembly Bill 3088 (2019-2020 Reg. Sess.), 2020 Cal. Stats., ch. 37, § 20 ("AB 3088") (RJN, Ex. 10) (enacting the "COVID-19 Tenant Relief Act of 2020," including Cal. Code Civ. Proc. § 1179.03); Senate Bill 91 (2021-2022 Reg. Sess.), 2021 Cal. Stats., ch. 2, § 17 ("SB 91") (RJN, Ex. 11) (amending Cal. Code Civ. Proc. § 1179.03 and related provisions to extend protections through June 30, 2021); Assembly Bill 832 (2021-2022 Reg. Sess.), 2021 Cal. Stats., ch. 27, § 15 ("AB 832") (RJN, Ex. 12) (further extending protections to Sept. 30, 2021).

time periods.[4] Beginning April 1, 2022, that restriction was removed—the only tenants who were not subject to eviction for nonpayment under state law were those who had a rent relief application pending as of March 31, 2022, and even that final, narrow protection expired June 30, 2022.[5]

At all times, these state law protections for nonpayment of rent were afforded only to those who provided a declaration of financial distress caused by COVID-19, and beginning in September 2020 "high-income" tenants were required to provide additional documentation of hardship.[6] Unlike Alameda County's Moratorium, state law did not bar the eviction of tenants who could afford to pay. And, also unlike Alameda County's Moratorium, state law continued to permit evictions for fault (nuisance, waste, material breach violations, etc.), and no-fault "just cause" reasons like an Ellis Act eviction or owner move-in eviction. Cal. Code Civ. Proc. § 1179.03.5(a)(3); Cal. Civ. Code § 1946.2.

### B.    Plaintiffs' Standing.

#### 1.    The California Apartment Association.

CAA is a § 501(c)(6) nonprofit corporation. CAA is the largest statewide rental housing trade association in the country, representing more than 50,000 rental property owners and operators who are responsible for nearly two million rental housing units throughout California. Many of its members are located in the COUNTY and are subject to, and adversely affected by, the Moratorium challenged herein. Decl. of Tom Bannon, filed herewith, ¶¶ 2-6.

CAA has standing because (i) individual members of CAA, by virtue of their rental property ownership, are subject to the Moratorium and could challenge it in

---

[4] AB 832, 2021 Cal. Stats., ch. 27, § 20 (RJN, Ex. 12) (codifying former Cal. Code Civ. Proc. § 1179.11(a), (c)).

[5] *See* Assembly Bill 2179 (2021-2022 Reg. Sess.), 2022 Cal. Stats., ch. 13, § 4 (RJN, Ex. 13) (adding Cal. Code Civ. Proc. § 1179.11(a)(4), (c)(2)).

[6] EO N-28-20, ¶ 2 (RJN, Ex. 8); AB 3088, § 20 (RJN, Ex. 10) (enacting Cal. Code Civ. Proc. §§ 1179.02.5, 1179.03).

their own right; (ii) the subject of this litigation is directly germane to CAA's organizational purpose, which is to advocate for, support, and protect the property and legal rights of CAA members and other rental property owners throughout the State of California; and (iii) neither the claims asserted, nor the equitable relief requested requires the participation of individual members in this lawsuit. *S. Cal. Rental Hous. Ass'n v. Cty. of San Diego*, 550 F. Supp. 3d 853, 869 (S.D. Cal. 2021) ("*SCRHA*") (local rental housing association had standing to raise takings and impairment of contracts claims against San Diego's moratorium); *S.F. Apartment Ass'n v. City & Cty. of S.F.*, 3 Cal. App. 5th 463, 472-74 (2016) ("*SFAA v. CCSF*") (local rental housing associations had standing to raise Ellis Act preemption).

### 2. The Individual Plaintiffs.

The individual Plaintiffs in this case—Stephen Lin, Alison Mitchell, Michael Hagerty, and Alex & Dannie Alvarez—are all property owners in Alameda County, who own rental units subject to the Moratorium. *See* Lin Decl., ¶ 2; Mitchell Decl., ¶ 2; Hagerty Decl., ¶ 2; Alvarez Decl., ¶ 2.

Each of the individual Plaintiffs has a tenant who has failed to make substantial rent payments during effective period of the Moratorium. And while some of the Plaintiffs have received partial relief payments from federal, state and local funding, *see* Lin Decl., ¶ 3; Alvarez Decl. ¶ 3, others have been unable to do so because their tenants either refused to cooperate, *see* Mitchell Decl., ¶¶ 5-6; Answer (ECF No. 18), ¶ 45, or because the tenant was deemed to be ineligible, *see* Hagerty Decl., ¶ 5; Answer (ECF No. 18), ¶ 47. In any event, even taking into account the relief payments that were available, all of these Plaintiffs have tenants who still owe *substantial* back rent:

///

///

///

///

- Mr. Lin's tenant stopped paying rent in July 2021 and has not paid anything since. He is behind on his rent in an amount of at least $24,000 at this point. Lin Decl., ¶¶ 3-4.

- Ms. Mitchell's tenant has paid no rent since March 2020, when the pandemic began, and has an outstanding balance of at least $75,000. Mitchell Decl., ¶ 4.

