NIELSEN MERKSAMER
~~PARRINELLO GROSS & LEONI~~LLP
    Christopher E. Skinnell, Esq. (S.B. No. 227093)
    Hilary J. Gibson, Esq. (S.B. No. 287862)
2350 Kerner Boulevard, Suite 250
San Rafael, California 94941
Telephone: (415) 389-6800
Facsimile: (415) 388-6874
Email: cskinnell@nmgovlaw.com
Email: hgibson@nmgovlaw.com

*Attorneys for ~~Plaintiff/Petitioners~~Plaintiffs*
CALIFORNIA APARTMENT
ASSOCIATION, STEPHEN LIN,
RAKESH and TRIPTI JAIN, ALISON
MITCHELL, MICHAEL HAGERTY, &
H. ALEX and DANNIE ALVAREZ

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA APARTMENT ASSOCIATION, STEPHEN LIN, RAKESH and TRIPTI JAIN, ALISON MITCHELL, MICHAEL HAGERTY, & H. ALEX and DANNIE ALVAREZ,<br><br>    *Plaintiffs ~~and Petitioners~~*,<br><br>vs.<br><br>COUNTY OF ALAMEDA, BOARD OF SUPERVISORS OF THE COUNTY OF ALAMEDA, and DOES 1-25,<br><br>    *Defendants ~~and Respondents.~~.* | Case No. 3:22-cv-02705-LB<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES, ~~INJUNCTIVE, AND DECLARATORY RELIEF; PETITION FOR WRIT OF MANDATE~~**<br><br>**[42 U.S.C. § 1983~~; Cal. CCP § 1085~~]**<br><br>DEPT: Courtroom B, 15th Floor<br>JUDGE: Hon. Laurel Beeler<br><br>**DEMAND FOR JURY TRIAL** |

1
2

<u>(Related to Case 3:22-cv-01274-LB,
*Williams v. County of Alameda, et al.*)</u>

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1.    Plaintiffs ~~and Petitioners~~ CALIFORNIA APARTMENT ASSOCIATION, STEPHEN LIN, RAKESH and TRIPTI JAIN, ALISON MITCHELL, MICHAEL HAGERTY, & H. ALEX and DANNIE ALVAREZ (collectively, "Plaintiffs"), hereby bring this complaint ~~and petition for relief~~ against Defendants ~~and Respondents~~ COUNTY OF ALAMEDA and the BOARD OF SUPERVISORS OF THE COUNTY OF ALAMEDA (collectively, "Defendants"), seeking damages caused by Defendants' residential eviction moratorium (the "Moratorium"~~) and an order declaring said Moratorium invalid, illegal, and unenforceable. Plaintiffs also request an immediate stay, and injunction against the enforcement of the Moratorium"~~), in effect from approximately March 2020 to April 29, 2023,[1] and especially (though not exclusively) the continued maintenance of that Moratorium after September 2021, long after COVID-19 vaccinations were widely available, State and County "stay-at-home" orders were repealed, allowing businesses and schools to fully reopen, and state law eviction restrictions were repealed.

## JURISDICTIONAL STATEMENT

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that the controversy arises under the United States Constitution and laws and under 42 U.S.C. § 1983, as hereinafter more fully appears. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1367(a) in that the causes of action stated herein arise out of a common nucleus of operative ~~fact~~facts, and thus form the same case or controversy under Article III of the United States Constitution.

## VENUE

---

[1] Plaintiffs would note that though rent that came due after April 2023 was not subject to the Moratorium, any rent that was not paid during the period the Moratorium was in place remains subject to the Moratorium Ordinance's permanent protection against eviction.

FIRST AMENDED COMPLAINT FOR DAMAGES, ~~INJUNCTIVE & DECLARATORY~~

~~RELIEF; PETITION FOR WRIT OF MANDATE~~

3.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(a), because all Defendants/Respondents reside in this District and the events giving rise to the claims occurred in this District.

### DIVISIONAL ASSIGNMENT

4.     Pursuant to Local Rule 3-2(c), this action arose in Alameda County, California, and thus should be assigned to the Court's Oakland Division.

### PARTIES

5.     Defendant and Respondent COUNTY OF ALAMEDA (hereafter "COUNTY") is a local government entity organized under the Constitution and laws of the State of California.

6.     Defendant and Respondent BOARD OF SUPERVISORS OF THE COUNTY OF ALAMEDA (hereafter "BOARD") is the main legislative and governing body of the COUNTY.

7.     Plaintiff CALIFORNIA APARTMENT ASSOCIATION ("CAA") is a § 501(c)(6) nonprofit corporation. CAA is the largest statewide rental housing trade association in the country, representing more than 50,000 rental property owners and operators who are responsible for nearly two million rental housing units throughout California. Many of its members are located in the COUNTY and are subject to, and adversely affected by, the Moratorium challenged herein. Those adverse effects include but are not limited to: refusing to pay rent for non-COVID-19 related reasons, refusing to relinquish possession, and creating nuisances and damage to members' properties. CAA's members have suffered lost rents, devalued properties, and some face impending foreclosures and bankruptcies, as a result of the Moratorium. CAA has standing because (i) individual members of CAA, by virtue of their rental property ownership, are subject to the Moratorium and could challenge it in their own right; (ii) the subject of this litigation is directly germane to CAA's organizational purpose, which is to

1  ~~advocate for, support, and protect the property and legal rights of CAA members and~~
2  ~~other rental property owners throughout the State of California; and (iii) neither the~~
3  ~~claims asserted, nor the equitable relief requested requires the participation of~~
4  ~~individual members in this lawsuit. CAA has a direct and substantial interest in~~
5  ~~ensuring that Defendants' decisions are in conformity with the requirements of law,~~
6  ~~that those requirements are properly executed, and that Defendants' duties are~~
7  ~~enforced.~~

8      ~~8.~~7.    Plaintiff STEPHEN LIN is an individual over the age of 18 and ~~is~~<u>was at</u>
9  <u>all times relevant to this case</u> an owner of residential rental property in Fremont that
10  ~~is~~<u>was</u> subject to the COUNTY's Moratorium.

11     ~~9.~~8.    Plaintiffs RAKESH and TRIPTI JAIN are individuals over the age of 18
12  and ~~are~~<u>were at all times relevant to this case</u> owners of residential rental property in
13  Fremont that ~~is~~<u>was</u> subject to the COUNTY's Moratorium.

14     ~~10.~~9.    Plaintiff ALISON MITCHELL is an individual over the age of 18 and
15  ~~is~~<u>was at all times relevant to this case</u> the co-owner, along with her husband, of
16  residential rental property in Emeryville that ~~is~~<u>was</u> subject to the COUNTY's
17  Moratorium.

18     ~~11.~~10. Plaintiff MICHAEL HAGERTY is an individual over the age of 18 and
19  ~~is~~<u>was at all times relevant to this case</u> also an owner of residential rental property in
20  Emeryville that ~~is~~<u>was</u> subject to the COUNTY's Moratorium.

21     ~~12.~~11. Plaintiffs H. ALEX and DANNIE ALVAREZ are individuals over the age
22  of 18 and <u>were at all times relevant to this case</u> owners of residential rental property
23  in Pleasanton that ~~is~~<u>was</u> subject to the COUNTY's Moratorium.

24     ~~13.~~12. Plaintiffs are not aware of the identities of Defendants~~/Respondents~~
25  DOES 1-25, who are responsible for the acts and omissions alleged herein and that
26  caused damage to Plaintiffs; therefore, Plaintiffs will amend this Complaint when the

27
28

true identities of DOES 1-25 are ascertained.

~~14.~~13. Plaintiffs are informed and believe that, at all times mentioned in this Complaint, all Defendants/~~Respondents~~ were the agents or employees of their co-Defendants/~~Respondents~~, and, in doing the things alleged in this Complaint, were acting within the course and scope of that agency and employment.

## **GENERAL FACTUAL ALLEGATIONS**

A.      **Background: The California Governor's Order, the Judicial Council's Eviction Moratorium, and the COVID-19 Tenant Relief Act.**

~~15.~~14. On March 4, 2020, in response to the COVID-19 pandemic, Governor Newsom declared a State of Emergency in California, pursuant to the California Emergency Services Act (ESA), Govt. Code § 8550, *et seq*. On March 16, 2020, Governor Newsom issued an executive order, which, in relevant part, permitted local governments to temporarily limit landlords' ability to evict tenants for nonpayment of rent due to the COVID-19 crisis, to the extent the tenants' inability to pay was attributable to negative financial impacts caused by the COVID-19 pandemic. In pertinent part, that order provided:

> [T]he statutory cause of action for unlawful detainer, Code of Civil Procedure section 1161 et seq., and any other statutory cause of action that could be used to evict or otherwise eject a residential . . . renter . . . is suspended only as applied to any tenancy . . . to which a local government has imposed a limitation on eviction pursuant to this paragraph 2 [relating to inability to pay rent because of Covid-19 financial distress], and only to the extent of the limitation imposed by the local government. [¶] Nothing in this Order shall relieve a renter of the obligation to pay rent, nor restrict a housing provider's ability to recover rent due.

Executive Order ("EO") N-28-20, ¶ 2.

~~15.      Though California's State of Emergency is still in place, most of its remaining provisions are set to expire on June 30, 2022, *see* EO No. N-04-22, and the~~On or about April 6, 2020, the California Judicial Council adopted Emergency Rule No. 1,

prohibiting California courts from issuing a summons in an unlawful detainer action unless the eviction was deemed by the court to be "necessary to protect public health and safety." That Rule remained in effect until September 1, 2020.

16.    The March 16, 2020 provision permitting local governments to temporarily limit COVID-19-related nonpayment evictions expired on September 30, 2020, *see* EO N-71-20, ¶ 3.

17.16.  Prior to the expiration of that latter provision, the California Legislature enacted the "COVID-19 Tenant Relief Act" andbut the "COVID-19 Small Housing Provider and Homeowner Relief Act of 2020" via Assembly Bill 3088 (2019-2020 Reg. Sess.), 2020 Cal. Stats., ch. 37 ("AB 3088"), effective August 31, 2020. CAA was directly involved in the legislative negotiations regarding AB 3088.

18.17. AB 3088 in part amended the State's unlawful detainer (UD) statutes, Code of Civil Procedure § 1161 *et seq*., and was aimed at "temporary emergency relief for financially distressed renters, homeowners, and small housing providers...." Among other things, AB 3088 provided statewide eviction protections during the "covered time period" (initially March 20, 2020, through January 31, 2021) for renters who could not pay their full rent for COVID-19-related reasons, provided that they paid at least 25 percent of the amount due during that period. AB 3088 also directed state agencies to engage about potential strategies for relief for renters and landlords who suffered COVID-19-related financial hardship.

19.18. Consistent with EO N-28-20, AB 3088's temporary moratorium on residential evictions was specifically limited to those based upon inability to pay for COVID-19-related financial distress. Cal. Code Civ. Proc. §§ 1161(2)-(3), 1179.01-1179.07. Even during the temporary moratorium, property owners were still permitted to file actions for, and courts were still permitted to find renters guilty of, unlawful detainer for fault, and no-fault "just cause" reasons as defined under Civil Code §

1946.2.**2** Cal. Code Civ. Proc. § 1179.03.5(a)(3).

~~20.~~19. AB 3088 also provided "this section addresses a matter of statewide concern rather than a municipal affair." The intent of the legislation "is to protect individuals negatively impacted by the COVID-19 pandemic," and "does not provide the Legislature's understanding of the legal validity on any specific ordinance, resolution, regulation, or administrative action adopted by a city, county, or city and county in response to the COVID-19 pandemic to protect renters from eviction." Cal. Code Civ. Proc. § 1179.05, subds. (b), (e), (f). While AB 3088's amendments continued to recognize local government's authority to enact eviction protections, it did not give *carte blanche* authority to do so, nor does it immunize "emergency" municipal regulations from challenges based on state law preemption.

~~21.~~20. The COVID-19-related nonpayment eviction protections of AB 3088 were extended twice thereafter, once to June 30, 2021 (through Senate Bill 91 (2021-2022 Reg. Sess.), 2021 Cal. Stats., ch. 2 ("SB 91")) and a second time to September 30, 2021 (through Assembly Bill 832 (2021-2022 Reg. Sess., 2021 Cal. Stats., ch. 27 ("AB 832")). SB 91 and AB 832 protected affected renters from eviction during this extended "covered time period," so long as they complied with the COVID-19-related financial distress requirements, including payment of ~~a specified portion~~at least 25 percent of the rent due. *See* Cal. Code Civ. Proc. § 1179.03(g)(1)(B).