- Mr. Hagerty's tenant has not paid any rent for most months during the approximately two years since the pandemic began and is behind on his rent in an amount of at least $47,350. Hagerty Decl., ¶ 4

- The Alvarezes' tenant also stopped paying rent in early 2020 and owes more than $24,000 in back rent. Alvarez Decl., ¶ 3.

Of course, all of these numbers continue to grow with every month that the Moratorium remains in place, and Plaintiffs are still prohibited from evicting these delinquent tenants. The State, County and municipal "rent relief" programs that were supposed to aid landlords ran out of money months ago, and applications are no longer being accepted. RJN, Exs. 4-6.

Moreover, several of these Plaintiffs specifically purchased the properties in question with the intention of eventually taking possession for their own use or they have proposed to do so as result of the pandemic, but they are precluded by the Moratorium from doing so. Alvarez Decl., ¶ 4; Mitchell Decl., ¶¶ 3 & 7.

## IV.  **THE MORATORIUM WORKS A PHYSICAL TAKING OF PROPERTY.**

### A.  **Applicable Legal Standard.**

The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." Takings come in three basic flavors: (1) physical takings, involving physical invasion of a plaintiff's property; (2) a regulation that deprives an owner of "all economically beneficial use of their property"; and (3)

regulatory takings, arising when government regulation "goes too far." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2070-72 (2021). By purporting to indefinitely prohibit landlords in Alameda County from evicting any renter for virtually any reason, with few exceptions, the Moratorium effects a physical taking of property.

A physical taking occurs "whether the government has physically taken property for itself or someone else—by whatever means…" *Cedar Point Nursery*, 141 S. Ct. at 2072. The mere fact that a purported right to physically invade the owner's land arises from a regulation, "statute, or ordinance, or miscellaneous decree" does not make it a "regulatory" taking rather than a physical taking, if it "results in a physical appropriation of property." *Id*. A physical taking is automatically, categorically entitled to compensation. *Id.* at 2071; *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2426-27 (2015). And compensation is due regardless of whether the invasion is permanent or temporary. "The duration of an appropriation—just like the size of an appropriation [citation]—bears only on the amount of compensation." *Id.* at 2074.

In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), the Supreme Court identified three critical property rights—"'sticks in the bundle of rights that are commonly characterized as property'"—that a physical occupation impairs: "'the rights to possess, use, and dispose of it.'" *Id.* at 434-35 (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979), & *United States v. General Motors Corp.*, 323 U.S. 373, 378 (1945)). A physical occupation destroys an owner's "right to possess the occupied space himself, and also [the] power to exclude the occupier from possession and use of the space," 458 U.S. at 435; it denies an owner the "power to control the use of the property" and obtain a profit from it, *id.* at 436; and "[f]inally, even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale, the permanent occupation of that space by a stranger will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property." *Id*. The Moratorium damages all of these rights.

**B.      Invasion of the Right to Exclude.**

First, Alameda County has appropriated an exclusive right of access for third parties who would not otherwise have such a right—essentially taking "a servitude or an easement." *Cedar Point Nursery*, 141 S. Ct. at 2073. It thereby invades property owners' "right to exclude," which is "universally held to be a fundamental element of the property right," *Kaiser Aetna*, 444 U.S. at 179-80.

In *Cedar Point Nursery*, the Court recently held that a California regulation granting labor unions a right to access an agricultural employer's property in order to solicit support for unionization amongst the owner's employees constituted a *per se* physical taking because, under the regulation, the government had appropriated a right of access to the growers' property, allowing union organizers to traverse it at will for three hours a day, up to 120 days a year. *Cedar Point Nursery*, 141 S. Ct. at 2072. In the same manner here, Alameda County has conferred a right on tenants to physically occupy property—Plaintiffs' property—that they would otherwise have no legal right to occupy, due to their failure to pay rent or material breaches of the lease.

It cannot be gainsaid that if the government commandeered Plaintiffs' rental units to house homeless strangers during the course of the pandemic—or as "government offices," or for any other purpose, for that matter—that a physical taking would result. *See Loretto*, 458 U.S. at 439 n.17. This is not materially different. *But for* the Moratorium, tenants who have failed to pay their rent, or who otherwise materially violate their leases, would have no legal right to possess these properties. The property's owners would have the right to exclude them, *see* Cal. Code Civ. Proc. § 1161, but Alameda County has vested the breaching tenant with the equivalent of a servitude or easement in the landlord's property for an indeterminate period.

The County will surely argue—and several district courts have admittedly held—that eviction moratoria differ from the case of a stranger (and, thus, *Cedar Point Nursery*), because Plaintiffs voluntarily invited the tenants to possess their property in the first instance. *See SCRHA*, 550 F. Supp. 3d at 865-66; *Jevons v. Inslee*,

561 F. Supp. 3d 1082, 1107 (E.D. Wash. 2021); *Gallo v. District of Columbia*, 2022 U.S. Dist. LEXIS 109644, at \*20-23 (D.D.C. June 21, 2022); *Farhoud v. Brown*, 2022 U.S. Dist. LEXIS 20033, at \*28 (D. Or. Feb. 3, 2022); *El Papel LLC v. Durkan*, 2021 U.S. Dist. LEXIS 181390, at \*43-47 (W.D. Wash. Sep. 15, 2021).[7] For this proposition, the cases rely on *Yee v. City of Escondido*, 503 U.S. 519 (1992).