~~22.~~21. SB 91 and AB 832 further spelled out the State's rental assistance program. Starting October 1, 2021, and until March 31, 2022, for any COVID-19-related hardship rental debt that came due between those dates, a property owner could move

---

**2** Civil Code § 1946.2, which delineates California's "just causes for eviction," does not apply to residential rental property subject to a local ordinance requiring just cause for termination. However, any local "just cause" provision enacted or amended after September 1, 2019, that is more "protective" than Civ. Code § 1946.2, must be consistent with that provision, and "not prohibited by any other area of law." Cal. Civ. Code § 1946.2(g)(1).

forward with a UD action for nonpayment of rent if the landlord submitted an application for rental assistance through the State or applicable local program on behalf of the tenant and (1) it was denied, or (2) the tenant did not cooperate in completing the application with specified time periods. AB 832, 2021 Cal. Stats., ch. 27, § 20 (codifying former Cal. Code Civ. Proc. § 1179.11(a), (c)). In late-March 2022 the Legislature enacted, and Lieutenant Governor Kounalakis signed,[3] Assembly Bill 2179 (2021-2022 Reg. Sess.), 2022 Cal. Stats., ch. 13, which extended the eviction moratorium to June 30, 2022, but only for tenants with a rent relief application pending as of March 31, 2022. Landlords ~~are~~were no longer required to submit an application on behalf of the tenant to pursue a UD action. Cal. Code Civ. Proc. § 1179.11(a), (c).

**B.    The COUNTY's Eviction Moratorium.**

22.    The COUNTY ratified its local emergency on March 10, 2020. (Res. No. R-2020-91.) On April 21, 2020, the BOARD adopted Urgency Ordinance No. O-2020-23, which ~~purports~~purported to prohibit most evictions—for any reason. The language in the urgency ordinance was then made a permanent part of the COUNTY's Code of Ordinances on June 23, 2020. (Ordinance No. O-2020-32; ACCO, ch. 6.120 (Ex. 2).) The COUNTY's moratorium ~~applies~~applied to "all evictions from residential units in the unincorporated and incorporated areas of the county" subject to very few exceptions. (ACCO § 6.120.030.) These exceptions ~~are~~were (1) Ellis Act withdrawals; (2) government orders requiring the unit to be vacated; or (3) "the resident poses an imminent threat to health or safety." (ACCO § 6.120.030(F).)

23.    However, even these narrow exceptions ~~apparently do~~did not ~~apply when the tenant claims~~generally permit property-owners to evict tenants who claimed a financial hardship due to the COVID-19 pandemic. (ACCO § 6.120.040.) For the entire duration of the Moratorium the Alameda County Superior Court refused to accept

---

[3] As Acting Governor, *see* Cal. Const. art. V, § 10.

1  unlawful detainer complaints for filing unless they alleged that they were not

2  prohibited by a local ordinance and were accompanied by "[a] declaration under oath

3  stating specific facts showing the health and safety related necessity or other

4  exception." (Alameda Cty. Super. Court, Former Emergency Rule 1.8a.) And though

5  this Court construed the Moratorium to permit Ellis Act evictions in such cases, in its

6  November 2022 order denying Plaintiffs' motion for summary judgment (ECF No. 43),

7  prior to that date the County's online guidelines advised residents that "if you provide

8  documentation that you have a COVID-related impact that made you unable to pay

9  rent on time, the ordinance prohibits your eviction and *there are no exceptions*. If you

10  do not provide documentation or are being evicted for any reason besides nonpayment

11  of rent, there are three exceptions to the eviction ordinance" including the Ellis Act.

12  (ECF No. 24, p. 19 [emphasis added].) Plaintiffs are informed and believe, and on that

13  basis allege, that the Alameda County Superior Court consequently refused to take

14  action on unlawful detainer complaints seeking to evict tenants on the basis of the Ellis

15  Act, when those tenants claimed financial hardship.

16      ~~23.~~24. The COUNTY'S Moratorium ~~provides~~Ordinance provided that it ~~is~~was an

17  "absolute defense" to an unlawful detainer action brought during its term. (ACCO §§

18  6.120.030(D), 6.120.040(D).) By its terms, the Moratorium ~~applies~~applied countywide—

19  in incorporated and unincorporated areas alike—except that cities ~~are~~were permitted

20  to provide even more stringent protections for renters. (ACCO § 6.120.110.)

21      25.    Also, by its terms, the Moratorium ~~expires~~was designed to expire sixty

22  days "after the expiration of the local health emergency." (ACCO § 6.120.030.) Per the

23  ratification of the local emergency, the local emergency ~~"shall~~was to "remain in effect

24  until the [BOARD] determines that the emergency no longer exists." (Res. No. R-2020-

25  91; *see also* Exec. Dept., State of Cal., "Proclamation of a State of Emergency" (Mar. 4,

26  2020), ¶¶ 7-8 [waiving requirement that local governments periodically renew state of

27

28

1   emergency].) ~~Plaintiffs are informed and believe, and on that basis allege, that the~~

2   ~~COUNTY's position is that the emergency still has not expired, and the blanket~~

3   ~~Moratorium on evictions therefore remains in effect. The Moratorium also provides that~~

4   ~~any rent a tenant fails~~

5         26.     COVID-19 vaccinations became widely available in early 2021. State and

6   County "stay-at-home" orders, which initially closed nonessential businesses and

7   restricted them on an ongoing basis were repealed in June of 2021, allowing businesses

8   and schools to fully reopen. In August 2021 the U.S. Supreme Court ended the Center

9   for Disease Control's federal eviction moratorium, concluding, in light of the widespread

10  availability of vaccines, that the hardships facing landlords could no longer be justified,

11  *see Ala. Ass'n of Realtors v. HHS,* 594 U.S. 758, 762-63 & 765-66 (2021). California state

12  law eviction restrictions—already less stringent than the County's to begin with—

13  began to phase out entirely at the end of September 2021, under AB 832. Yet the County

14  Board of Supervisors left the Moratorium in place until April 29, 2023—another 18

15  months after the state eviction restrictions began to phase out and more than three

16  years after the Moratorium took effect.

17        ~~24.~~27. The County's Moratorium Ordinance also provides that any rent a tenant

18  failed to pay during the declared state of emergency can never be the basis of an

19  eviction, even if the tenant ~~refuses~~has refused to pay it after the state of emergency ~~has~~

20  ended. (ACCO § 6.120.090(B) & (D).) Such back-rent may only be pursued as consumer

21  debt and cannot be collected through the unlawful detainer process. (ACCO §

22  6.120.090(D).) But that remedy has proven—predictably[4]—to be an "illusory" one for

23

24      [4] *See Heights Apartments, LLC v. Walz,* 30 F.4th 720, 729 n.7 (8th Cir. 2022) ("While

25  landlords may bring an action against delinquent tenants for past-due rent, monetary

relief obtained against a judgment-proof individual is an illusory remedy, as has been

26  recognized by the Supreme Court.") (citing *Ala. Ass'n of Realtors v. HHS,* 594 U.S. 758,

765 (2021). *See also Baptiste v. Kennealy,* 490 F. Supp. 3d 353, 376 (D. Mass. 2020)

27

28

1  the Plaintiffs herein.

2  ~~25.~~28. While Emeryville initially adopted its own eviction moratorium in 2020,

3  that eviction expired by its own terms on September 30, 2020.[5] Property owners in

4  Emeryville nevertheless ~~remain~~remained subject to the COUNTY's Moratorium until

5  the end of April 2023.

6  ~~26.~~29. Pleasanton never had its own separate eviction moratorium, but property

7  owners in Pleasanton were nevertheless ~~remain~~ subject to the COUNTY's Moratorium

8  from March of 2020 through April of 2023.

9  ~~27.~~30. On March ~~25~~27, 2020, the Fremont City Council ~~ratified an Executive~~

10  ~~Order~~ratified an Executive Order of the City Manager, establishing a temporary

11  moratorium on evictions of residential tenants in Fremont. The ~~CITY's~~City's

12  Residential Eviction Moratorium ~~provides~~provided that ~~during~~"[d]uring the period of

13  local emergency declared in response to COVID-19, no landlord shall endeavor to evict

14  a ~~residential tenant~~Residential Tenant in either of the following situations: (1) for

15  nonpayment of rent if the ~~tenant~~Tenant demonstrates that the ~~tenant~~Tenant is unable

16  to pay rent due to financial impacts related to COVID-19~~,~~ ... or (2) for a no-fault eviction

17  unless immediately necessary because of the existence of a hazardous condition

18  affecting tenants or neighbors~~.~~." For-fault evictions continued to be permitted.

19  However, Fremont's website ~~advises~~subsequently advised residents that Alameda

20  "County's ordinance superseded the City of Fremont's emergency order establishing a

21  moratorium on residential evictions during the COVID-19 crisis, so the County's

22  ordinance provides that its regulation of residential evictions applies in the City of

23

24

25  ("this right [to seek back rent as consumer debt] is largely illusory, as tenants who have

26  not paid their rent for many months because of economic distress—or indeed for any

   other reason—are unlikely to pay a money judgment against them.").

27  [5] See Emeryville Ord. No. 20-017, § 3.

28

Fremont."**6** The City Manager, acting as the City Director of Emergency Services, formally withdrew the Executive Order in June 2021, and the City Council ratified that withdrawal at its meeting on July 2021. Yet property owners in Fremont remained subject to the County's Moratorium for an additional 21 months.

B**C.**   **The COUNTY and Various Cities' Rent Relief Assistance Programs.**

28.31. State law ~~requires~~required local governments to develop mechanisms by which landlords and renters may file applications for, and receive if eligible, COVID-19-related rent relief.

29.32. The COUNTY ~~operates~~operated a rent relief assistance program called "Housing Secure."⁷ The However, as of April 4, 2022, the Housing Secure website ~~currently states~~stated, "We are still accepting applications *even though we are oversubscribed*" (emphasis added) and "We have received more requests for funds than we have currently available." Moreover, many applications to the COUNTY's rent relief program ~~have been~~were held pending in limbo for months at a time without action. The County ceased accepting new applications altogether on May 13, 2022. (*See* ECF No. 24, pp. 36-37.)

30.33. Emeryville likewise ~~operates~~operated a rent relief assistance program called the Emeryville Emergency Rental Assistance Program ("ERAP"). Emeryville partnered with an organization called the Bay Area Community Service ("BACS") to administer the program on the City's behalf. ~~The~~As of April 4, 2022, the Emeryville ERAP website ~~currently states~~stated, "As of November 12, 2020, BACS has stopped accepting applications for assistance, as all funds have been reserved under the

---

**6** *See* City of Fremont, "Understanding Residential Eviction Moratoriums During the COVID-19 Pandemic," *~~online at~~* ~~https://www.fremont.gov/4023/Eviction-Moratorium-FAQs (last visited Apr. 4, 2022).~~the text of which is archived online at https://www.rhasouthernala.com/2021/07/06/residential-eviction-moratorium-fremont/ (last visited Feb. 21, 2025).

⁷ *See* https://www.ac-housingsecure.org/?locale=en (last visited Apr. 4, 2022).

FIRST AMENDED COMPLAINT FOR DAMAGES, ~~INJUNCTIVE &~~
~~DECLARATORY~~

~~RELIEF; PETITION FOR WRIT OF MANDATE~~

1 Emergency Rental Assistance Program. If you have submitted an application and have

2 not received notification regarding your application, please contact BACS at 510-759-

3 4868." Indeed, as of February 26, 2025, it still does. **8**

4      31.34. Fremont ~~operates~~operated a rent relief program called "Keep Fremont

5 Housed." ~~That~~As of April 4, 2022, that program's website ~~currently states~~stated, "Keep

6 Fremont Housed will continue to accept applications after March 31, 2022 as long as

7 funds remain. However, as of February 1, 2022, applications submitted for the Keep

8 Fremont Housed Rental Assistance Program will be placed on a waitlist."~~9~~ The City

9 closed its rental assistance application portal altogether as of July 8, 2022. (ECF No.

10 24, p. 39.)