But that reliance is misplaced, as the only Court of Appeals to consider the question to date—the Eighth Circuit—recently held in *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 726-27 (8th Cir. 2022) ("*Walz*"), *reh'g en banc denied at* 2022 U.S. App. LEXIS 16863 (8th Cir. June 16, 2022), reversing the dismissal of a physical takings challenge to the State of Minnesota's eviction moratorium.

In *Yee*, owners of a mobile home park alleged that a city's mobile home rent control ordinance effected a physical taking of their property because preexisting state law limited the bases upon which the park owner could terminate the mobile homeowner's tenancy to "the nonpayment of rent, the mobile home owner's violation of law or park rules, and the park owner's desire to change the use of his land." 503 U.S. at 523. The park owners argued that the rent control law, when viewed in the context of state law, constituted a physical takings because it transferred significant value of the property from the owner to the (incumbent) tenant, *id.* at 529-30, and because it deprived them "of the ability to choose their incoming tenants," *id.* at 530-31. With respect to the former argument, the Court held that virtually any regulation could be held to transfer value or wealth, and that the allegations, though potentially relevant to a regulatory takings claim, did not establish a physical takings. *Id.* at 529-30. With respect to the latter, the Court held, "Because they voluntarily open their property to occupation by others, petitioners cannot assert a *per se* right to

---

[7] Three other district court decisions, *Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 220-21 (D. Conn. 2020), *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 388 (D. Mass. 2020), and *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148, 162-63 (S.D.N.Y. 2020), rejected a *per se* physical takings claim in connection with eviction moratoria, citing *Yee*, but they predated *Cedar Point Nursery*.

1  compensation based on their inability to exclude particular individuals." *Id.* at 531.

2      But this statement has to be read in the overall context of the case. *Yee* simply

3  did <u>not</u> hold that the government could relieve mobile home park tenants of the need

4  to pay rent altogether, for an indefinite period of time, while still retaining possession,

5  and that such continuous adverse possession would not be a physical takings. Rather,

6  *Yee* addressed a normal landlord-tenant relationship: in which tenants were expected

7  to pay rent (regulated, but still required to provide the landlord a fair return on

8  investment[8]) or face eviction; where the landlord could evict for violations of the law

9  or park rules; and where the landlord retained the right to cease renting altogether.

10  *See Yee,* 503 U.S. at 527-28.[9]

11      None of those is true of the Moratorium ordinance. For the last nearly two-and-

12  a-half years, tenants in Alameda County need not have paid *any* rent to retain

13  possession, and that remains the case; tenants generally cannot be evicted even for

14  violations of law or material breaches of the lease; and—at least with respect to a

15  tenant who claims a COVID hardship—the Moratorium purports to require the

16  landlord to maintain the property's use as a rental unit indefinitely. In essence, the

17  landlord-tenant relationship has been destroyed, and the County is compelling

18  landlords to house individuals who are, in legal effect, trespassers.[10,11]

19  _____

20  [8] *Pennell v. San Jose,* 485 U.S. 1, 13-14 (1988).

   [9] It is also worth noting the narrowness of the claim in *Yee.* The mobile home park
21  owners did "not claim that the ordinary rent control statutes regulating housing
   throughout the country violate the Takings Clause," 503 U.S. at 526, and they also
22  did not challenge the state law restrictions on terminating the lease, *see id.* at 531 n.*.
   As the Court understood the argument, the owners only contended that the rent
23  control system undermined their ability to influence the tenant's choice of whom to
   sell to, by depriving the park owners of the power to threaten a rent increase for a
24  disfavored purchaser. *Id.*

25  [10] *See W. Union Tel. Co. v. Hansen & Rowland Corp.,* 166 F.2d 258, 262 (9th Cir.
   1948) (a tenant who retains possession when no longer entitled to under the lease is a
26  "trespasser"); *Spinks v. Equity Residential Briarwood Apartments,* 171 Cal. App. 4th
   1004, 1038 (2009) (same) (citing 5 Witkin, SUMM. OF CAL. LAW (10th ed. 2005), *Torts,* §
27  421, p. 636); *Fragomeno v. Ins. Co. of the W.,* 207 Cal. App. 3d 822, 834 (1989) (same).
   [11] Indeed, the Moratorium, on its face, seems to even preclude eviction of

28

The Supreme Court recently held, "preventing [property owners] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude." *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021). Tellingly, the Court cited *Loretto*, 458 U.S. at 435—a *physical* takings case—in support of this proposition, rather than *Yee*, which held that a normal rent control law may give rise to a regulatory takings claim but does not invade the right to exclude and therefore does not give rise to a physical takings claim. 503 U.S. at 527-28. The Court thus indicated—as the *Walz* court held, *see* 30 F.4th at 733—that preventing eviction for nonpayment altogether is qualitatively different from normal rent control. The Moratorium, therefore, effects a *per se* physical taking of Plaintiffs' property.