11      32.35. The Pleasanton website simply ~~directs~~directed residents to the County's

12 rent relief program. **10**

13      36.    Even to the extent the assistance programs operated as intended, any

14 given tenant was limited to 18 months' rental assistance, *see* 15 U.S.C. § 9058c(d)(1)(A),

15 though the "emergency" declared by the COUNTY ~~has now dragged on for more than~~

16 ~~24 months. Moreover~~dragged on for more than three years. Thus, a property owner

17 whose tenant stopped paying rent in March 2020 would only have been able to

18 potentially obtain rent relief covering the period through the end of August 2021,

19 shortly before the State's eviction moratorium began to phase out. In other words, even

20 leaving aside the shortage of funds, many landlords—including the Plaintiffs herein—

21

22      **8** *See* City of Emeryville, "COVID-19 Housing Resources," *online at*

23 https://www.ci.emeryville.ca.us/1364/COVID-19-Housing-Resources (last visited ~~Apr.~~

~~4, 2022~~Feb. 26, 2025).

24      ~~9 *See* City of Fremont, "Keep Fremont Housed Program," *online at*~~

25 ~~https://www.fremont.gov/3864/Keep-Fremont-Housed-Program (last visited Apr. 4,~~

~~2022).~~

26      **10** *See* City of Pleasanton, "Rental Assistance Programs," *online at*

27 http://www.cityofpleasantonca.gov/resident/housing/rentals/assistance.asp (last visited

~~Apr. 4, 2022~~Feb. 26, 2025).

28

would not have been able to obtain rent relief funds to cover the loss of rent for any period during which state law would have permitted the eviction of tenants for nonpayment of rent but the Moratorium prevented it.

~~33.~~37. Additionally, a tenant was only eligible for assistance under those programs if the tenant's "household income … ~~is~~[wa]s not more than 80 percent of the area median income," with priority given to those tenants with household incomes "not more than 50 percent of the area median income"—regardless of the income of the landlord. *See* Cal. Health & Saf. Code § 50897.1(b).

~~34.~~38. Importantly, tenants in the COUNTY ~~need~~were not required to participate in *any* rent relief program to avoid eviction; the Moratorium ~~prohibits~~prohibited evictions even for those tenants who ~~refuse~~refused to cooperate with a landlord's request that they seek relief under these programs. ~~This~~, which directly ~~contradicts~~contradicted the purpose, intent and procedures of state law.

**D.     Regulatory Takings.**

39.     "The Takings Clause of the Fifth Amendment states that 'private property [shall not] be taken for public use, without just compensation.'" *Knick v. Twp. of Scott*, 588 U.S. 180, 184 (2019) (alterations in original). This includes when the "government directly appropriates private property or ousts the owner from his domain," *i.e.*, a physical takings, *see Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005), but the Supreme Court has also "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment. In Justice Holmes' storied but cryptic formulation, 'while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.'" *Id.* at 537 (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393 (1922)). When a regulation denies the owner of *all* economically beneficial or productive use of

1    the land, it is a categorical taking. *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019

2    (1992).

3        40.    When, however, "a regulation places limitations on land that fall short of

4    eliminating all economically beneficial use, a taking nonetheless may have occurred,

5    depending on a complex of factors" identified by the Court in *Penn Central Transp. Co.*

6    *v. New York City*, 438 U.S. 104 (1978). *See Palazzolo v. Rhode Island*, 533 U.S. 606, 617

7    (2001). That rule has specifically been held to apply when the regulatory action in

8    question takes the form of a temporary moratorium on the use of the private party's

9    property, as here. *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S.

10   302, 335-36 (2002) ("*Tahoe-Sierra*").

11       41.    "'[T]he Court for the most part has refrained from elaborating ... definitive

12   rules' about when regulation goes so far as to become a taking. [Citation] Judicial

13   decisions considering regulatory takings claims are typically 'characterized by

14   essentially ad hoc, factual inquiries, designed to allow careful examination and

15   weighing of all the relevant circumstances.'" *Colony Cove Props., Ltd. Liab. Co. v. City*

16   *of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (quoting *Murr v. Wisconsin*, 582 U.S. 383,

17   393 (2017), and *Tahoe-Sierra*, 535 U.S. at 322). However, under *Penn Central*, a Court

18   evaluates the following three factors of "particular significance": (1) "[t]he economic

19   impact of the regulation on the claimant;" (2) "the extent to which the regulation has

20   interfered with distinct investment-backed expectations"; and (3) "the character of the

21   governmental action." 438 U.S. at 124.

22       42.    Moreover, in a temporary regulatory takings case, "the duration of the

23   restriction is one of the important factors that a court must consider." *Tahoe-Sierra*,

24   535 U.S. at 342. While "normal delays"—such as those typically involved in "obtaining

25   building permits, changes in ordinances, variances, and the like"—will not typically

26   give rise to a taking, *id*. at 333, "an extraordinary delay in decision-making may

constitute a taking." *Cooley v. United States*, 324 F.3d 1297, 1306-07 (Fed. Cir. 2003); *see also David Hill Dev., Ltd. Liab. Co. v. City of Forest Grove*, No. 3:08-cv-266-AC, 2012 U.S. Dist. LEXIS 156028, at \*57-59 (D. Or. Oct. 30, 2012) (denying motions for judgment notwithstanding the verdict and for new trial where jury found extraordinary delay amounted to a regulatory takings).

43.    "The question of whether a delay is extraordinary is not a simple matter of the number of months or years taken by the Government to make its decision however." *Bass Enterprises Production Co. v. United States*, 381 F.3d 1360, 1366 (Fed. Cir. 2004) (citing *Tahoe-Sierra*, 535 U.S. at 333, 337-38). "'Instead of such an easy guidepost, courts must evaluate a number of factors to determine whether the delay is extraordinary,' including the reasons for the delay and whether the delay is proportionate to the nature of the government process." *David Hill Dev., Ltd. Liab. Co.*, 2012 U.S. Dist. LEXIS 156028, at \*59-60 (quoting *Bass Enterprises*, 381 F.3d at 1366). It is a fact-intensive question. *Reforce, Inc. v. United States*, No. 11-884L, 2012 U.S. Claims LEXIS 2256, at \*18 (Fed. Cl. Dec. 11, 2012). So, while in *Tahoe-Sierra* the Court concluded that a 32-month development moratorium did not constitute a *categorical* taking[11] and deferred to the trial court's (unappealed) determination that the delay was reasonable under the circumstances of that case, delays of as little as a year have been found to be takings in other cases, based on their specific circumstances. *See David Hill Dev., Ltd. Liab. Co.*, 2012 U.S. Dist. LEXIS 156028, at \*59 (declining to overturn jury's determination that a year-long delay was "extraordinary" under the circumstances); *Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 162 (W.D.N.Y. 2006) (denying a preliminary injunction, but ordering a town to either end its moratorium

---

[11] Importantly, *Tahoe-Sierra* did not hold that the 32-month delay was not a regulatory taking under *Penn Central*, "both because petitioners expressly disavowed that theory, and because they did not appeal from the District Court's conclusion that the evidence would not support it." 535 U.S. at 334.

with 90 days or render a decision on the plaintiff's hardship application, because "to pass constitutional muster, a moratorium must be of reasonable duration" and "[u]nder the circumstances here, it does seem curious and suspicious that a two-year period is needed to adopt a zoning plan for wind turbines."). *See also Tahoe-Sierra*, 535 U.S. at 341 ("It may well be true that any moratorium that lasts for more than one year should be viewed with special skepticism.").

44.    In this case, the delay that the Moratorium imposed on the use of Plaintiff's property was "extraordinary" under the circumstances. The COUNTY's COVID-19 Moratorium was one of the longest-running in the Nation,[12] and one of the most restrictive. It was in place more than twice as long as the federal eviction moratorium (to the extent that moratorium was applicable in California in light of AB 3088). State law only barred eviction for complete nonpayment of rent for six months (March 2020 to August 2020) and it only barred eviction where the tenant paid at least some of the rent for 13 more months (September 2020 to September 2021), for a total of 19 months in all. The COUNTY's Moratorium barred eviction of any tenant for virtually any reason for 37 months—again, twice as long. An additional circumstance enhancing the "extraordinariness" is the breadth of the COUNTY's Moratorium as opposed to state law. State law only prohibited the eviction of tenants who attested under penalty of perjury that they had suffered "COVID-19-related financial distress"; after the first six months it required that tenants make at least partial payment; and

---

[12] *Compare Gallo v. District of Columbia*, 659 F. Supp. 3d 21, 22 (D.D.C. 2023) ("landlords who had used the District[ of Columbia]'s rental-assistance program could begin filing eviction lawsuits in October of [2021]"); *Stuart Mills Props, LLC v. City of Burbank*, No. 2:22-cv-04246-RGK-AGR, 2022 U.S. Dist. LEXIS 180191 (C.D. Cal. Sep. 19, 2022) (Burbank's commercial eviction moratorium expired in September 2021); *Jevons v. Inslee*, No. 22-35050, 2023 U.S. App. LEXIS 20453, at *2 (9th Cir. Aug. 8, 2023) (Washington's eviction moratorium "expired in October 2021"); *S. Cal. Rental Hous. Ass'n v. Cty. of San Diego*, 550 F. Supp. 3d 853, 859 (S.D. Cal. 2021) (noting San Diego County's eviction moratorium ordinance set to expire August 14, 2021).

it permitted evictions on other "for cause" grounds, such as damaging the property (*i.e.*, waste or nuisance), breach of the lease, etc. The COUNTY's Moratorium, by contrast, did not contain these protections for property-owners.

45.    In particular, the continued maintenance of the Moratorium after September 2021 was extraordinary. By that time, vaccines were widely available,[13] businesses and schools were re-opened, the federal eviction moratorium had expired, and the State's partial moratorium under AB 3088—which was already more permissive than the County's—had begun phasing out. By that time, demand for rent relief funds was already beginning to exceed supply, so the harm to property owners continued to grow. And the unemployment rate in Alameda County, which peaked at 14.8% in April 2020, had fallen to 5.2% by September 2021—less than a point higher than in March 2020 (4.4%)—and it continued to fall, matching the March 2020 rate by November of that year.[14] Yet the COUNTY BOARD still persisted in maintaining the Moratorium for another year-and-a-half. The Moratorium may have initially begun as a response to COVID-19, particularly in the early months when residents were ordered to "shelter-in-place" and most businesses were closed, but the continued maintenance of it when virtually all of the other restrictions were long-since repealed belies the notion that the "extraordinary delay" in question can be justified on that basis.[15] In

---

[13] *See Ala. Ass'n of Realtors*, 594 U.S. at 763 (August 2021 ruling agreeing with district court decision that equitable principles did not support leaving the federal eviction moratorium in place any longer where "Vaccine and rental-assistance distribution had improved since the stay was entered, while the harm to landlords had continued to increase.").

[14] *See* Fed. Reserve Bank of St. Louis, "Unemployment Rate in Alameda County, CA: Dec. 2019 to Feb. 2025," *available online at* https://alfred.stlouisfed.org/graph/?g=1E27I (last visited Feb. 27, 2025).

[15] Plaintiffs do not mean to concede that application of the Moratorium prior to September 2021 was not a taking, but the invasion became especially egregious after that time.

FIRST AMENDED COMPLAINT FOR DAMAGES, ~~INJUNCTIVE &~~
~~DECLARATORY~~
~~RELIEF; PETITION FOR WRIT OF MANDATE~~

1    circumstances involving "an acute risk to public health … judicial scrutiny may recede
2    to its lowest ebb, leaving room for an energetic response by the political branches to the
3    many uncertainties accompanying the onset of a public health crisis. But when a crisis
4    stops being temporary, and as days and weeks turn to months and years, the slack in
5    the leash eventually runs out. 'While the law may take periodic naps during a
6    pandemic, we will not let it sleep through one.'"
7    *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 297 (D.D.C. 2020) (quoting
8    *Roberts v. Neace*, 958 F.3d 409, 414-15 (6th Cir. 2020) (per curiam)).

9        46.    The Moratorium also interfered with Plaintiffs' distinct investment-
10   backed expectations. "To form the basis for a taking claim, a purported distinct
11   investment-backed expectation must be objectively reasonable." *Colony Cove*, 888 F.3d
12   at 452; *see also Bridge Aina Le'a, LLC v. State Land Use Comm'n*, 950 F.3d 610, 633
13   (9th Cir. 2020). The reasonableness of a plaintiff's expectations must be evaluated
14   against "the regulatory environment at the time of the acquisition of the property."
15   *Bridge Aina Le'a*, 950 F.3d at 634. "[T]he purpose [of this *Penn Central* factor] is to
16   limit recovery to owners who could demonstrate that they bought their property in
17   reliance on a state of affairs that did not include the challenged regulatory regime."
18   *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996).