The County may also argue that there is no taking because tenants are purportedly not relieved of the obligation to pay rent—the landlord's remedy is simply to pursue damages instead. But "[w]hile landlords may bring an action against delinquent tenants for past-due rent, monetary relief obtained against a judgment-proof individual is an illusory remedy, as has been recognized by the Supreme Court." *Walz*, 30 F.4th at 729 n.7 (citing *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489, which noted that eviction moratoria place landlords "at risk of irreparable harm by depriving them of rent payments with no guarantee of eventual recovery").**[12]** Additionally, the Moratorium provides that any rent a tenant fails to pay during the declared state of emergency can *never* be the basis of an eviction, even if the tenant refuses to pay after the emergency ends, so if a tenant resumes payment again after (if?) the Moratorium eventually lifts, he or she can remain tens or hundreds of thousands of dollars in arrears and continue to occupy the unit. ACCO § 6.120.090(B) & (D) (RJN, Ex. 14).

---

squatters.

**[12]** *See also Baptiste*, 490 F. Supp. 3d at 376 ("this right [to seek back rent as damages] is largely illusory, as tenants who have not paid their rent for many months because of economic distress—or indeed for any other reason—are unlikely to pay a money judgment against them.").

**C.      Invasion of the Right to Possess/Occupy for Personal Use.**

Separate and apart from the Moratorium's invasion of the "right to exclude," the Moratorium invades another fundamental aspect of property ownership—the "right to possess the occupied space himself[.]" *Loretto*, 458 U.S. at 435-36.

Several of the individual plaintiffs in this case wish to evict their delinquent tenants to move into those units themselves. *See* Alvarez Decl., ¶ 4; Mitchell Decl., ¶¶ 3 & 7. Doing so would allow them to at least mitigate the ongoing costs of maintaining the rental units subject to the Moratorium while continuing to pay their own (rapidly escalating) costs of living. Traditionally, they would have been able to do so by exercising their rights under the Ellis Act or an "owner move-in," but the Moratorium bars them from doing even that.

This also points to a physical taking, and it further distinguishes this case from *Yee*. *Yee* expressly relied on the fact that the mobile home park owners in that case were not required to continue using the property as a mobile home park and observed that "[a] different case would be presented were the statute, on its face or as applied, to compel a landowner over objection to rent his property or to refrain in perpetuity from terminating a tenancy." *See* 503 U.S. at 527-28. Consistent with that observation, numerous cases have recognized that a law that bars a property owner from recovering her property for her own personal use on an indefinite basis works a physical taking. *See, e.g., Ross v. City of Berkeley*, 655 F. Supp. 820, 836-42 (N.D. Cal. 1987) (physical taking resulted from regulation that precluded owner from retaking possession of commercial property for the purposes of owner occupancy); *Bakanauskas v. Urdan*, 206 Cal. App. 3d 621, 627 (1988) (precluding a property owner from recovering a rental unit for his or her own personal use "would render the statute unconstitutionally confiscatory"); *Harmon v. Markus*, 412 Fed. Appx. 420, 422 (2d Cir. 2011) (rejecting a physical takings claim because landlords retained the ability under New York law to recover the premises for their own personal use); *335-7 LLC v. City of N.Y.*, 524 F. Supp. 3d 316, 328 (S.D.N.Y. 2021) ("In accordance with *Yee*, courts in

1  this Circuit have long upheld [New York's Rent Stabilization Law] against facial

2  physical taking challenges because landlords have voluntarily offered their property

3  for rent and, by the express terms of the RSL, landlords can evict unsatisfactory

4  tenants, reclaim or convert units, or exit the market").

5       **D.    Detrimental Impact on the Right to Dispose.**

6       As a formal matter, Plaintiffs "retain the bare legal right to dispose of the

7  occupied space by transfer or sale," but as the Court noted in *Loretto*, the indefinite

8  "occupation of that space by a stranger will ordinarily empty the right of any value,

9  since the purchaser will also be unable to make any use of the property." 458 U.S. at

10  436. *See* Mitchell Decl., ¶ 8 (re unsuccessful attempt to sell tenant-occupied condo).

11  **V.   ALAMEDA COUNTY'S CONTINUED MAINTENANCE OF THE**

12       **MORATORIUM UNCONSTITUTIONALLY IMPAIRS CONTRACTS.**

13       The Contracts Clause, Art. 1, § 10, of the U.S. Constitution, provides: "No State

14  shall . . . pass any . . . Law impairing the Obligation of Contracts." The Clause applies

15  to local governments, and violations thereof are actionable under 42 U.S.C. § 1983.

16  *So. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003).

17       **A.    Applicable Legal Standard.**

18       The Supreme Court has adopted a three-part test to assess whether the

19  Contracts Clause is violated, as set out in *Energy Reserves Grp., Inc. v. Kansas Power*

20  *& Light Co.*, 459 U.S. 400, 411-12 (1983). Under that test, a court asks:

21       1.    "[W]hether the state law has, in fact, operated as a substantial

22             impairment of a contractual relationship."

23       2.    If a substantial impairment is found, whether there is "a significant and

24             legitimate public purpose behind the regulation";

25       3.    "Once a legitimate public purpose has been identified, the next inquiry is

26             whether the adjustment of 'the rights and responsibilities of contracting

27             parties [is based] upon reasonable conditions and [is] of a character

28             appropriate to the public purpose justifying [the legislation's] adoption.'"

1    *Id.* at 411-12 (internal citations omitted).

2    An impairment is "substantial" if it "undermines the contractual bargain,

3    interferes with a party's reasonable expectations, and prevents the party from

4    safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018).

5    "Total destruction" or repudiation of the contract is not necessary for an impairment

6    to be substantial. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 26-27 (1977).