19       47.    While landlords operate in a regulated field, and might have anticipated
20   *some* future limits on their relationships with their tenants, "no amount of prior
21   regulation could have led landlords to expect anything like the blanket Moratorium,"
22   *Apartment Ass'n of L.A. Cty., Inc. v. City of L.A.*, 500 F. Supp. 3d 1088, 1096 (C.D. Cal.
23   2020), much less one that lasted over three full years. *See also Baptiste v. Kennealy*,
24   490 F. Supp. 3d 353, 384 (D. Mass. 2020) ("the court finds that a reasonable landlord
25   would not have anticipated a virtually unprecedented event such as the COVID-19
26   pandemic that would generate a ban on even initiating eviction actions against tenants

27
28

who do not pay rent and on replacing them with tenants who do pay rent."); *Heights Apartments, LLC v. Walz*, 30 F.4th 720, 734 (8th Cir. 2022) ("no landlord could have reasonably expected regulations of the duration and extent present in" Minnesota); *GHP Mgmt. Corp. v. City of L.A.*, No. CV 21-06311 DDP (JEMx), 2022 U.S. Dist. LEXIS 209157, at *15 (C.D. Cal. Nov. 17, 2022) ("The regulatory environment existing prior to the pandemic, however, gave Plaintiffs little reason to expect that they might be barred from evicting tenants for nonpayment of rent. *Bridge Aina Le'a*, 950 F.3d at 634. "'Distinct investment-backed expectations" implies reasonable probability, *like expecting rent to be paid*, not starry eyed hope of winning the jackpot if the law changes. *A landlord buys land burdened by lease-holds in order to acquire a stream of income from rents and the possibility of increased rents or resale value in the future.*") (quoting *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010)) (italics added by *GHP Mgmt.* court).

48.    The Moratorium worked a regulatory takings with respect to Plaintiffs' property. This is especially so when applied in light of "the purpose of the Takings Clause, which is to prevent the government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" *Palazzolo*, 533 U.S. at 617-18.

## FIRST CLAIM FOR RELIEF

~~35.    Due to the COUNTY's Moratorium, even a well-off tenant who was financially unaffected by COVID-19 has, for the past two years, had the ability to deny payment to their landlords—even if the landlord is less well-off— with little to no consequence, and the rent relief programs have proven woefully inadequate to satisfy the needs to compensate landlords for the detrimental impacts of the Moratorium.~~

1    E.    The Detrimental Impacts(Violation of the 5th Amendment to the U.S.

2    Constitution (Regulatory Takings) by Alison Mitchell Against All Defendants

3    (42 U.S.C. § 1983))[16]

4        49.    The allegations contained in Paragraphs 1 through 48 of this First

5    Amended Complaint are hereby incorporated by reference.

6        50.    By enacting the Moratorium and, especially, continuing to maintain it

7    after September 2021, when state law eviction restrictions began to phase out

8    altogether, the COUNTY violated the Fifth Amendment of the United States

9    Constitution, which prohibits the taking of private property for public use without just

10   compensation. The Moratorium effected a regulatory taking of Plaintiff ALISON

11   MITCHELL's property.

12       36.51. Ms. MITCHELL was prevented from evicting her tenant for the entirety

13   of the 37-month Moratorium on Plaintiffs..

14       •    STEPHEN LIN

15       37.    Plaintiff STEPHEN LIN and his wife own a condominium located at 39901

16   Lindsay McDermott Lane, Fremont, CA 94538, which they rent out. Their tenants

17   stopped paying rent in July 2021 and have not paid anything since. While the City of

18   Fremont's ERAP program paid five months of rent covering July 2021 to November

19   2021, the rent from December 2021 to present has not been paid. The tenants are now

20   more than $12,000 delinquent in rent. The non-payment is causing substantial

21

22

23       [16] Because this Court previously dismissed Plaintiffs' claims for a physical takings,
     both facial and as-applied; for impairment of contract; for due process; and for
24   preemption with prejudice, the omission of those causes of action from this First
     Amended Complaint does not waive Plaintiffs' right to appeal those claims in the
25   future, as appropriate. *See Lacey v. Maricopa Cty.*, 693 F.3d 896, 928 (9th Cir. 2012)
     (en banc) ("For claims dismissed with prejudice and without leave to amend, we will
26   not require that they be repled in a subsequent amended complaint to preserve them
     for appeal.").
27

28

1   hardship for the LINS, because Mrs. LIN lost her job as a result of the pandemic and

2   they rent the home they are living in, so they are having to pay their own rent plus the

3   expenses of a mortgage, property taxes, and repairs and maintenance for the

4   condominium in Fremont. They rely on the rent from the condominium to meet those

5   expenses.

6        38.   Even more detrimental, however, is that the tenants are damaging the

7   Fremont property and causing a nuisance to the neighbors. For one thing, the lease

8   agreement permitted two small dogs. Instead, since at least mid-2021, the tenants have

9   had three large German Shepherds and a Huskie. Those dogs bark constantly, resulting

10  in neighbors complaining to the homeowners' association and County animal control.

11  The tenants have ignored repeated requests to address the barking.

12       39.1.  The dogs also defecate and urinate all over the patio and garage, which

13  the tenants address by hosing those two areas down at least three times a day. The

14  water bill for the unit has more than doubled as a result, and it has caused moisture to

15  build up outside on the stucco, resulting in algae growth outside and black mold in the

16  garage from the constant water exposure. Mr. LIN has repeatedly asked the tenants to

17  stop hosing down the patio and garage, but they refuse, and they also refuse to grant

18  Mr. LIN or his agents' entry to the property to abate the mold.

19       40.   Mr. LIN also recently received a public health notice from the CITY

20  informing him that the home has become infested with cockroaches.

21       41.   The LINS' homeowners' association has complained to Mr. LIN repeatedly

22  about the conditions at the unit, and, though it has not yet fined them, it could do so

23  under the terms of the CCRs. Mr. LIN has attended numerous HOA meetings to

24  apologize to his neighbors for the conditions caused by his tenants, but which the LINS

25  have no ability to address due to the COUNTY's Moratorium. In sum, not only are the

26  LINS' tenants failing to pay rent, thereby causing financial hardship to the LINS, the

27

28

1    ~~eviction Moratorium also permit them to violate other material terms of the lease and~~

2    ~~damage the LINS' property without any means of protecting it.~~

3    - **~~THE JAINS~~**

4    ~~42.     Plaintiffs RAKESH and TRIPTI JAIN own a three-bedroom house located~~

5    ~~at 336 Escobar Street, Fremont, CA. The rent proceeds were intended to fund college~~

6    ~~educations for their children, one of whom graduates high school this May. Their tenant~~

7    ~~stopped paying rent immediately upon taking possession in January 2020. In fact, he's~~

8    ~~never paid a cent. His deposit check and check for the first month's rent both bounced~~

9    ~~within three days of him taking possession, and he has not paid anything since. Yet he~~

10   ~~remains protected from eviction by the COUNTY's Moratorium. While the City of~~

11   ~~Fremont's ERAP program paid the JAINS 12 months' worth of outstanding rent, the~~

12   ~~tenant remains approximately $58,000 in arrears, for an additional 16 months of~~

13   ~~unpaid rent. Furthermore, the JAINS are informed and believe, and on that basis~~

14   ~~allege, that the tenant has engaged in numerous lease violations, including (1) having~~

15   ~~four German Shepherds on the property when the lease forbids pets, (2) subletting~~

16   ~~portions of the unit without permission, and (3) making modifications to the unit~~

17   ~~without permission or appropriate permits. The tenant has also denied the JAINS entry~~

18   ~~to the unit.~~

19   ~~43.~~1.   ~~The JAINS are further informed and believe, and on that basis allege, that~~

20   ~~the District Attorney lodged a criminal complaint against the tenant in 2020 based on~~

21   ~~his provision of a fraudulent W-2, credit report and a bad check to the JAINS in~~

22   ~~connection with his lease application, but that case remains unresolved. *See People v.*~~

23   ~~*Singh*, Case No. 20-CR-015044 (Alameda Co. Super. Court, filed Nov. 17, 2020). The~~

24   ~~JAINS are also informed and believe, based on conversations with staff in the District~~

25   ~~Attorney's office, that the tenant had previously engaged in similar activity with~~

26   ~~previous landlords and that the office was on the lookout for him.~~

27

28

44.    Faced with the inability to collect any rent for their property, the JAINS also investigated the possibility of removing the house from the market under the Ellis Act, Govt. Code § 7060 *et seq.*, so that they could move into the house themselves. But, though the COUNTY's moratorium is not a model of clear legislative drafting, it appears that it even purports to prohibit evictions under the Ellis Act when that tenant claims financial hardship due to COVID-19,[17] and the JAINS have been unable to evict on that basis either.

45.1.   The situation has been extremely stressful for the JAINS, causing Mrs. JAIN major anxiety and emotional distress, including panic attacks, and causing her to require occasional medication to treat the effects of the stress and anxiety.

- **ALISON MITCHELL**

52.    Plaintiff ALISONThroughout the duration of the Moratorium, Ms. MITCHELL and her husband ownowned a condominium located at 5855 Horton Street, #524, Emeryville, CA. They bought the property in 2003 as a place to eventually "age in place"—a place to move into when remaining in their two-story suburban home becomes infeasible—because it is on a single level in a secured building right next to the train station with free local public transport and access to most of their needs without driving. In the meantime, though, the income from the rental was intended to help fund the MITCHELLs'MITCHELLS' retirement.

46.53. However, their tenant stopped paying rent in March 2020 and has paid no

---

[17] *See* Alameda County Hous. & Cmty. Devel. Dept., "Alameda County COVID-19 Eviction Moratorium" (Aug. 11, 2020), *available online at* https://www.acgov.org/cda/hcd/documents/EvictionMoratoriumOrdinanceSummaryFAQ8.11.20.pdf (last visited May 4, 2022), p. 1 ("if you provide documentation that you have a COVID-related impact that made you unable to pay rent on time, the ordinance prohibits your eviction *and there are no exceptions*. If you do not provide documentation or are being evicted for any reason besides nonpayment of rent, there are three exceptions to the eviction ordinance," including the Ellis Act (emphasis added)).

rent ~~since. She (the~~ thereafter. The tenant~~) has an outstanding balance~~ lived rent free throughout the entire life of ~~approximately $75,000~~the Moratorium, and the MITCHELLS were unable to evict her until November 2023. The MITCHELLS submitted an application to the COUNTY's ERAP program in May 2021, and their property manager ~~has~~ submitted all the documents that the program ~~has~~ requested of them by way of documentation. However, the tenant ~~has~~ failed to respond to requests from the COUNTY's ERAP program for additional documents to support her eligibility for the payments, so ~~no action has been taken on it~~the MITCHELLS never received any rent relief funds to offset their losses.

54.    In total, the MITCHELLS lost approximately $135,000 in uncollected rent in total, not even taking into account rent increases that they were entitled to impose and interest that they would have been able to earn on that rental income. Those rent increases and interest likely represent an additional $30,000 to $35,000 in lost income or more. Just considering the period after September 2021, the MITCHELLS lost approximately $75,000 in uncollected rent, again not taking into account rent increases and interest, which would likely represent an additional $15,000 or more.

55.    Nor was lost income the only detrimental economic impact. Had the MITCHELLS not had a squatter living in their unit in September 2021, they estimate they would have been able to sell it for $800,000 or more, but they could not do so with the tenant present. Indeed, the MITCHELLS tried to sell the condo, at a steep discount and with an offer to assign the rights to the unpaid back rent (to the extent permitted by state law, *see* Cal. Civ. Code § 1788.66), but they received virtually no interest from potential buyers, and their broker advised them that they would be unable to be able to sell the property as long as the tenant remained in possession. When they ultimately were able to sell the property, after regaining possession in November 2023, they sold at $695,000, meaning that they lost approximately $100,000 dollars in equity as well.

1  At the same time, they lost their "grandfathered-in" property tax base under
2  Proposition 13, which will surely cost them tens of thousands of dollars more in
3  property taxes for a comparably priced unit in the future.