7    As to the second and third prongs, though the government is not required to

8    demonstrate the existence of an emergency to sustain an act that impairs contracts,

9    "[u]ndoubtedly the existence of an emergency and the limited duration of a relief

10   measure are factors to be assessed in determining the reasonableness of an

11   impairment…" *Id.* at 22 n.19. Thus, though the courts generally give deference to the

12   government with respect to these prongs, the Eight Circuit recently held—in

13   considering the State of Minnesota's eviction moratorium—that such deference

14   becomes ever less appropriate over time, and an impairment that is sustainable in the

15   short-term, in response to a crisis, may become unconstitutional if maintained

16   indefinitely. *Walz*, 30 F.4th at 726-27. *See also* *Home Bldg. & Loan Ass'n v. Blaisdell*,

17   290 U.S. 398, 442 (1934) ("*Blaisdell*") ("It is always open to judicial inquiry whether

18   the exigency still exists upon which the continued operation of the law depends.").

19   This is consistent with holdings of the Supreme Court that "[t]he severity of the

20   impairment measures the height of the hurdle the state legislation must clear.

21   Minimal alteration of contractual obligations may end the inquiry at its first stage.

22   Severe impairment, on the other hand, will push the inquiry to a careful examination

23   of the nature and purpose of the state legislation." *Allied Structural Steel Co. v.*

24   *Spannaus*, 438 U.S. 234, 245 (1978). *See also* *Energy Reserves Grp.*, 459 U.S. at 411.

25   The longer the Moratorium is sustained, the more severe the cumulative burdens on

26   landlords get. *Compare* *Blaisdell*, 290 U.S. at 398 (upholding temporary mortgage

27   moratorium where mortgagors were required to pay a reasonable rent to meet

28   mortgagor's costs) *with* *W. B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935) (finding a

1   similar mortgage moratorium to be an unconstitutional impairment when the
2   duration was indefinite and there was no obligation by the mortgagor to pay the
3   mortgagee a sufficient sum to meet the mortgagor's costs).

**B.   The County's Moratorium Ordinance Substantially Impairs Lease Agreements Throughout the County.**

With respect to a lease agreement for real property, it is virtually impossible to imagine a more "substantial" impairment than a law that effectively relieves tenants of the need to pay any rent at all, while allowing them to retain possession of that property, for more than two years and counting.[13] The same is true of the landlord's inability to enforce other material lease terms, such as restrictions on pets or the obligation to reasonably maintain the condition of the property, or to evict for "cause," such as nuisance, waste, or violations of law. As the Eight Circuit observed in *Walz*, "It is axiomatic that a landlord's bargain of receiving rent in exchange for a tenant's possession of the property is greatly diminished if the landlord's right to exclude the tenant is minimal or non-existent. The same is true if other terms of the lease cannot be enforced." 30 F.4th at 729 (eviction moratorium substantially impaired leases). *See also Apartment Ass'n of L.A. Cty. v. City of L.A.*, 10 F.4th 905, 913 (9th Cir. 2021) ("*AAGLA*") (assuming eviction moratorium substantially impaired leases).

**C.   The Justification for the Maintaining the Draconian Restrictions Imposed by the Moratorium Is Far Weaker Than It Was in 2020.**

Regarding the question of whether there is "a significant and legitimate public purpose behind the regulation," whether or not there was in the initial months of the pandemic, "[i]t is always open to judicial inquiry whether the exigency still exists upon which the continued operation of the law depends," *Blaisdell*, 290 U.S. at 442,

---

[13] "While landlords may bring an action against delinquent tenants for past-due rent, monetary relief obtained against a judgment-proof individual is an illusory remedy, as has been recognized by the Supreme Court." *Walz*, 30 F.4th at 729 n.7 (citing *Ala. Ass'n of Realtors*, 141 S. Ct. at 2489).

1    and as the pandemic wears into its third year "and time is available for more

2    reasoned and less immediate decision-making by public health officials," a more

3    critical review by the courts is warranted. *Walz*, 30 F.4th at 726-27.

4         Early on, the State of California and local governments, including Alameda

5    County, imposed stringent "stay-at-home" orders that sought to prevent transmission

6    of the virus. *See* EO N-33-20 (Mar. 19, 2020) (RJN, Ex. 7); Alameda Cnty. Pub. Health

7    Dep't, "Seven Bay Area Jurisdictions Order Residents to Stay Home" (Mar. 16, 2020)

8    (RJN, Ex. 1). But those State and county stay-at-home orders were repealed long ago,

9    and businesses and schools are fully reopened. *See* Alameda Cnty. Pub. Health Dep't,

10   "Alameda County Is Aligned with the State's Beyond the Blueprint Framework" (June

11   14, 2021) (RJN, Ex. 2). The provision of Governor Newsom's March 16, 2020 executive

12   order permitting local governments to temporarily limit COVID-19-related

13   nonpayment evictions expired on September 30, *2020*—almost two full years ago. *See*

14   EO N-71-20, ¶ 3 (RJN, Ex. 9). And "the County admits that the Bay Area has seen

15   significant improvement in circumstances relating to the pandemic since March of

16   2020 and has a relatively high rate of vaccinations. The County also admits that there

17   are fewer restrictions on business and lower unemployment rates compared to the

18   immediate economic impacts of the pandemic in early 2020." Answer (ECF No. 18), ¶

19   74. Even California's less-draconian eviction constraints—which at least required

20   tenants to pay *some* of their rent to avoid eviction, *see* Cal. Code Civ. Proc. §

21   1179.03(g)(1)(B), and which permitted "for cause" evictions—have expired. At this

22   point, any "emergency" justification for the Moratorium has dissipated, and the

23   rationale for its continued maintenance is ever less sustainable. *See United States*

24   *Trust Co.*, 431 U.S. at 22 n.19 ("the existence of an emergency and the limited

25   duration of a relief measure" are relevant to the analysis).