4  ~~47.~~56. The MITCHELLS ~~continue~~, of course, continued to bear substantial costs
5  for the unit, however, including property taxes, insurance, homeowners' association
6  dues, repairs and maintenance, and property management, and those costs ~~are~~
7  ~~eating~~ate into the MITCHELLS' retirement savings. The financial effects ~~have~~
8  ~~become~~became so burdensome that the ~~MITCHELLs~~MITCHELLS consulted an
9  attorney about removing the condominium from the rental market under the Ellis Act~~,~~
10  ~~but that~~ eviction process, so that they could regain possession for sale, but because the
11  property is ~~itself costly, and~~a condominium the MITCHELLS ~~have been~~were unable to
12  pursue that option. ~~The MITCHELLS decided to try to sell the condo   at a steep~~
13  ~~discount and with an offer to assign the rights to the unpaid back rent (to the extent~~
14  ~~permitted by state law, *see* Cal. Civ. Code § 1788.66)   but they have had little interest~~
15  ~~from potential buyers and their broker has advised them that they are extremely~~
16  ~~unlikely to be able to sell the property as long as the tenant remains in possession.~~
17  ~~Moreover, the tenant will not respond to communications from Mrs.~~*See Valnes v. Santa*
18  *Monica Rent Control Bd.*, 221 Cal. App. 3d 1116 (1990) (Ellis Act does not apply to
19  condominiums). In the end, Ms. MITCHELL~~,~~ ended up having to sell her ~~property~~
20  ~~management company, or her attorney~~interests in three income-producing limited
21  partnerships at a significant discount to enable the MITCHELLS to have sufficient
22  cash to offset the costs attributable to the Moratorium.

23  • ~~MICHAEL HAGERTY~~

24  ~~48.   Plaintiff MICHAEL HAGERTY owns a condominium located at 6~~
25  ~~Commodore Drive, #334, Emeryville, CA, which he has rented out for approximately~~
26  ~~the past 10 years. Mr. HAGERTY is retired and relies on the income from this rental~~

1  property to help fund his retirement. Mr. HAGERTY's current tenant has not paid any

2  rent for most months in approximately two years—essentially since the beginning of

3  the pandemic—and Mr. HAGERTY has been forced to withdraw money from his

4  Individual Retirement Account ("IRA") to pay the costs of maintaining the

5  condominium. Mr. HAGERTY's property manager applied to the COUNTY's ERAP

6  program approximately a year ago, but the application was denied because the tenant

7  was deemed ineligible. The tenant owes approximately $47,350 in back rent and that

8  number continues to grow. The tenant has also rented a room of the condominium out

9  through Airbnb within the past two years, in violation of the lease.

10  • **THE ALVAREZES**

11  49.  Plaintiffs H. ALEX ALVAREZ and DANNIE ALVAREZ (the

12  ALVAREZES) own a single family home located at 2919 Liberty Drive, Pleasanton, CA.

13  The ALVAREZES sold their primary residence in 2019 with the intention of downsizing

14  and moving into the home in Pleasanton. They spoke with their tenant about this plan

15  at the time, and he asked if he could stay in the property until May 2020, when his son

16  would graduate. The ALVAREZES agreed, splitting time between Texas—where they

17  care for Dannie's elderly parents—and California, where they have been staying in an

18  RV.

19  50.  Once the COUNTY's Moratorium took effect in early 2020, the tenant

20  stopped paying rent altogether, citing financial hardship. The ALVAREZES are

21  informed and believe, and on that basis allege, that the tenant's financial hardship is

22  not attributable to the COVID-19 pandemic; it is attributable to his decision to leave

23  his six-figure salary job *prior to the pandemic* to start his own business, which has

24  proven to be less successful than he anticipated, and to his unwillingness to look for a

25  new job. Essentially, he is using the rent money that he owes the ALVAREZES to

26  subsidize his business. Though the ALVAREZES were able to get a rent relief payment

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE &
DECLARATORY

RELIEF; PETITION FOR WRIT OF MANDATE

1    for a portion of the outstanding amount, the tenant remains approximately $24,000 in

2    arrears and the number continues to grow. As a result of the financial impacts, Mrs.

3    ALVAREZ had to postpone her planned retirement for more than a year.

4        51.    More importantly, though, the ALVAREZES are indefinitely barred from

5    moving back into their own home, as they had long planned, and selling the home would

6    be extraordinarily difficult—if not impossible—while a non-paying tenant remains in

7    possession. At a minimum, the ALVAREZES would have to sell at a steep discount due

8    to the Moratorium. They would also face significant property and income tax

9    penalties—potentially in the hundreds of thousands of dollars—if they were to sell their

10   current property for a replacement.

11       52.    To the extent Plaintiffs were required to exhaust any administrative

12   remedies, they all have, as alleged herein.

13                          **FIRST CLAIM FOR RELIEF**

14   **(Violation of the 5th Amendment to the U.S. Constitution (Takings Clause)**

15               **Against All Defendants (42 U.S.C. § 1983))**

16       53.    Plaintiffs hereby incorporate by reference the allegations contained in

17   Paragraphs 1 through 51 of this Complaint.

18       54.    By enacting the Moratorium, the COUNTY violated the Fifth Amendment

19   of the United States Constitution, which prohibits the taking of private property for

20   public use without just compensation. The Moratorium violates the Fifth Amendment

21   of the United States Constitution on its face and as applied to Plaintiffs.

22       55.    Defendants' Moratorium purports to prohibit Plaintiffs from evicting any

23   renter in the COUNTY, including the incorporated parts of the COUNTY, for virtually

24   any reason, with few exceptions. The Moratorium, which has no definitive end date,

25   perpetrates physical takings by illegally nullifying Plaintiffs' and other landlords' right

26   to occupy their properties without just compensation; the Moratorium eliminates

27

28

1  renters' rent obligations and sanctions renters' trespassing on Plaintiffs' properties.
2  Though the Moratorium purports to hold tenants responsible for the eventual payment
3  of missed rent installments, as the Eight Circuit recently noted, "[w]hile landlords may
4  bring an action against delinquent tenants for past-due rent, monetary relief obtained
5  against a judgment-proof individual *is an illusory remedy*, as has been recognized by
6  the Supreme Court." *Heights Apartments, LLC v. Walz*, No. 21-1278, ___ F.4th ___, 2022
7  U.S. App. LEXIS 9092, at *14 n.7 (8th Cir. Apr. 5, 2022) (emphasis added) (citing *Ala.*
8  *Assoc. of Realtors v. Dept. of Health and Human Servs.*, 141 S. Ct. 2485, 2489 (2021)).
9  *See also Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 376 (D. Mass. 2020) ("this right [to
10  seek back rent as consumer debt] is largely illusory, as tenants who have not paid their
11  rent for many months because of economic distress—or indeed for any other reason—
12  are unlikely to pay a money judgment against them."). Preventing landlords "from
13  evicting tenants who breach their leases intrudes on one of the most fundamental
14  elements of property ownership—the right to exclude." *Ala. Assoc. of Realtors*, 141 S.
15  Ct. at 2489. *See also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435
16  (1982); *Cedar Point Nursery v. Hassid*, 141 S. Ct 2063 (2021) (physical taking occurs
17  when government gives third party a substantial right of access to the owner's property
18  and deprives the owner of the ability to exclude); *Gwynar v. City and County of San*
19  *Francisco*, 90 Cal. App. 4th 637, 655 (2001) (physical taking occurs when a regulation
20  "effectively extinguish[es] plaintiffs' right to occupy substantial portions of their
21  property," such as when they are precluded from moving into a unit that they own).
22      56.   The COUNTY's Moratorium also interferes with Plaintiffs' investment-
23  backed expectations and results in either a substantial or total deprivation of the
24  economic value of Plaintiffs' properties. *Penn Central Transp. Co. v. New York City*, 438
25  U.S. 104 (1978). The Moratorium is devaluing properties by prohibiting Plaintiffs from
26  recovering possession of their properties—even for their personal use—and even

27
28

FIRST AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE & DECLARATORY
RELIEF; PETITION FOR WRIT OF MANDATE

Case No. 3:22-cv-02705-LB
Page 30

1  despite renters perpetuating ongoing nuisances and *continued* nonpayment of rents.

2  Plaintiffs have suffered significant financial losses due to the Moratorium, and continue

3  to suffer these losses, notwithstanding the current government "relief" programs in

4  place, which have resulted in little to no relief. Plaintiffs' "investment-backed

5  expectations" have been violated as a matter of law. This is especially so when applied

6  in light of "the purpose of the Takings Clause, which is to prevent the government from

7  'forcing some people alone to bear public burdens which, in all fairness and justice,

8  should be borne by the public as a whole.' [Citation.]" *Palazzolo v. Rhode Island*, 533

9  U.S. 606, 617-18 (2001).

10    57.    When the MITCHELLS finally did regain possession of their unit, they

11  discovered that the tenant had significantly damaged the property, necessitating

12  substantial repairs, which took nearly a year to complete. Among other things, all of

13  the flooring had to be replaced, as did the appliances and window coverings. One of the

14  windows had BB gun holes through the glass. The garbage disposal and heaters were

15  non-functional. Restoring the unit to a livable condition necessitated repairs costing in

16  excess of $30,000.

17    58.    Factoring in the lost equity, lost rental income[18] and interest, discounted

18  sale of other investments, and significant repair costs (to say nothing of substantial

19  legal fees), the Moratorium likely cost the MITCHELLS several hundred thousands of

20  dollars overall, just in the post-September 2021 period alone—and more over the course

21  of the entire Moratorium. (The precise amount is to be further determined based on the

22  evidence to be presented at trial.)

23    59.    The Moratorium also interfered with the MITCHELLS' investment-

24  backed expectations. At the time the MITCHELLS acquired and began renting their

25

26    [18] *See Colony Cove*, 888 F.3d at 451 ("Projected income streams can contribute to a

27  method for determining the post-deprivation value of property…").

28

property, in 2003, residential units in Emeryville weren't even subject to plain-vanilla rent control laws, much less a regulatory system that permitted a tenant to hold over for three years without paying any rent whatsoever. So while landlords operate in a regulated field, and might have anticipated *some* future limits on their relationships with their tenants, "no amount of prior regulation could have led landlords to expect anything like the blanket Moratorium," *Apartment Ass'n of L.A. Cty., Inc. v. City of L.A.*, 500 F. Supp. 3d 1088, 1096 (C.D. Cal. 2020), much less one that lasted over three full years.

60.     Finally, the MITCHELLS each suffered significant physical effects and emotional distress from the effects of the Moratorium and the economic hardship that it caused them.

~~57.~~61. For     the     foregoing     reasons,     the     COUNTY's     Moratorium ~~constitutes~~constituted a takings without just compensation~~,~~ and thus ~~violates~~violated Plaintiffs' rights protected by the United States Constitution.

~~58.     An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. 28 U.S.C. § 2201.~~

~~59.     As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, and loss of opportunity value in an amount that is yet to be ascertained to be further determined at trial. Plaintiffs also entitled to recover attorneys' fees under 42 U.S.C. § 1983.~~

**SECOND CLAIM FOR RELIEF**

**(Violation of Article I, Section 19, of the California Constitution (Inverse Condemnation) by Alison Mitchell Against All Defendants)**

~~60.~~62. ~~Plaintiffs hereby incorporate by reference the~~The allegations contained in Paragraphs 1 through ~~58~~61 of this First Amended Complaint are hereby incorporated

by reference.

61.63. The COUNTY's Moratorium ~~violates~~violated Article I, Section 19, of the California Constitution on its face and as applied to ~~Plaintiffs~~ALISON MITCHELL, for all the reasons alleged herein.

62.64. The COUNTY's Moratorium therefore ~~constitutes~~constituted a takings without just compensation~~,~~ and thus ~~violates Plaintiffs'~~violated Plaintiff's rights protected by the California Constitution.

~~63.    An actual controversy has arisen and now exists between the parties relating to these legal rights and duties for which Plaintiffs desire a declaration of rights, therefore making a declaratory judgment necessary. 28 U.S.C. § 2201.~~

64.65. As a result of Defendants' actions, ~~Plaintiffs~~Plaintiff, as alleged herein, ~~have~~has suffered out of pocket expenses, loss of property value, ~~and~~loss of opportunity value, and loss of income in an amount that is yet to be ascertained to be further determined at trial.

### THIRD CLAIM FOR RELIEF

### (Violation of the ~~Article I, § 10, of~~ 5th Amendment to the U.S. Constitution ~~(Impairment of Contracts)~~Regulatory Takings) by Michael Hagerty Against All Defendants (42 U.S.C. § 1983))

65.66. ~~Plaintiffs hereby incorporate by reference the~~The allegations contained in Paragraphs 1 through ~~63~~48 of this First Amended Complaint~~.~~ are hereby incorporated by reference.