26   **D.    The Moratorium Is Not Tailored Appropriately to Its Purpose.**

27        Even where an important public purpose is identified, the government's action

28   must be "tailored appropriately to its purpose," *Energy Reserves Grp.*, 459 U.S. at 410

n.11; it "is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well." *United States Trust Co.*, 431 U.S. at 31. And while "'[a]t the outset of an emergency, it may be appropriate for courts to tolerate very blunt rules' set by officials navigating unprecedented situations[, e]ven so, a state's authority to impose restrictions is not unlimited and judicial deference, even in an emergency or a crisis like the COVID-19 pandemic, 'does not mean wholesale judicial abdication.'" *Walz*, 30 F.4th at 730 (quoting *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2605 (2020) (mem.) (Alito, J., dissenting from the denial of application for injunctive relief), and *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 74 (2020) (Kavanaugh, J., concurring).

The Alameda County Moratorium is exceedingly blunt indeed—far too blunt, especially at this late date. Like the Minnesota moratorium at issue in *Walz*, Alameda County's moratorium "practically prohibited all evictions rather than just those logically related to the pandemic's economic hardships." 30 F.4th at 731. With three exceedingly narrow exceptions, "landlords in the entire [County] [a]re obligated to house non-paying, employed, healthy, non-quarantining individuals in the same way as unemployed, sick, and quarantining individuals whose predicaments were tied to COVID-19." *Id*. The moratorium requires landlords to tolerate tenants who violate their leases, who create nuisances, and who cause damage to the property. *Id*.

And, while the tenants are freed of virtually all their obligations under the lease, landlords are still held to theirs. They must continue to pay mortgages, insurance premiums, utility bills, and property taxes, and they must continue to bear the costs of maintaining the property in accordance with stringent state law—or potentially face a suit from the non-paying tenant for lack of habitability. *See Landeros v. Pankey*, 39 Cal. App. 4th 1167, 1169 (1995). Moreover, the Moratorium takes no account of the relative circumstances of the landlords and tenants themselves. A mom-and-pop landlord (like the individual Plaintiffs here) is prohibited from evicting even a wealthy, non-paying tech executive, who has the means to pay

rent but simply refuses to do so. And if that tenant makes a sufficient income—"more than 80 percent of the area median income"—even landlords of modest means generally cannot qualify for rental relief funds. *See* Cal. Health & Saf. Code § 50897.1(b). (In fact, State law gave priority to tenants who made less than 50% of AMI, *see id.* at (b)(1), and the County prioritized tenants making less than 30%, RJN, Ex. 5, p. 7.) Furthermore, because "for cause" evictions are barred, where the tenant claims a purported COVID-19 hardship a landlord is even prevented from moving into his or her own property, which could at least mitigate the landlords' ongoing costs.

Perhaps worst of all, there is no end in sight. Like the Minnesota moratorium at issue in *Walz*, the term of Alameda County's Moratorium has no explicit end date; the Moratorium expires when the County Board someday votes to end the emergency.

Finally, it is worth noting that the State of California provided tenants with substantial relief tied to the pandemic, but it did so in a far more appropriately tailored way. The "COVID-19 Tenant Relief Act," AB 3088, *supra*, as subsequently amended, also limited evictions in light of the pandemic, but its temporary moratorium on residential evictions was specifically limited to those based upon inability to pay for COVID-19-related financial distress. Cal. Code Civ. Proc. §§ 1161(2)-(3), 1179.01-1179.07. Even during the temporary moratorium, property owners were still permitted to file actions for, and courts were still permitted to find renters guilty of, unlawful detainer for fault, and no-fault "just cause" reasons as defined under Civil Code § 1946.2. Cal. Code Civ. Proc. § 1179.03.5(a)(3). And even tenants affected by COVID-19 were required to pay *some* of their rent to avoid eviction. *See* Cal. Code Civ. Proc. § 1179.03(g)(1)(B); *see also* W. B. Worthen Co., 295 U.S. at 61 (striking down Louisiana's mortgage moratorium and distinguishing the moratorium previously upheld in *Blaisdell*, in part on the ground that Louisiana's imposed no obligation to make sufficient payments to the mortgagor to cover costs).

**E.      The Ninth Circuit's *Apartment Association* Decision Cannot Save Alameda County's Moratorium.**

The County will no doubt argue that the Ninth Circuit has already blessed Los Angeles's eviction moratorium in *AAGLA*, 10 F.4th at 905, and that its decision in that case compels this Court to uphold Alameda County's moratorium, too. Not so. "Every case must be determined upon its own circumstances," *id.* at 916 (quoting *Blaisdell*, 290 U.S. at 430), and *AAGLA* is readily distinguishable.