67.    By enacting the Moratorium and, especially, continuing to maintain it after September 2021, when state law eviction restrictions began to phase out altogether, the COUNTY violated the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation. The Moratorium effected a regulatory taking of Plaintiff MICHAEL

HAGERTY's property.

68.    Mr. HAGERTY was prevented from evicting his tenant for the entirety of the 37-month Moratorium.

~~66.    Throughout the duration of the Moratorium, Mr. HAGERTY owned a condominium located at 6 Commodore Drive, #334, Emeryville, CA. He bought the property approximately 10 years earlier as an investment property. Mr. HAGERTY is retired and relies on the income from this rental property to help fund his retirement. Mr.~~ The Contracts Clause, ~~Art. 1, § 10, of the United States Constitution,~~ provides: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." The Contracts Clause applies to local governments and prohibits them from enacting ordinances that substantially impair Plaintiffs' existing, lawful contracts, *i.e.*, lease agreements.

~~67.    The Ninth Circuit has ruled that Contracts Clause violations are indeed actionable under 42 U.S.C. § 1983. Specifically, the Ninth Circuit has stated, "The right of a party not to have a State, or a political subdivision thereof, impair its obligations of contract is a right secured by the first article of the United States Constitution. A deprivation of that right may therefore give rise to a cause of action under section 1983." *So. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003).~~

~~68.    In determining whether a contractual impairment is substantial, courts consider "the extent to which the law undermines the contractual bargain, interferes with a party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 138 S. Ct. 1815, 1822 (2018). If a court determines that a law works a substantial impairment, it then considers "whether the state law is drawn in an 'appropriate' and 'reasonable' way to advance 'a significant and legitimate public purpose.'" *Id.* (quoting *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983)).~~

~~69.    "It is axiomatic that a landlord's bargain of receiving rent in exchange for~~

1     a tenant's possession of the property is greatly diminished if the landlord's right to

2     exclude the tenant is minimal or non-existent. The same is true if other terms of the

3     lease cannot be enforced." *Heights Apartments, LLC*, No. 21-1278, ___ F.4th ___, 2022 U.S.

4     App. LEXIS 9092, at *14.

5          70.     Where, as here, a law substantially impairs a contract, the public entity

6     bears the burden of showing that the impairment is both reasonable and necessary,

7     and the government "is not free to impose a drastic impairment when an evident and

8     more moderate course would serve its purposes equally well." *United States Trust Co.*

9     *v. New Jersey*, 431 U.S. 1, 31 (1977). Moreover, an impairment that is sustainable in

10    the short-term, in response to a crisis, may become an unconstitutional impairment if

11    maintained over time. *Compare Home Building & Loan Assn. v. Blaisdell*, 290 U.S. 398

12    (1934) (upholding temporary mortgage moratorium where mortgagors were required to

13    pay a reasonable rent to the mortgagor to allow it to meet costs) *with W. B. Worthen*

14    *Co. v. Kavanaugh*, 295 U.S. 56 (1935) (finding a similar mortgage moratorium to be an

15    unconstitutional impairment when the duration was longer and there was no obligation

16    by the mortgagor to pay the mortgagee a sufficient sum to allow the mortgagor to meet

17    its costs); *Heights Apartments, LLC*, No. 21-1278, ___ F.4th ___, 2022 U.S. App. LEXIS

18    9092, at *9-10.

19         71.     Under these standards, the COUNTY's Moratorium violates the Contracts

20    Clause of the United States Constitution. It fundamentally upends the contractual

21    bargains struck between Plaintiffs and their tenants by effectively relieving the tenants

22    of their obligation to pay rent and comply with certain other provisions of their leases,

23    and depriving [landlords, like Plaintiffs] of rent payments with no guarantee of

24    eventual recovery." *Ala. Assoc. of Realtors*, 141 S. Ct. at 2489. And it permanently

25    deprives landlords of the ability to pursue back rent through the unlawful detainer

26    mechanism, leaving only the option of an action for consumer debt, which several courts

27

28

1    have recognized is an "illusory remedy." *Heights Apartments, LLC*, No. 21-1278, __ F.4th

2    __, 2022 U.S. App. LEXIS 9092, at *14 n.7; *Baptiste*, 490 F. Supp. 3d at 376. Under the

3    COUNTY's Moratorium, Plaintiffs, as well as other property owners and/or landlords,

4    are required to allow tenants to remain on the properties rent free for an unspecified

5    duration of time, thus depriving Plaintiffs of the opportunity to collect any portion of

6    rent from their current tenants, or otherwise rent their properties to tenants who can

7    pay rent. "The moratorium has put the applicants, along with millions of landlords

8    across the country, at risk of irreparable harm by depriving them of rent payments with

9    no guarantee of eventual recovery." *Ala. Ass'n of Realtors.*, 141 S. Ct. at 2489. Such an

10   ordinance is the quintessential "substantial" impairment, as it "undermines the

11   contractual bargain, interferes with a party's reasonable expectations, and prevents the

12   party from safeguarding or reinstating his rights." *Sveen*, 138 S. Ct. at 1822. And even

13   if these impacts were justified in the early going of the pandemic, the circumstances

14   have so dramatically changed that their continued maintenance without an end in sight

15   no longer meets the constitutional standard. "At a time when local authorities were

16   confronted with a public health crisis that was rapidly developing, poorly understood,

17   and in need of immediate and decisive action," greater deference may have been

18   appropriate, but "[t]he public health crisis has since evolved, and time is available for

19   more reasoned and less immediate decision-making by public health officials," so more

20   stringent review is warranted. *Heights Apartments, LLC*, No. 21-1278, __ F.4th __, 2022

21   U.S. App. LEXIS 9092, at *9-10 (applying heightened level of scrutiny in light of the

22   passage of time since the beginning of the pandemic).

23           72.    In continuing to maintain the Moratorium and apply it to Plaintiffs and

24   other landlords, the COUNTY has acted under color of statute, ordinance, regulation

25   and policy of the municipality. The COUNTY's conduct has deprived Plaintiffs of the

26   rights, privileges, and immunities secured by the United States Constitution and/or

27

28

1  ~~laws of the United States to which Plaintiffs are and were legitimately entitled.~~

2  ~~73.    Plaintiffs have no adequate remedy at law to prevent or redress the~~
3  ~~irreparable injuries alleged herein. Unless the COUNTY is enjoined and restrained~~
4  ~~from enforcing or threatening to enforce their Moratorium, Plaintiffs will be irreparably~~
5  ~~injured. They will be deprived of rights guaranteed under the United States~~
6  ~~Constitution, and will continue to suffer substantial loss of rents, profits, and good will,~~
7  ~~the nature and extent of which will be extremely difficult or impossible to ascertain. As~~
8  ~~the constitutional violations are ongoing, Plaintiffs are entitled to injunctive relief now.~~

9  69.    HAGERTY's tenant during the Moratorium did not pay any rent for most
10  months over the three-year duration of the Moratorium, and Mr. HAGERTY was forced
11  to withdraw money from his Individual Retirement Account ("IRA") to pay the costs of
12  maintaining the condominium.

13  70.    Mr. HAGERTY's property manager applied to the COUNTY's ERAP
14  program approximately in 2021, but the application was denied because the tenant was
15  deemed ineligible.

16  71.    The tenant also rented a room of the condominium out through Airbnb
17  during the Moratorium, in violation of the lease, allowing him to profit from Mr.
18  HAGERTY's property at Mr. HAGERTY's expense.

19  72.    When the Moratorium expired at the end of April 2023, the tenant owed
20  approximately $73,000 in back rent, not even taking into account rent increases that
21  he was entitled to impose and interest that he would have been able to earn on that
22  rental income. Those rent increases and interest likely represent an additional $20,000
23  to $30,000 in lost income or more. Just considering the period after September 2021,
24  Mr. HAGERTY lost approximately $45,000 in uncollected rent, again not taking into
25  account rent increases and interest, which would likely represent an additional $15,000
26  or more.

27

28

73.    In May 2023, in an effort to avoid eviction proceedings, Mr. HAGERTY offered the tenant $2,400 to cover moving expenses if he moved out immediately, and a payment plan to pay back the balance owed. The tenant agreed, and took the money, then promptly refused to make payments in accordance with their agreement. Mr. HAGERTY filed suit, and the tenant paid $4,000, but Mr. HAGERTY can no longer locate the tenant. In other words, Mr. HAGERTY was able to recover, on net, $1,600 of the $73,000 that the tenant owed him, further demonstrating that the ability to collect back-rent as consumer debt is an illusory remedy.

74.    Nor was lost income the only detrimental economic impact. Had Mr. HAGERTY not had a squatter living in his unit in September 2021, he likely would have been able to sell it for $800,000 or more, but he could not do so with the tenant present. If he had tried selling it at the end of the Moratorium, he would likely have only been able to sell it for approximately $550,000 meaning that he lost approximately $200,000 to $250,000 in equity as well.

75.    Mr. HAGERTY, of course, continued to bear substantial costs for the unit, including property taxes, insurance, homeowners' association dues, repairs and maintenance, and property management, and those costs ate into Mr. HAGERTY's savings.

76.    When Mr. HAGERTY finally did regain possession of the unit, he discovered that the tenant had significantly damaged the property, necessitating substantial repairs. Restoring the unit to a livable condition necessitated repairs costing thousands of dollars.

77.    Factoring in the lost equity, lost rental income and interest, withdrawals from his IRA, and significant repair costs (to say nothing of legal fees), the Moratorium likely cost Mr. HAGERTY several hundred thousands of dollars overall, just in the post-September 2021 period alone—and more over the course of the entire Moratorium. (The

precise amount is to be further determined based on the evidence to be presented at trial.)

78.    The Moratorium also interfered with Mr. HAGERTY's investment-backed expectations. At the time Mr. HAGERTY acquired and began renting his property, almost 15 years ago, residential units in Emeryville weren't even subject to plain-vanilla rent control laws, much less a regulatory system that permitted a tenant to hold over for three years without paying any rent whatsoever. So while landlords operate in a regulated field, and might have anticipated *some* future limits on their relationships with their tenants, "no amount of prior regulation could have led landlords to expect anything like the blanket Moratorium," *Apartment Ass'n of L.A. Cty., Inc. v. City of L.A.*, 500 F. Supp. 3d 1088, 1096 (C.D. Cal. 2020), much less one that lasted over three full years.

79.    For the foregoing reasons, the COUNTY's Moratorium constituted a takings without just compensation and thus violated Plaintiffs' rights protected by the United States Constitution.

**FOURTH CLAIM FOR RELIEF**

**(Violation of Article I, Section 19, of the ~~14th Amendment to the U.S.~~California Constitution ~~(Due Process Clause)~~Inverse Condemnation) by Michael Hagerty Against All Defendants ~~(42 U.S.C. § 1983)))~~**

~~74.~~80. ~~Plaintiffs hereby incorporate by reference the~~ The allegations contained in Paragraphs 1 through ~~72~~48 and 66 to 79 of this First Amended Complaint are hereby incorporated by reference.

81.    The COUNTY's Moratorium violated Article I, Section 19, of the California Constitution on its face and as applied to MICHAEL HAGERTY, for all the reasons alleged herein.

82.    The COUNTY's Moratorium therefore constituted a takings without just

1    compensation and thus violated Plaintiff's rights protected by the California

2    Constitution.

3        83.    As a result of Defendants' actions, Plaintiff, as alleged herein, has suffered

4    out of pocket expenses, loss of property value, loss of opportunity value, and loss of

5    income in an amount that is yet to be ascertained to be further determined at trial.