For one thing, as already discussed above, the passage of time is a key distinction. AAGLA's contracts clause challenge to Los Angeles's ordinance was filed on June 11, 2020, *id.*—not quite three months into the pandemic, when state and local stay-at-home orders remained in full effect, businesses were closed, and vaccines were still a distant dream. Even when the district court ruled on the preliminary injunction motion in November 2020, many businesses remained closed, and vaccines were still not available. *See Apartment Ass'n of L.A. Cty., Inc. v. City of L.A.*, 500 F. Supp. 3d 1088, 1091-92 (C.D. Cal. 2020). The Ninth Circuit was obliged to determine whether the district court has abused its discretion in finding, in those circumstances, that the plaintiff had failed to demonstrate a substantial likelihood of success on the merits of its claim. 10 F.4th at 911. But almost two years have passed since the district court issued its ruling. We are in a far different world now, and a greater degree of scrutiny is, accordingly, warranted. *See Walz*, 30 F.4th at 727.

Moreover, Alameda's Moratorium law is far broader than Los Angeles's, meaning that the assessment of whether it is appropriately tailored is different. For one thing, the Los Angeles ordinance only prohibited eviction for nonpayment of rent if the tenant had substantial loss of income or increased expenses *attributable to COVID-19 itself*, and landlords could "continue to seek to evict tenants based on their good-faith belief that the tenants are not protected under the eviction moratorium." *AAGLA*, 10 F.4th at 909-10. Wealthy, employed individuals who remained able to pay their rent were not given a two-year rent holiday, as has happened in Alameda

County. Also, Los Angeles does not permanently ban evictions based on failure to pay during the state of emergency, like Alameda County does. Furthermore, while Los Angeles purported to limit "no-fault" evictions, with two limited exceptions[14] it—unlike Alameda County—continued to permit *for fault* evictions, such as for material breaches of the lease or damage to the property, even for tenants who had suffered a loss of income. *Id*. *See also* L.A.M.C. § 49.99.2. Finally, the Ninth Circuit and district court in *AAGLA* both considered the availability of rental relief funds to be a significant consideration. *See* 10 F.4th at 916; 500 F. Supp. 3d at 1099. But there is no question that (1) many landlords could not qualify for relief, because it was limited to certain thresholds based on the tenant's income and depended on the tenant's cooperation;[15] (2) while the County's Moratorium will have been in place for at least 30 months by the time this motion is heard, such financial relief as landlords were able to qualify for was limited to no more than 18 months' rent at most;[16] and (3) funds are no longer available in any event.[17] In sum, the circumstances in *AAGLA* were materially different than they are here.

## VI.   INSOFAR AS THE MORATORIUM PROHIBITS EVICTIONS UNDER THE ELLIS ACT, IT IS PREEMPTED BY CALIFORNIA STATE LAW.

The Ellis Act, Cal. Govt. Code § 7060 *et seq*., "allows property owners who seek to exit the rental business to evict residential tenants and prohibits local governments from 'compel[ling] the owner of any residential real property to offer, or to continue to offer, accommodations in the property for rent or lease.'" *Small Property Owners of San Francisco Institute v. City and County of San Francisco*, 22 Cal. App. 5th 77, 79 (2018) ("*Small Property Owners*") (quoting Cal. Govt. Code § 7060(a)). As such, the Act gives residential rental property owners the right to withdraw their units from the

---

[14] The two exceptions were "'the presence of unauthorized occupants or pets, or for nuisance related to COVID-19.'" *AAGLA*, 10 F.4th at 910.

[15] *See* Cal. Health & Saf. Code § 50897.1(b); Answer (ECF No. 18), ¶¶ 45 & 47.

[16] *See* Cal. Health & Saf. Code § 50897.1(b); 15 U.S.C. § 9058c(d)(1)(A).

[17] *See* RJN, Exs. 4-6 (Emergency Rental Assistance Program websites).

rental market, provided specified procedures are followed. The statute is expressly preemptive in nature and does not give local governments the option to suspend the Act's provisions, or place additional, burdensome requirements on landlords' ability to exercise their rights under the Act. *SFAA v. CCSF*, 3 Cal. App. 5th at 482. As discussed below, while the Alameda Moratorium is far from the model of clarity, it appears that the County is taking the position that a tenant with a documented COVID-19 hardship status cannot be evicted for *any* reason, including under the Ellis Act. To the extent that is the case, the Moratorium is preempted.

## A.   The Ellis Act Preempts Local Eviction Controls that Prohibit Landlords from Removing Rental Units from the Marketplace.

A local law is preempted if it duplicates state law, contradicts state law, or enters into an area fully occupied by general law, either expressly or by legislative implication. *Sherwin-Williams Co. v. City of Los Angeles*, 4 Cal. 4th 893, 897-98 (1993). It is well-settled that the Ellis Act "'completely occupies the field of substantive eviction controls over landlords who wish to withdraw' all units from the residential rental market.'" *Small Property Owners*, 22 Cal. App. 5th at 85. *See also* *SFAA v. CCSF*, 3 Cal. App. 5th at 77-78 (same); *Johnson v. City and County of San Francisco*, 137 Cal. App. 4th 7, 14 (2008) (same); *City of Santa Monica v. Yarmark*, 203 Cal. App. 3d 153, 165 (1988). "Thus, the Ellis Act was clearly meant to preempt any local ordinance that prohibited a landlord from removing its rental units from the marketplace." *L.A. Lincoln Place Inv'rs v. City of L.A.*, 54 Cal. App. 4th 53, 62 (1997). A local ordinance that prohibits or burdens the exercise of rights under the Ellis Act is facially void. *SFAA v. CCSF*, 3 Cal. App. 5th at 475, 477.