6                        **FIFTH CLAIM FOR RELIEF**

7    **(Violation of the 5th Amendment to the U.S. Constitution (Regulatory**

8        **Takings) by Rakesh and Tripti Jain Against All Defendants)**

9        84.    The allegations contained in Paragraphs 1 through 48 of this First

10   Amended Complaint are hereby incorporated by reference.

11       85.    By enacting the Moratorium and, especially, continuing to maintain it

12   after September 2021, when state law eviction restrictions began to phase out

13   altogether, the COUNTY violated the Fifth Amendment of the United States

14   Constitution, which prohibits the taking of private property for public use without just

15   compensation. The Moratorium effected a regulatory taking of Plaintiffs RAKESH and

16   TRIPTI JAIN's property.

17       86.    Since 2012, Plaintiffs RAKESH and TRIPTI JAIN owned a three-bedroom

18   house located at 336 Escobar Street, Fremont, CA, which they rented out. The rent

19   proceeds were intended to fund college educations for their children. However, their

20   tenant stopped paying rent immediately upon taking possession in January 2020—

21   before the pandemic even began. In fact, he never paid a cent. His deposit check and

22   check for the first month's rent both bounced within three days of him taking

23   possession, and he never paid anything thereafter. The JAINS are informed and

24   believe, and on that basis allege, that the District Attorney lodged a criminal complaint

25   against the tenant in 2020 based on his provision of a fraudulent W-2, credit report and

26   a bad check to the JAINS in connection with his lease application, but even now that

27

28

case remains pending. *See People v. Singh*, Case No. 20-CR-015044 (Alameda Cty. Super. Court filed Nov. 17, 2020). The JAINS are also informed and believe, based on conversations with staff in the District Attorney's office, that the tenant had previously engaged in similar activity with previous landlords and that the office was on the lookout for him.

87.    Yet he remained protected from eviction by the COUNTY's Moratorium and could not be evicted until November 2022, when the Court ruled that Ellis Act evictions were permitted by the COUNTY's Moratorium, contrary to the previous public pronouncements of the COUNTY itself. The JAINS, faced with the inability to collect any rent for their property, had filed an unlawful detainer complaint under the Ellis Act in the Alameda County Superior Court in October 2021, but the Superior Court took no action on the complaint until November 2022.

88.    While the City of Fremont's ERAP program paid the JAINS $43,500 in rental assistance, that was far shy of the amount the tenant owed and failed to pay. When the tenant was finally evicted, he had failed to pay approximately $125,000 in rent during his time of possession, not even taking into account rent increases that the JAINS were entitled to impose and interest that they would have been able to earn on that rental income. Those rent increases and interest likely represent an additional $20,000 to $30,000 in lost income or more. Just considering the period after September 2021, the JAINS lost more than $50,000 in uncollected rent, again not taking into account rent increases and interest, which would likely represent an additional $15,000 or more.

89.    The JAINS, of course, continued to bear substantial costs for the house, including property taxes, insurance, repairs and maintenance, and property management, and those costs ate into their savings.

90.    Furthermore, the JAINS are informed and believe, and on that basis

allege, that the tenant engaged in numerous lease violations, including (1) having four German Shepherds on the property when the lease forbids pets, (2) subletting portions of the unit without permission, and (3) making modifications to the unit without permission or appropriate permits. The tenant also denied the JAINS entry to the unit. Following their tenant's eviction, when they were finally able to regain possession, the JAINS had to spend approximately $50,000 to repair the damage to the property incurred during the extended period during which the Moratorium prevented them from seeking to recover possession over the course of nearly three years.

91.    Nor was lost income and repair costs the only detrimental economic impacts. Had the JAINS not had a squatter living in their unit in September 2021, they likely would have been able to sell it for $1,700,000 or more, but they could not do so with the tenant present. If they had tried sell it in the months following the ultimate eviction—November, December, January, or February of 2022-2023—they would likely have only been able to sell it for approximately $1,500,000 meaning that they lost approximately $200,000 in equity as well.

92.    The situation was extremely stressful for the JAINS, causing Mrs. JAIN major anxiety and emotional distress, including panic attacks, and causing her to require occasional medication to treat the effects of the stress and anxiety.

93.    Factoring in the lost equity, lost rental income and interest, and significant repair costs (to say nothing of legal fees), the Moratorium likely cost the JAINS several hundred thousands of dollars overall, just in the post-September 2021 period alone—and more over the course of the entire Moratorium. (The precise amount is to be further determined based on the evidence to be presented at trial.)

94.    The Moratorium also interfered with the JAINS' investment-backed expectations. At the time the JAINS acquired and began renting their property, in 2012, residential units in Fremont weren't even subject to plain-vanilla rent control

laws, much less a regulatory system that permitted a tenant to hold over for three years without paying any rent whatsoever. So while landlords operate in a regulated field, and might have anticipated *some* future limits on their relationships with their tenants, "no amount of prior regulation could have led landlords to expect anything like the blanket Moratorium," *Apartment Ass'n of L.A. Cty., Inc. v. City of L.A.*, 500 F. Supp. 3d 1088, 1096 (C.D. Cal. 2020), much less one that lasted over three full years.

95.    For the foregoing reasons, the COUNTY's Moratorium constituted a takings without just compensation and thus violated Plaintiffs' rights protected by the United States Constitution.

### SIXTH CLAIM FOR RELIEF

### (Violation of Article I, Section 19, of the California Constitution (Inverse Condemnation) by Rakesh and Tripti Jain Against All Defendants)

96.    The allegations contained in Paragraphs 1 through 48 and 84 to 95 of this First Amended Complaint are hereby incorporated by reference.

97.    The COUNTY's Moratorium violated Article I, Section 19, of the California Constitution on its face and as applied to RAKESH and TRIPTI JAIN, for all the reasons alleged herein.

98.    The COUNTY's Moratorium therefore constituted a takings without just compensation and thus violated Plaintiffs' rights protected by the California Constitution.

99.    As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, loss of opportunity value, and loss of income in an amount that is yet to be ascertained to be further determined at trial.

**SEVENTH CLAIM FOR RELIEF**

**(Violation of the 5th Amendment to the U.S. Constitution (Regulatory**

**Takings) by H. Alex and Dannie Alvarez Against All Defendants)**

100.    The allegations contained in Paragraphs 1 through 48 of this First Amended Complaint are hereby incorporated by reference.

101.    By enacting the Moratorium and, especially, continuing to maintain it after September 2021, when state law eviction restrictions began to phase out altogether, the COUNTY violated the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation. The Moratorium effected a regulatory taking of Plaintiffs H. ALEX and DANNIE ALVAREZ'S property.

~~75.~~    For approximately 35 years, from 1989 and up to and including throughout the duration of the Moratorium, Plaintiffs H. ALEX ALVAREZ and DANNIE ALVAREZ (the ALVAREZES) owned a single-family home located at 2919 Liberty Drive, Pleasanton, CA, which they had long rented out. However, in 2016 they completely renovated the house with the intention of downsizing and moving into the home in Pleasanton in their retirement, and in 2019 the ALVAREZES sold their primary residence to pursue that goal. They spoke with their tenant about this plan at the time, and he asked if he could stay in the property until May 2020, when his son would graduate. ~~The COUNTY's Moratorium violates Plaintiffs' substantive and procedural due process rights under the U.S. Constitution. The Moratorium violates Plaintiffs' substantive due process rights on its face and as applied because Plaintiffs' have protected property interests in their real properties, and Defendants' continued imposition of the blanket Moratorium is irrational and lacking in a legitimate government interest because there is no justification for such extreme measures, especially at this point. Indeed, California's COVID-19 Tenant Relief Act never imposed~~

1   ~~such draconian restrictions. Further, the Bay Area has seen significant improvement~~
2   ~~in circumstances relating to the pandemic since March of 2020, has a high rate of~~
3   ~~vaccinations, and federal and state officials have recognized that COVID-19 is either~~
4   ~~in, or moving to, an endemic stage. The COUNTY long ago abandoned the shelter-in-~~
5   ~~place policies that were the natural justification for the Moratorium. There are few~~
6   ~~remaining restrictions on businesses, and unemployment rates are very low, as opposed~~
7   ~~to the immediate economic impacts of the pandemic in early 2020. And the COUNTY~~
8   ~~has even withdrawn its mask mandate for public spaces. There is, at this point, no~~
9   ~~plausible justification for continuing the Moratorium indefinitely. The pandemic should~~
10  ~~not be used as a cursory justification for what would otherwise be a plainly illegal law.~~
11  ~~Defendants therefore have no rational basis for the continued imposition of the~~
12  ~~Moratorium. The Moratorium violates procedural due process because it, in effect,~~
13  ~~deprive Plaintiffs of *any* procedure to recover their properties under most cases, even~~
14  ~~in circumstances where tenants have not suffered financial hardship.~~

15  ~~76.    The aforesaid acts, as alleged herein, constitute violations of Plaintiffs'~~
16  ~~procedural and substantive due process rights. An actual controversy has arisen and~~
17  ~~now exists between the parties relating to these legal rights and duties for which~~
18  ~~Plaintiffs desire a declaration of rights, therefore making a declaratory judgment~~
19  ~~necessary. 28 U.S.C. § 2201.~~

20  102.    The ALVAREZES agreed, because they knew they would be spending
21  several months in Texas—where they care for Dannie's elderly parents—before moving
22  into the Pleasanton home.

23  103.    Once the COUNTY's Moratorium took effect in early 2020, however, the
24  situation changed. The tenant stopped paying rent altogether, citing financial
25  hardship. The ALVAREZES are informed and believe, and on that basis allege, that
26  the tenant's financial hardship was not attributable to the COVID-19 pandemic; it is

27
28

attributable to his decision to leave his six-figure salary job *prior to the pandemic* to start his own business, which proved to be less successful than he anticipated, and to his unwillingness to look for a new job. The ALVAREZES even tried to help him find employment, but he told them he was unwilling to work for anyone else. Essentially, he used the rent money that he owed the ALVAREZES to subsidize his business.

104.    The ALVAREZES filed an unlawful detainer action under the Ellis Act in April 2022, but they were not able to get any action on it until December of that year. Ultimately, the tenant agreed to leave the property as of March 2023. Upon recovering possession, the ALVAREZES discovered that the property had been damaged by the tenant, and he left piles of personal belongings and furniture. It cost the ALVAREZES nearly $10,000 to repair the unit and dispose of the refuse that was left behind.

105.    By the time the ALVAREZES regained possession, the tenant had failed to pay almost $85,000 in rent, not even taking into account rent increases that the ALVAREZES were entitled to impose and interest that they would have been able to earn on that rental income. Those rent increases and interest likely represent an additional $10,000 to $15,000 in lost income or more. Though the ALVAREZES were able to get a rent relief payment for a portion of the outstanding amount, the tenant still ultimately ended up approximately $40,000 in arrears, almost all of which was attributable to the period after September 2021. Again, that does not take into account rent increases and interest, which would likely represent an additional $5,000 to $10,000 more.

106.    The ALVAREZES, of course, continued to bear substantial costs for the house, including property taxes, insurance, repairs and maintenance, and property management, and those costs ate into their savings. As a result, Dannie was forced to postpone her planned retirement for several years.

107.    More importantly, though, the ALVAREZES were prevented from moving

back into their own home, as they had long planned. And because they had sold their prior home in anticipation of moving into the Pleasanton home, they ended up spending the entire three years of the Moratorium living out of their RV, which they had intended to leave in Texas during those periods where they went check in on Dannie's parents. The need to drive the RV back and forth so they had somewhere to live while in California, and the need to rent space to park it in California, likely cost the ALVAREZES tens of thousands of dollars in added costs and depreciation of the RV itself.

108.     The ALVAREZES made attempts to sell the home during the Moratorium, but they were unable to do so while a non-paying tenant remained in possession. They were ultimately able to sell the property after the Moratorium ended for $1,300,000, which may have exceeded what they could have received in October 2021, but the result was that they were unable to afford a new home in California at the "stepped-up" property tax rates of thousands of dollars more per month that a new home would be subject to under Proposition 13. And to avoid $300,000 in capital gains taxes on the sale, they engaged in a Section 1031 exchange, meaning they had to use the proceeds of the sale to purchase a new rental property, rather than a place that they could move into.[19] Ultimately, they ended up buying a small condominium in Texas to have a place to live that was not the RV.

109.     The situation was extremely stressful for the ALVAREZES, causing significant health issues for both of them, and requiring them to both start taking

---

[19] *See* U.S. Internal Rev. Serv., "Fact Sheet: Like-Kind Exchanges Under IRC Section 1031" (Feb. 2008), *available online at* https://www.irs.gov/pub/irs-news/fs-08-18.pdf (last visited Mar. 3, 2025), p. 2 ("Both the relinquished property you sell and the replacement property you buy must meet certain requirements. [¶] Both properties must be held for use in a trade or business or for investment. *Property used primarily for personal use, like a primary residence* or a second home or vacation home, *does not qualify for like-kind exchange treatment*" (emphasis added)).

1   medication to treat the effects of the stress and anxiety.