## B.   The County's Moratorium Purports to Prohibit Landlords from Removing Rental Units from the Marketplace.

The Moratorium prohibits the exercise of rights under the Ellis Act.

Initially it applies to "all evictions from residential units in the unincorporated and incorporated areas of the county" subject to very few exceptions. ACCO §

6.120.030 (*see* RJN, Ex. 14). These exceptions are (1) Ellis Act withdrawals; (2) government orders requiring the unit to be vacated; or (3) "the resident poses an imminent threat to health or safety." ACCO § 6.120.030(F). However, even these narrow exceptions apparently do not apply when the tenant claims a financial hardship due to the COVID-19 pandemic. ACCO § 6.120.040.

The County's intent is made crystal clear in its FAQs about the Moratorium:

Under the ordinance, no documentation is required of a tenant or homeowner to stop an eviction proceeding. However, *if you provide documentation that you have a COVID-related impact that made you unable to pay rent on time, the ordinance prohibits your eviction and there are no exceptions.* If you do not provide documentation or are being evicted for any reason besides nonpayment of rent, there are three exceptions to the eviction ordinance:

1. It is necessary to comply with a government order (for example, if your unit is "red-tagged")

2. Your landlord takes your unit off the market (Ellis Act);

3. There is an imminent health or safety concern (for example, black mold), not including suspected exposure to COVID-19.

RJN, Ex. 3 (emphasis added). As such, pursuant to the County's interpretation, a landlord is *only* able to pursue an Ellis Act eviction if a tenant has not provided documentation of a COVID-related impact allegedly affecting their ability to pay rent; if a tenant provides such documentation, the Moratorium *prohibits the landlord from taking the unit off the market pursuant to the Ellis Act.*

Pursuant to the robust body of case law discussed *supra*, this prohibition on a landlord's ability to exercise rights pursuant to the Ellis Act is preempted and therefore invalid. Further, it is no answer to say that the prohibition is only temporary, and the County may, at some unspecified future date, allow landlords to exercise their statutory right to take a rental unit off the market. Decisional law on this issue is clear that it is not only a complete prohibition on Ellis Act evictions that is preempted, and local jurisdictions are *also* prohibited from enacting legislation that operates to substantively limits or burden the ability to exercise rights granted by the

Act. *See SFAA v. CCSF*, 3 Cal. App. 5th at 468-69 (invalidating local ordinance that allowed Ellis Act evictions but penalized them by imposing a 10-year waiting period after withdrawing a rental unit from the market before qualifying to apply for approval to merge the withdrawn unit into one or more other units). A Moratorium which, for more than two years and with no end in sight, has prohibited landlords from withdrawing rental units from the market, to move back into their own properties or otherwise, directly interferes with the ability to exercise rights expressly granted by state law. This aspect of the County's ordinance is void on its face.

> **C.     Governor Newsom Did Not Waive the Application of the Ellis Act as Part of His Emergency Orders, and There Is No Other Authority for the County to Ignore Preemptive State Law.**

As noted above, on May 16, 2020, Governor Newsom issued an executive order that permitted local governments to temporarily limit landlords' ability to evict tenants for nonpayment of rent due to the COVID-19 crisis and waived preemptive state law that would interfere with that power. EO N-28-20, ¶ 2 (RJN, Ex. 8). However, the extent of that waiver was narrowly defined, applying only when:

> "(i) The basis for the eviction is nonpayment of rent, or a foreclosure, arising out of a substantial decrease in household or business income (including, but not limited to, a substantial decrease in household income caused by layoffs or a reduction in the number of compensable hours of work, or a substantial decrease in business income caused by a reduction in opening hours or consumer demand), or substantial out-of-pocket medical expenses; and

> "(ii) The decrease in household or business income or the out-of-pocket medical expenses described in subparagraph (i) was caused by the COVID- 19 pandemic, or by any local, state, or federal government response to COVID-19, and is documented.

*Id.* The basis of an Ellis Act eviction is not the nonpayment of rent or a foreclosure. Thus, this waiver didn't *ever* authorize local interference with Ellis Act rights. But even if it did, that waiver expired on September 30, 2020, EO N-71-20, ¶ 3 (RJN, Ex. 9). No other state law exempts the County from the full force of the Ellis Act.

## VII.     **CONCLUSION.**

For the foregoing reasons, summary judgment in Plaintiffs' favor is warranted.

1

2  Dated: July 18, 2022

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

NIELSEN MERKSAMER
    PARRINELLO GROSS & LEONI LLP

By: _____

Christopher E. Skinnell

*Attorneys for Plaintiffs*
CALIFORNIA APARTMENT
ASSOCIATION, STEPHEN LIN,
RAKESH and TRIPTI JAIN, ALISON
MITCHELL, MICHAEL HAGERTY, &
H. ALEX and DANNIE ALVAREZ