2      110.   Factoring in the lost rental income and interest, and significant repair

3   costs (to say nothing of legal fees), the Moratorium likely cost the ALVAREZES a

4   hundred thousand dollars overall, just in the post-September 2021 period alone. (The

5   precise amount is to be further determined based on the evidence to be presented at

6   trial.)

7      111.   The Moratorium also interfered with the ALVAREZ' investment-backed

8   expectations. At the time the ALVAREZES acquired and began renting their property,

9   in 1989, residential units in Pleasanton weren't even subject to plain-vanilla rent

10  control laws, much less a regulatory system that permitted a tenant to hold over for

11  three years without paying any rent whatsoever. So while landlords operate in a

12  regulated field, and might have anticipated *some* future limits on their relationships

13  with their tenants, "no amount of prior regulation could have led landlords to expect

14  anything like the blanket Moratorium," *Apartment Ass'n of L.A. Cty., Inc. v. City of

15  L.A.*, 500 F. Supp. 3d 1088, 1096 (C.D. Cal. 2020), much less one that lasted over three

16  full years.

17     112.   For the foregoing reasons, the COUNTY's Moratorium constituted a

18  takings without just compensation and thus violated Plaintiffs' rights protected by the

19  United States Constitution.

20              **EIGHTH CLAIM FOR RELIEF**

21  **(Violation of Article I, Section 19, of the California Constitution (Inverse**

22  **Condemnation) by H. Alex and Dannie Alvarez Against All Defendants)**

23     113.   The allegations contained in Paragraphs 1 through 48 and 100 to 112 of

24  this First Amended Complaint are hereby incorporated by reference.

25     114.   The COUNTY's Moratorium violated Article I, Section 19, of the

26  California Constitution on its face and as applied to H. ALEX and DANNIE ALVAREZ,

27

28

FIRST AMENDED COMPLAINT FOR DAMAGES, ~~INJUNCTIVE &
DECLARATORY~~
~~RELIEF; PETITION FOR WRIT OF MANDATE~~

Case No. 3:22-cv-02705-LB
Page 48

1  for all the reasons alleged herein.

2      115.   The COUNTY's Moratorium therefore constituted a takings without just

3  compensation and thus violated Plaintiffs' rights protected by the California

4  Constitution.

5      77.116.        As a result of Defendants' actions, Plaintiffs, as alleged herein, have

6  suffered out of pocket expenses, loss of property value, ~~emotional distress, and~~ loss of

7  opportunity value, and loss of income in an amount that is yet to be ascertained to be

8  further determined at trial. ~~Plaintiffs are also entitled to recover attorneys' fees under~~

9  ~~42 U.S.C. §§ 1983 & 1988(b).~~

10           ~~**FIFTH CLAIM FOR RELIEF**~~

11           **NINTH CLAIM FOR RELIEF**

12  **(Violation of ~~Article XI, § 7, of the California~~5th Amendment to the U.S.**

13  **Constitution ~~(State Law Preemption)~~Regulatory Takings) by Stephen Lin**

14           **Against All Defendants ~~(Cal. CCP § 1085)~~))**

15      78.117.        ~~Plaintiffs hereby incorporate by reference the~~The allegations

16  contained in Paragraphs 1 through ~~76~~48 of this First Amended Complaint. ~~are hereby~~

17  ~~incorporated by reference.~~

18      118.   By enacting the Moratorium and, especially, continuing to maintain it

19  after September 2021, when state law eviction restrictions began to phase out

20  altogether, the COUNTY violated the Fifth Amendment of the United States

21  Constitution, which prohibits the taking of private property for public use without just

22  compensation. The Moratorium effected a regulatory taking of Plaintiff STEPHEN

23  LIN's property.

24      119.  Since 2012, Plaintiff STEPHEN LIN and his wife have owned a

25  condominium located at 39901 Lindsay McDermott Lane, Fremont, CA 94538, which

26  they have long rented out. In July 2021, the LINS' tenant stopped paying rent and did

27

28

not pay anything thereafter for the remainder of the Moratorium. While the City of Fremont's ERAP program paid five months of rent covering July 2021 to November 2021, the rent from December 2021 through the end of the Moratorium was not paid. The tenant incurred nearly $70,000 in unpaid rent, not even taking into account rent increases that the LINS were entitled to impose and interest that they would have been able to earn on that rental income. Those rent increases and interest likely represent an additional $10,000 to $15,000 in lost income or more. And, of course, all of that accrued after September 2021. And while the City of Fremont's ERAP program eventually ended up paying $36,600, that still fell far short of the total loss of income.

120.    The non-payment has caused substantial hardship for the LINS, because Mrs. LIN lost her job as a result of the pandemic, and they rent the home they are living in, so they were forced to pay their own rent plus the expenses of a mortgage, property taxes, and repairs and maintenance for the condominium in Fremont. They rely on the rent from the condominium to meet those expenses.

121.    Even more detrimental, however, is that the tenants caused substantial damage to the Fremont property and caused a nuisance to the neighbors. For one thing, the lease agreement permitted two small dogs. Instead, since at least mid-2021, the tenants have had three large German Shepherds and a Huskie. Those dogs barked constantly, resulting in neighbors complaining to the homeowners' association and County animal control. The tenants ignored repeated requests to address the barking.

122.    The dogs also defecated and urinated all over the patio and garage, which the tenants addressed by hosing those two areas down at least three times a day. The water bill for the unit more than doubled as a result, and it caused moisture to build up outside on the stucco, resulting in algae growth outside and black mold in the garage from the constant water exposure. Mr. LIN repeatedly asked the tenants to stop hosing down the patio and garage, but they refused, and they also refused to grant Mr. LIN or

1    his agents' entry to the property to abate the mold.

2        ~~79.    Mr. Under Article XI, § 7, of the California Constitution, a county can only~~

3    ~~"make and enforce within its limits all local, police, sanitary, and other ordinances and~~

4    ~~regulations *not in conflict with general laws*." (Emphasis added.) In other words,~~

5    ~~counties remain subject to superior state law.~~

6        ~~80.    The Ellis Act, Cal. Govt. Code § 7060 *et seq.*, is a state law that "preempts~~

7    ~~local action with regard to substantive controls over landlords who wish to withdraw~~

8    ~~all accommodations from the residential rental housing market while specifying areas~~

9    ~~in which local governments may regulate in a manner consistent with the [Ellis] Act."~~

10   ~~*S.F. Apartment Ass'n v. City & Cty. of S.F.*, 20 Cal. App. 5th 510, 520 (2018). To the~~

11   ~~extent the COUNTY's Moratorium purports to prevent evictions under that Act for~~

12   ~~those claiming to suffer financial hardship due to COVID-19, it is preempted and~~

13   ~~unenforceable.~~

14       ~~81.    As alleged herein, Plaintiffs have a beneficial interest in ensuring that the~~

15   ~~Moratorium is struck down so that Plaintiffs statutory and constitutional rights are not~~

16   ~~infringed upon. Plaintiffs do not have a plain, speedy, or adequate remedy in the~~

17   ~~ordinary course of law, and therefore relief is necessary to compel Defendants to correct~~

18   ~~their actions, which are unlawful and in excess of their authority.~~

19       123.   LIN also received a public health notice from the CITY informing him that

20   the home had become infested with cockroaches.

21       124.   The LINS' homeowners' association complained to Mr. LIN repeatedly

22   about the conditions at the unit, and Mr. LIN attended numerous HOA meetings to

23   apologize to his neighbors for the conditions caused by his tenants, but which the LINS

24   had no ability to address due to the COUNTY's Moratorium. In sum, not only were the

25   LINS' tenants failing to pay rent, thereby causing financial hardship to the LINS, the

26   eviction Moratorium also permitted the tenants to violate other material terms of the

27

28

lease and damage the LINS' property without any means of protecting it. Upon recovering possession of the unit, the LINS had to pay approximately $25,000 more to repair the property to a livable standard. They had to replace the moisture damaged sheetrock, carpets, and tile flooring; paint the whole house; and more.

125.    Nor was lost income and repair costs the only detrimental economic impacts. Had the LINS not had a squatter living in their unit in in the first few months of 2023, they likely would have been able to sell it for as much as $800,000, but they could not do so with the tenant present. If they had tried selling it in the summer of 2023, following the end of the Moratorium, they would likely have been able to sell it for less than $700,000 meaning that they lost approximately $100,000 of more in equity as well.

126.    Factoring in the lost equity, lost rental income and interest, and significant repair costs (to say nothing of legal fees), the Moratorium likely cost the LINS one- to two-hundred thousand dollars overall, all in the post-September 2021 period. (The precise amount is to be further determined based on the evidence to be presented at trial.)

127.    The Moratorium also interfered with the LINS' investment-backed expectations. At the time the LINS acquired and began renting their property in 2012, residential units in Fremont weren't even subject to plain-vanilla rent control laws, much less a regulatory system that permitted a tenant to hold over for three years without paying any rent whatsoever. So while landlords operate in a regulated field, and might have anticipated *some* future limits on their relationships with their tenants, "no amount of prior regulation could have led landlords to expect anything like the blanket Moratorium," *Apartment Ass'n of L.A. Cty., Inc. v. City of L.A.*, 500 F. Supp. 3d 1088, 1096 (C.D. Cal. 2020), much less one that lasted over three full years.

128.    For the foregoing reasons, the COUNTY's Moratorium constituted a

takings without just compensation and thus violated Plaintiff's rights protected by the United States Constitution.

### TENTH CLAIM FOR RELIEF

### (Violation of Article I, Section 19, of the California Constitution (Inverse Condemnation) by H. Alex and Dannie Alvarez Against All Defendants)

129.   The allegations contained in Paragraphs 1 through 48 and 117 to 128 of this First Amended Complaint are hereby incorporated by reference.

130.   The COUNTY's Moratorium violated Article I, Section 19, of the California Constitution on its face and as applied to STEPHEN LIN, for all the reasons alleged herein.

131.   The COUNTY's Moratorium therefore constituted a takings without just compensation and thus violated Plaintiffs' rights protected by the California Constitution.

132.   As a result of Defendants' actions, Plaintiffs, as alleged herein, have suffered out of pocket expenses, loss of property value, loss of opportunity value, and loss of income in an amount that is yet to be ascertained to be further determined at trial.

### PRAYER

WHEREFORE, Plaintiffs/~~Petitioners~~ pray for relief as follows:

1.   ~~Preliminary and permanent injunctions preventing enforcement of the COUNTY's Moratorium.~~

~~2.~~1.   A ~~declaratory~~For a judgment ~~determining~~ that the ~~COUNTY's~~ Moratorium ~~(a) constitutes a~~worked an unlawful taking of Plaintiffs' property in violation of Plaintiffs' rights under the Fifth Amendment of the United States ~~and California Constitutions, (b) unconstitutionally impairs contracts, (c) violates Plaintiffs' right to due process, and (d)~~

~~violates state law~~<u>Constitution, which prohibits the taking of private property for public use without just compensation</u>.

~~3.~~<u>2.</u>    For special damages for out-of-pocket expenses, loss of property value, and loss of opportunity costs in an amount that is yet to be ascertained.

~~4.~~<u>3.</u>    For general damages according to proof, in an amount that is yet to be ascertained.

~~5.    For a writ of mandamus or mandate or other appropriate relief, including an injunction, declaration, and/or order, enjoining and voiding the Moratorium for all of the reasons alleged above.~~

~~6.    For a judgment that the Moratorium works an unlawful takings on its face and/or as applied, and has prevented Plaintiffs from maintaining economically viable use of their respective properties without just compensation in violation of Plaintiffs' rights under the Fifth Amendment of the United States Constitution, which prohibits the taking of private property for public use without just compensation; and upon such judgment, give Defendants the opportunity to revoke the Moratorium and mitigate its damages in Plaintiffs' inverse condemnation and Fifth Amendment takings action against Defendants.~~

~~7.~~<u>4.</u>    For costs of suit herein, including attorneys' fees.

~~8.~~<u>5.</u>    For such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: ~~May 4, 2022~~<u>March 3, 2025</u>                NIELSEN MERKSAMER <small>LLP</small>

~~PARRINELLO GROSS & LEONI~~<small>LLP</small>

By: _____

Christopher E. Skinnell

*Attorneys for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CALIFORNIA APARTMENT
ASSOCIATION, STEPHEN LIN,
RAKESH and TRIPTI JAIN, ALISON
MITCHELL, MICHAEL HAGERTY, &
H. ALEX and DANNIE ALVAREZ