NIELSEN MERKSAMER LLP
  Christopher E. Skinnell, Esq. (S.B. No. 227093)
  Hilary J. Gibson, Esq. (S.B. No. 287862)
2350 Kerner Boulevard, Suite 250
San Rafael, California 94901
Telephone: (415) 389-6800
Facsimile: (415) 388-6874
Email: cskinnell@nmgovlaw.com
Email: hgibson@nmgovlaw.com

*Attorneys for Plaintiff/Petitioners*
CALIFORNIA APARTMENT
ASSOCIATION, STEPHEN LIN,
RAKESH and TRIPTI JAIN, ALISON
MITCHELL, MICHAEL HAGERTY, &
H. ALEX and DANNIE ALVAREZ

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA APARTMENT ASSOCIATION, STEPHEN LIN, RAKESH and TRIPTI JAIN, ALISON MITCHELL, MICHAEL HAGERTY, & H. ALEX and DANNIE ALVAREZ,<br><br>    *Plaintiffs and Petitioners*,<br><br>vs.<br><br>COUNTY OF ALAMEDA, BOARD OF SUPERVISORS OF THE COUNTY OF ALAMEDA, and DOES 1-25,<br><br>    *Defendants and Respondents.* | Case No. 3:22-cv-02705-LB<br><br>**PLAINTIFFS' OPPOSITION TO COUNTY OF ALAMEDA'S MOTION DISMISS THE FIRST AMENDED COMPLAINT**<br><br>**[FED. R. CIV. PROC. 56]**<br><br>DATE: August 14, 2025<br>TIME: 9:30 a.m.<br>DEPT: Courtroom B, 15th Floor<br>JUDGE: Hon. Laurel Beeler<br><br><br>(Related to Case 3:22-cv-01274-LB, *Williams v. County of Alameda, et al.*) |

## **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................ 6

II.   LEGAL STANDARD ......................................................................... 9

III.  KEY ALLEGATIONS OF THE FIRST AMENDED COMPLAINT, PRESUMED TO BE TRUE, AND JUDICIALLY NOTICEABLE FACTS .............................................................................................. 9

    A.   Background ........................................................................... 9

    B.   Effects of the Moratorium on the Individual Plaintiffs Herein ............. 14

IV.  PLAINTIFFS ALLEGE A TEMPORARY REGULATORY TAKINGS ............. 18

    A.   The FAC Adequately Alleges That the Moratorium Had a Severe Economic Impact on the Individual Plaintiffs ......................................... 19

        1.   The case law does not support the County's unduly narrow view of the relevant economic impacts ............................ 19

        2.   Plaintiffs provided sufficient detail at the pleading stage .......... 22

    B.   The County's Extended Moratorium Substantially Interfered with Plaintiffs' Reasonable Investment-Backed Expectations ............... 23

    C.   The Character of the Governmental Action Also Supports the Conclusion that the Moratorium Effected a Taking ............................... 27

    D.   The Extraordinary Duration of the County's Moratorium Further Supports the Conclusion That It Effected a Taking ................. 29

    E.   Balance of Factors ............................................................ 32

V.   CONCLUSION ................................................................................ 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*640 Tenth LP v. Newsom,*
    78 Cal. App. 5th 840 (2022) ......................................................................25

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021) ............................................................................13, 26

*Am. 5, LLC v. Twp. of Monroe,*
    No. 24-cv-11313, 2025 U.S. Dist. LEXIS 53960 (E.D. Mich. Mar. 24,
    2025) ......................................................................................................28

*Armstrong v. United States,*
    364 U.S. 40 (1960) ................................................................................29

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................22, 23

*Baptiste v. Kennealy,*
    490 F. Supp. 3d 353 (D. Mass. 2020) .............................................24, 26

*Bass Enterprises Production Co. v. United States,*
    381 F.3d 1360 (Fed. Cir. 2004) .............................................................30

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................22, 23

*Birkenfeld v. Berkeley,*
    17 Cal. 3d 129 (1976) ............................................................................10

*Block v. Hirsh,*
    256 U.S. 135 (1921) ..............................................................................26

*Bordelon v. Baldwin Cty.,*
    No. CA 20-0057-C, 2022 U.S. Dist. LEXIS 196442 (S.D. Ala. Oct. 28,
    2022) ......................................................................................................21

*Bridge Aina Le'a, LLC v. State Land Use Comm'n,*
    950 F.3d 610 (9th Cir. 2020) ..........................................20, 22, 23, 24

*Capitol Hill Baptist Church v. Bowser,*
    496 F. Supp. 3d 284 (D.D.C. 2020) .......................................................29

*Childs v. Eltinge,*
    29 Cal. App. 3d 843 (1973) ...................................................................10

*Coates v. Hall,*
 512 F. Supp. 2d 770 (W.D. Tex. 2007) ............................................................28

*Colony Cove Props., Ltd. Liab. Co. v. City of Carson,*
 888 F.3d 445 (9th Cir. 2018) ..........................................................................20

*Cooley v. United States,*
 324 F.3d 1297 (Fed. Cir. 2003) .......................................................................30

*Cwynar v. City & Cty. of San Francisco,*
 90 Cal. App. 4th 637 (2001) ............................................................................27

*Darby Dev. Co., Inc. v. United States,*
 112 F.4th 1017 (Fed. Cir. 2024), *reh'g en banc denied,* 2025 U.S. App.
 LEXIS 13907 (Fed. Cir. June 6, 2025) ...........................................................27

*David Hill Dev., Ltd. Liab. Co. v. City of Forest Grove,*
 No. 3:08-cv-266-AC, 2012 U.S. Dist. LEXIS 156028 (D. Or. Oct. 30,
 2012) ...........................................................................................................21, 30

*Ecogen, LLC v. Town of Italy,*
 438 F. Supp. 2d 149 (W.D.N.Y. 2006) ............................................................30

*Farhoud v. Brown,*
 No. 3:20-cv-2226-JR, 2022 U.S. Dist. LEXIS 20033 (D. Or. Feb. 3,
 2022) .................................................................................................................24

*GHP Mgmt. Corp. v. City of L.A.,*
 No. CV 21-06311 DDP, 2022 U.S. Dist. LEXIS 209157 (C.D. Cal. Nov.
 17, 2022), *aff'd, GHP Mgmt. Corp. v. City of L.A.,* No. 23-55013, 2024
 U.S. App. LEXIS 13097 (9th Cir. May 31, 2024) ...........................................24

*Guggenheim v. City of Goleta,*
 638 F.3d 1111 (9th Cir. 2010) *(en banc)* .............................................23, 24, 28

*Hawkeye Commodity Promotions, Inc. v. Vilsack,*
 486 F.3d 430 (8th Cir. 2007) ...........................................................................28

*Heights Apartments, LLC v. Walz,*
 30 F.4th 720 (2022), *reh'g denied,* 39 F.4th 479 (8th Cir. 2022) .........24, 25, 27

*Home Bldg. & Loan Asso. v. Blaisdell,*
 290 U.S. 398 (1934) ..................................................................................25, 26

*Lingle v. Chevron U.S.A. Inc.,*
 544 U.S. 528 (2005) ..........................................................................19, 22, 29

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ......................................................................................... 27, 28

*McDougal v. Cty. of Imperial,*
    942 F.2d 668 (9th Cir. 1991) ...................................................................................... 9

*Palazzolo v. Rhode Island,*
    533 U.S. 606 (2001) ................................................................................................ 19

*Parents for Privacy v. Barr,*
    949 F.3d 1210 (9th Cir. 2020) .................................................................................... 9

*Penn Central Transportation Co. v. New York City,*
    [438 U.S. 104 (1978)] ....................................................................................... *passim*

*Penn. Coal Co. v. Mahon,*
    260 U.S. 393 (1922) ................................................................................................ 18

*Rancho De Calistoga v. City of Calistoga,*
    800 F.3d 1083 (9th Cir. 2015) .................................................................................. 18

*Reoforce, Inc. v. United States,*
    No. 11-884L, 2012 U.S. Claims LEXIS 2256 (Fed. Cl. Dec. 11, 2012) ..................... 30

*Russellville Legends, LLC v. United States,*
    172 Fed. Cl. 455 (2024) ........................................................................................... 20

*Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002) ......................................................................................... *passim*

*TJM 64, Inc. v. Harris,*
    475 F. Supp. 3d 828 (W.D. Tenn. 2020) ................................................................. 24

*United States v. Causby,*
    328 U.S. 256 (1946) ........................................................................................... 27, 28

*United States v. Ritchie,*
    342 F.3d 903 (9th Cir. 2003) ...................................................................................... 9

*W. B. Worthen Co. v. Kavanaugh,*
    295 U.S. 56 (1935) .................................................................................................. 25

*Williams v. Alameda Cty.,*
    642 F. Supp. 3d 1001 (N.D. Cal. 2022) .................................................................. 25

*Yee v. City of Escondido,*
    503 U.S. 519 (1992) ......................................................................................... 18, 27

**Statutes**

Alameda Cty. Urgency Ordinance No. O-2020-23 (Apr. 21, 2020) ..........................11

Alameda Cty. Ord. No. O-2020-32 (June 23, 2020), § II ............................11

Assem. Bill 832 (2021-2022 Reg. Sess.), Cal. Stats., ch. 27 ...................................13

    § 15 ......................................................................................13

    § 20 ......................................................................................13

Assem. Bill 2179 (2021-2022 Reg. Sess.), Cal. Stats., ch. 13, § 4............................13

Assem. Bill 3088 (2019-2020 Reg. Sess.), Cal. Stats., ch. 37............................13, 14

    § 20 ...............................................................................13, 14

Cal. Civ. Code § 1788.66 ........................................................................26

Cal. Civ. Code § 1946.2 ..........................................................................14

Cal. Code Civ. Proc. §§ 1159 *et seq.* ...........................................................9

Cal. Code Civ. Proc. §§ 1161 *et seq.* .........................................................10

COVID-19 Tenant Relief Act of 2020, Cal. Code Civ. Proc. §§ 1179.01–
1179.07 ...........................................................................................13

    § 1179.02.5 .....................................................................................14

    § 1179.03 ...............................................................................13, 14

    § 1179.03.5(a)(3)...........................................................................14

COVID-19 Rental Housing Recovery Act, Cal. Code Civ. Proc. §§
1179.08–1179.15 ..............................................................................13

    § 1179.11(a) ...................................................................................13

    § 1179.11(a)(4).................................................................................13

    § 1179.11(c) ...................................................................................13

    § 1179.11(c)(2)................................................................................13

Sen. Bill 91 (2021-2022 Reg. Sess.), Cal. Stats., ch. 2, § 17 ...................................13

**Other Authorities**

Alameda Cty. Pub. Health Dep't, "Alameda County Is Aligned with
the State's Beyond the Blueprint Framework" (June 14, 2021) ........................ 12

Alameda Cty. Super. Court, Former Emergency Rule 1.8a ..................................... 11

Cal. Exec. Order N-28-20 (Mar. 16, 2020), ¶ 2 .................................................. 10, 14

Cal. Exec. Order N-71-20 (June 30, 2020), ¶ 3 ..................................................... 12

Cal. R. Ct., Appx., Former Emergency Rule 1(e) ..................................................... 12

Fed. R. Civ. Proc. 8 .................................................................................................... 22

Fed. R. Civ. Proc. 8(a)(2) .......................................................................................... 22

Fed. R. Civ. Proc. 26(a)(1)(A)(iii) ............................................................................ 23

## I.    **INTRODUCTION**.

As the Court knows, this case arises out of Alameda County's three-year long imposition—from March of 2020 to April 29, 2023—of a near-total ban on evictions within the County, for virtually any reason (the "Moratorium"). Originally adopted in response to the COVID-19 pandemic, "the County's COVID-19 Moratorium was one of the longest-running in the Nation, and one of the most restrictive." (First Amended Complaint, ECF No. 101 ["FAC"], ¶ 44.) The federal eviction moratorium was ended by the Supreme Court, in August *2021*, and that State of California's more tailored tenant protection laws were almost entirely phased out the following month. By then, vaccinations were widely available, "shelter-in-place" was no longer the order of the day, and schools and other businesses had long-since been allowed to operate virtually without restriction. Yet, the County continued to use the pandemic as a pretext to maintain its sweeping, draconian eviction ban for 18 additional months.

In contrast to applicable state law, the County's Moratorium relieved tenants of eviction for failing to pay rent for those three years altogether, regardless of whether the tenant could afford to make the rent payments; it did not require even partial payment of rent during that period, unlike state law; and, also unlike state law, the Moratorium even prohibited landlords from evicting tenants who breached material terms of their lease, commit nuisance, waste or fraud, or who violated the law. Nor could many landlords regain these rental units for their own use, to stop the bleeding. (Landlords, of course, were not freed of their continuing obligations—financial or otherwise—in connection with these rental units.)

The individual Plaintiffs herein are all Alameda County landlords who, for the duration of the Moratorium, were prevented from evicting tenants who (among other things) failed to pay rent to the tune of tens of thousands of dollars and damaged Plaintiffs' property. For *three years*, the County forced these landlords to dedicate their property to the accomplishment of the County's purposes, largely at the landlords' own expense and to the detriment of Plaintiffs' property values. Whatever

the justification for doing so in the early months of the pandemic, by the time this case was filed it had dissipated. The First Amended Complaint in this action alleges that continued maintenance of the County's blanket Moratorium, and the cumulative impacts it continued to sanction despite dramatically improved circumstances, effected a temporary regulatory taking of Plaintiffs' property. The County's Motion to Dismiss the FAC (ECF No. 106, hereafter "MTD") should be denied.

## II.    LEGAL STANDARD.

"It is axiomatic that the motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted." *McDougal v. Cty. of Imperial*, 942 F.2d 668, 676 n.7 (9th Cir. 1991) (quoting *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986) (internal quotation marks omitted)). "This admonition [against 12(b)(6) dismissal] is perhaps nowhere so apt as in cases involving claims of inverse condemnation where the Supreme Court itself has admitted its inability 'to develop any "set formula"' for determining when compensation should be paid, *Penn Central Transportation Co. v. New York City*, [438 U.S. 104, 124 (1978)], resorting instead to 'essentially ad hoc, factual inquiries' to resolve this difficult question." *Id*.

In considering a motion to dismiss, a district court must accept all of the complaint's allegations as true and "construe all factual inferences in the light most favorable to the plaintiff." *Parents for Privacy v. Barr*, 949 F.3d 1210, 1221 (9th Cir. 2020). Typically, review is limited to the face of the pleadings, but a court may consider documents attached to or incorporated by reference in the complaint, or matters of judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## III.   KEY ALLEGATIONS OF THE FIRST AMENDED COMPLAINT, PRESUMED TO BE TRUE, AND JUDICIALLY NOTICEABLE FACTS.

### A.    Background.

Since 1872, landlords in California have had a statutory right under the state's unlawful detainer law, Cal. Code Civ. Proc. §§ 1159 *et seq.*, to pursue a summary proceeding to evict tenants who fail to pay their rent or who engage in material

breaches of their leases. "The rights and remedies afforded a landlord by the statutory provisions are given in lieu of his common law rights and remedies which included the right to enter and expel the tenant by force." *Childs v. Eltinge*, 29 Cal. App. 3d 843, 853 (1973). And while the courts have held that local governments may place reasonable limits on evictions—limiting the amount of rent that can be charged or imposing "just cause" for eviction laws, *Birkenfeld v. Berkeley*, 17 Cal. 3d 129 (1976)— both the courts and the Legislature have carefully protected the interests of property owners in collecting lawful rents and in enforcing lawful lease terms, especially by evicting tenants who did not pay their lawful rent or who violated their leases, *see, e.g., id.* (striking down local laws that interfered with unlawful detainer statutes).

In March 2020, however, in response to the COVID-19 pandemic, Governor Newsom declared a State of Emergency in California. On March 16, 2020, Governor Newsom issued an executive order, which, in relevant part, permitted local governments to temporarily limit landlords' ability to evict tenants for nonpayment of rent due to the COVID-19 crisis, though only to the extent the tenants' inability to pay was attributable to negative financial impacts caused by the COVID-19 pandemic itself. In pertinent part, that order provided:

> [T]he statutory cause of action for unlawful detainer, Code of Civil Procedure section 1161 et seq., and any other statutory cause of action that could be used to evict or otherwise eject a residential . . . renter . . . is suspended only as applied to any tenancy . . . to which a local government has imposed a limitation on eviction pursuant to this paragraph 2 [relating to inability to pay rent because of COVID-19 financial distress], and only to the extent of the limitation imposed by the local government. [¶] Nothing in this Order shall relieve a renter of the obligation to pay rent, nor restrict a housing provider's ability to recover rent due.

Cal. Executive Order ("EO") N-28-20 (Mar. 16, 2020), ¶ 2, *see* Plaintiffs' Request for Judicial Notice, filed July 18, 2022 (ECF No. 24) (hereafter "RJN"), pp. 47-48.[1]

---

[1] As noted, the Court can consider judicially noticeable facts in connection with this motion, and the Court has already taken judicial notice of the exhibits attached to this Request. *See* ECF No. 43, pp. 11-12.

On April 21, 2020, acting pursuant to this authority, the Alameda County's Board of Supervisors adopted the ordinance at issue here, Urgency Ordinance No. O-2020-23 (RJN, pp. 181-94), which imposed a moratorium on virtually all evictions in Alameda County, for any reason.[2] The Moratorium prohibited "all evictions from residential units in the unincorporated and incorporated areas of the county" subject to very few exceptions. Alameda County Code of Ordinances ("ACCO," RJN, pp. 173-80) § 6.120.030. These exceptions were (1) Ellis Act withdrawals; (2) government orders requiring the unit to be vacated; or (3) "the resident poses an imminent threat to health or safety." ACCO § 6.120.030(F). However, even these narrow exceptions did not apply when the tenant claims a financial hardship due to the COVID-19 pandemic. ACCO § 6.120.040.[3] The County's Moratorium provided that it was an "absolute defense" to an unlawful detainer action brought during its term. ACCO §§ 6.120.030(D), 6.120.040(D). By its terms, the Moratorium applied countywide—in incorporated and unincorporated areas alike—except that cities were permitted to provide even more stringent protections for renters. ACCO § 6.120.110. The Moratorium also provides—still, today—that any rent a tenant failed to pay during

---

[2] The language in the urgency ordinance was made a permanent part of the County's Code of Ordinances on June 23, 2020. Ordinance No. O-2020-32, § II (RJN, pp. 204-12); ACCO, ch. 6.120 (RJN, pp. 173-80).

[3] Though this Court construed the Moratorium to permit Ellis Act evictions in such cases, in its November 2022 order denying Plaintiffs' motion for summary judgment (ECF No. 43), prior to that date the County's online guidelines advised residents that "if you provide documentation that you have a COVID-related impact that made you unable to pay rent on time, the ordinance prohibits your eviction and *there are no exceptions*. If you do not provide documentation or are being evicted for any reason besides nonpayment of rent, there are three exceptions to the eviction ordinance" including the Ellis Act. (ECF No. 24, p. 19 [emphasis added].) And for the entire duration of the Moratorium the Alameda County Superior Court refused to accept unlawful detainer complaints for filing unless they alleged that they were not prohibited by a local ordinance and were accompanied by "[a] declaration under oath stating specific facts showing the health and safety related necessity or other exception." (Alameda Cty. Super. Court, Former Emergency Rule 1.8a.) The FAC alleges that "the Alameda County Superior Court consequently refused to take action on unlawful detainer complaints seeking to evict tenants on the basis of the Ellis Act, when those tenants claimed financial hardship." (FAC ¶ 23; *see also* FAC ¶ 87 & 104 [alleging that the Alameda Superior Court refused to take action on Ellis Act evictions filed by the Jains and the Alvarezes until after this Court's ruling].)

the Moratorium can *never* be the basis of an eviction, even if the tenant refuses to pay after the state of emergency has ended. ACCO § 6.120.090(B) & (D).

Also, by its terms, the Moratorium expired sixty days "after the expiration of the local health emergency," ACCO § 6.120.030. The emergency was finally lifted on February 28, 2023, and the Moratorium finally expired on April 29, 2023. ECF No. 58, Ex. A. In other words, landlords in Alameda County were precluded from evicting tenants for nonpayment of rent, or for virtually any reason, for *more than three years*.

Whatever the rationale for imposing the Moratorium in the early days of the pandemic, it cannot be disputed—indeed, the County has expressly admitted—that by the time this case was filed in May 2022, "the Bay Area ha[d] seen significant improvement in circumstances relating to the pandemic since March of 2020 and ha[d] a relatively high rate of vaccinations. The County also admits that there [we]re fewer restrictions on business and lower unemployment rates compared to the immediate economic impacts of the pandemic in early 2020." Answer to Original Complaint (ECF No. 18), ¶ 74.

To put a finer point on it, the California state courts' temporary moratorium on unlawful detainer actions was repealed effective September 1, *2020*, Cal. R. Ct., Appx., Emergency Rule 1(e). That was almost two years before this case was filed. Governor Newsom's March 2020 executive order permitting local governments to temporarily limit COVID-19-related nonpayment evictions expired a month later, on September 30, 2020. *See* EO N-71-20 (June 30, 2020), ¶ 3 (RJN, p. 52). COVID-19 vaccinations became widely available in early 2021. State and County "stay-at-home" orders, which initially closed nonessential businesses and restricted them on an ongoing basis were repealed in June of 2021, *almost a year* before this case was filed, and businesses and schools were fully reopened.[4] And in August 2021 the U.S.

---

[4] *See* Alameda Cty. Pub. Health Dep't, "Alameda County Is Aligned with the State's Beyond the Blueprint Framework" (June 14, 2021) (RJN, p. 16) ("Alameda County is rescinding its Shelter-in-Place Order…").

Supreme Court ended the Center for Disease Control's federal eviction moratorium, concluding, in light of the widespread availability of vaccines, that the hardships facing landlords could no longer be justified, *see Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 762-63 & 765-66 (2021).

Even California's statutory limits on pandemic-related evictions, the "COVID-19 Tenant Relief Act," Cal. Code Civ. Proc. §§ 1179.01–1179.07, and the "COVID-19 Rental Housing Recovery Act," Cal. Code Civ. Proc. §§ 1179.08–1179.15, which were *far* more tailored than Alameda County's Moratorium, had been phased out. Beginning September 1, 2020, and until September 30, 2021, landlords in other counties could evict tenants who failed to pay at least 25 percent of their rent during that period.[5] Beginning October 1, 2021, other counties' landlords regained the ability to evict tenants for *any* nonpayment of rent, provided that the landlord verified that he or she submitted an application for rental assistance through the State or applicable local program on behalf of the tenant and (1) it was denied, or (2) the tenant did not cooperate in completing the application with specified time periods.[6]

Yet the Alameda County Board of Supervisors left the Moratorium in place until April 29, 2023—another 18 months after the state eviction restrictions began to phase out and more than three years after the Moratorium took effect.

Further, at all relevant times, the applicable state law protections for nonpayment of rent were afforded only to those who provided a declaration of

---

[5] *See* Assembly Bill 3088 (2019-2020 Reg. Sess.), 2020 Cal. Stats., ch. 37, § 20 ("AB 3088") (RJN, pp. 59-88) (enacting the "COVID-19 Tenant Relief Act of 2020," including Cal. Code Civ. Proc. § 1179.03); Senate Bill 91 (2021-2022 Reg. Sess.), 2021 Cal. Stats., ch. 2, § 17 ("SB 91") (RJN, pp. 90-120) (amending Cal. Code Civ. Proc. § 1179.03 and related provisions to extend protections through June 30, 2021); Assembly Bill 832 (2021-2022 Reg. Sess.), 2021 Cal. Stats., ch. 27, § 15 ("AB 832") (RJN, pp. 122-60) (further extending protections to Sept. 30, 2021).

[6] AB 832, 2021 Cal. Stats., ch. 27, § 20 (RJN, pp. 144-45) (codifying former Cal. Code Civ. Proc. § 1179.11(a), (c)). Beginning April 1, 2022, that restriction was removed—the only tenants who were not subject to eviction for nonpayment under state law were those who had a rent relief application pending as of March 31, 2022, and even that final, narrow protection expired June 30, 2022. *See* Assembly Bill 2179 (2021-2022 Reg. Sess.), 2022 Cal. Stats., ch. 13, § 4 (RJN, p. 170) (adding Cal. Code Civ. Proc. § 1179.11(a)(4), (c)(2)).

---

financial distress caused by COVID-19, and beginning in September 2020 "high-income" tenants were required to provide additional documentation of hardship.[7] Unlike Alameda County's Moratorium, state law did not bar the eviction of tenants who could afford to pay. And, also unlike Alameda County's Moratorium, state law continued to permit evictions for fault (nuisance, waste, material breach violations, etc.), and no-fault "just cause" reasons like an owner move-in. Cal. Code Civ. Proc. § 1179.03.5(a)(3); Cal. Civ. Code § 1946.2. That was not the case in Alameda County, at least as a practical matter.[8]

In this case, the delay that the Moratorium imposed on the use of Plaintiff's property was extraordinary under the circumstances. In particular, the continued maintenance of the Moratorium after September 2021 was extraordinary. The County's Moratorium was in place more than twice as long as the federal eviction moratorium (to the extent that moratorium was applicable in California in light of AB 3088). State law only barred eviction for complete nonpayment of rent for six months (March 2020 to August 2020) and it only barred eviction where the tenant paid at least some of the rent for 13 more months (September 2020 to September 2021), for a total of 19 months in all. The County's Moratorium barred eviction of any tenant for virtually any reason for 37 months—again, twice as long. Moreover, the County's Moratorium was far broader than State law, which contained substantial protections for property-owners that the Alameda Moratorium did not.

## B. Effects of the Moratorium on the Individual Plaintiffs Herein.

The individual Plaintiffs in this case—Rakesh & Tripti Jain, Stephen Lin, Alison Mitchell, Michael Hagerty, and Alex & Dannie Alvarez—all owned rental properties in Alameda County that were subject to the Moratorium, *see* FAC, ¶¶ 7-11, 52, 69, 86-87, 102 & 119, and each has a tenant who failed to make substantial rent

---

[7] EO N-28-20, ¶ 2 (RJN, pp. 47-48); AB 3088, § 20 (RJN, pp. 82-86) (enacting Cal. Code Civ. Proc. §§ 1179.02.5, 1179.03).
[8] *See* note 3, *supra*.

payments during the effective period of the Moratorium. While some of the Plaintiffs received partial relief payments from federal, state and local funding, *see* FAC, ¶¶ 88, 105, 119, others were unable to do so because their tenants either refused to cooperate, *see* FAC, ¶ 53,[9] or the tenant was deemed to be ineligible, *see* FAC, ¶ 70.[10] In any event, the rent relief programs were inadequate, and even taking into account such relief payments as were available, the FAC alleges that each of these Plaintiffs suffered in the high tens of thousands in unpaid—and unrecoverable—rent as a result of the County's Moratorium, plus lost rent increases and interest. Four of the five Plaintiffs lost equity substantial equity in their properties, ranging from $100,000 to $250,000. All the properties suffered *substantial* physical damage requiring significant repairs, in addition to having to pay property taxes, insurance, homeowners' association dues, maintenance, and property management costs during the entirety of the Moratorium. All were forced to cash out or forego other investments to make ends meet, and several Plaintiffs suffered significant medical issues and emotional distress due to the stressful situation. More specifically:

- **Alison Mitchell** and her husband lost more than $100,000 in estimated equity between September 2021, when the federal and State moratoria ended, and November 2023, when they were finally able to recover the property and sell it for $695,000. They lost approximately $135,000 in uncollected rent, not even taking into account rent increases they were entitled to impose and interest they would have been able to earn on that rental income, which likely represent an additional $30,000 to $35,000 in lost income (or more). Just in the period after September 2021, the MITCHELLS lost approximately $75,000 in uncollected rent, again not taking into account rent increases and interest, which would likely

---

[9] *See also* Answer (ECF No. 18), ¶ 45 (admitting the corresponding allegations of the original complaint).

[10] *See also* Answer (ECF No. 18), ¶ 47 (admitting the corresponding allegations of the original complaint).

represent $15,000 or more. They lost their "grandfathered-in" property tax base under Proposition 13, which will surely cost them tens of thousands of dollars more in property taxes for a comparably priced unit in the future. And repairing the damage done by the tenant after they finally recovered the unit cost more than $30,000. In total, the Moratorium likely cost the Mitchells several hundred thousands of dollars overall, just in the post-September 2021 period alone—and more over the course of the entire Moratorium. (FAC ¶¶ 49-65.)

- **Michael Hagerty** lost between $200,000 and $250,000 in estimated equity between September 2021 and the end of the Moratorium. He lost $73,000 in back rent, of which he was only able to recover $1,600 before the tenant disappeared, not counting an estimated $20,000 to $30,000 in lost rent increases and interest. (He lost approximately $45,000 in unpaid rent, plus $15,000 or more in rent increase and interest after September 2021 alone.) Repairing the unit, when he was finally able to recover it from the tenant, costs thousands of additional dollars, and the need to continue covering costs while he was unable to collect rent also cost him tens of thousands that he was forced to withdraw from his retirement account. Factoring in all of these effects, the Moratorium likely cost Mr. HAGERTY several hundred thousands of dollars overall, just in the post-September 2021 period alone—and more over the course of the entire Moratorium. (FAC ¶¶ 66-83.)

- **Rakesh & Tripti Jain** lost approximately $200,000 in estimated equity between September 2021 and the end of the Moratorium. Plus they lost more than $80,000 in unpaid rent, even factoring in a partial payment from Fremont's ERAP program, plus an estimated $20,000 to $30,000 in rent increases and interest ($50,000 in lost rent plus $15,000 or more in lost increases and interest just in the period after September 2021.) Once

they were able to recover possession of the unit, in November 2022, they had to pay $50,000 to repair the extensive damage done by the tenant. And the need to continue covering costs while they was unable to collect rent significantly cut into their savings and their childrens' college funds. Factoring in all these effects, the Moratorium likely cost the JAINS several hundred thousands of dollars overall, just in the post-September 2021 period alone—and more over the course of the entire Moratorium. (FAC ¶¶ 84-99.)

- **H. Alex and Dannie Alvarez** lost approximately $85,000 in unpaid rent, plus an additional $10,000 to $15,000 in lost rent increases and interest. Though the Alvarezes were able to get a rent relief payment for a portion of the outstanding amount, the tenant still ultimately ended up approximately $40,000 in arrears, almost all of which was attributable to the period after September 2021, plus rent increases and interest, which would likely represent an additional $5,000 to $10,000 more. They also, as a result of the Moratorium, were prevented from claiming the home to live in as intended and therefore were forced to spend all three years living in an RV, with all of the attendant costs thereof. And when they were able to finally sell the property, they had little choice by to use the proceeds to purchase another rental property, rather than a new home, to avoid $300,000 in capital gains taxes on the sale. Factoring in all the relevant financial effects, the Moratorium likely cost the Alvarezes more than a hundred thousand dollars, in the post-September 2021 period alone. (FAC ¶¶ 100-116.)

- **Stephen Lin** lost approximately $100,000 in estimated equity from early 2022,[11] when Fremont's ERAP program ceased covering the

---

[11] The reference to "the first few months of 202**3**" in Paragraph 125 is a typo.

tenant's rent and the end of the Moratorium. Plus, the tenant failed to pay nearly $70,000 worth of rent, not counting rent increases and interest totaling an additional $10,000 to $15,000, all after September 2021. (Fremont's ERAP program paid less than half the lost amount.) Upon recovering the property at the end of the Moratorium, Mr. Lin had to pay approximately $25,000 to repair extensive damage caused by the tenant's dogs, mold that the tenant had prevented Mr. Lin from abating, moisture damage, etc. And the need to cover costs of the unit while being unable to obtain rent significantly affected the Lins' savings. Factoring in all of these effects, the Moratorium likely cost the Lins one- to two-hundred thousand dollars overall, all in the post-September 2021 period. (FAC ¶¶ 117-132.)

## IV.    PLAINTIFFS ALLEGE A TEMPORARY REGULATORY TAKINGS.

"[W]hile property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). Compensation is required if "considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee v. City of Escondido*, 503 U.S. 519, 522-23 (1992) (citing *Penn Central*, 438 U.S. at 123-25). The "chief" factors governing this inquiry—the so-called *Penn Central* factors—are the regulation's economic impact on the claimant, the extent to which it interferes with distinct investment-backed expectations, and the character of the government action. *Rancho De Calistoga v. City of Calistoga*, 800 F.3d 1083, 1090 (9th Cir. 2015).

However, the Supreme Court has also made clear that these factors are not

exclusive and other factors will be relevant, depending on the nature of the claim.[12] For example, when, as here, the deprivation was temporary, "the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 342 (2002) ("*Tahoe-Sierra*"). The Court has also admonished that the *Penn Central* factors are not to be applied as a formulaic test. *Id.* at 326-27 & n.23. While they serve as "'important guideposts that lead to the ultimate determination whether just compensation is required,'" *id.* at n.23 (quoting *Palazzolo*, 533 U.S. at 632-33 (O'Connor, J., concurring), "'[t]he temptation to adopt what amount to *per se* rules in either direction must be resisted.'" *Id.* At the end of the day, *Penn Central* requires "essentially ad hoc, factual inquiries," 438 U.S. at 124, to determine whether the challenged actions "are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).

### A. The FAC Adequately Alleges That the Moratorium Had a Severe Economic Impact on the Individual Plaintiffs.

#### 1. The case law does not support the County's unduly narrow view of the relevant economic impacts.

The first *Penn Central* factor is "the regulation's economic impact on the claimant." As detailed above and in the FAC, each of the individual Plaintiffs suffered severe economic impacts as a result of the County's moratorium, to the tune of hundreds of thousands of dollars. The County nevertheless contends that the allegations of the FAC are inadequate because, in the County's view, the FAC does not allege a diminution of property value of at least 50% as to four of the Plaintiffs or any diminution on behalf of the Alvarezes. Based "solely" on that supposed failure, the County urges the Court to hold Plaintiffs fail to state a claim. MTD at 14:17.

---

[12] *See Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001)  (whether a regulatory taking has occurred "depend[s] on a complex of factors *including* the" *Penn Central* factors (emphasis added)).

The flaws in this argument are numerous.

First, while the Ninth Circuit has noted that it is unaware of a case in which a taking has been found with a diminution less than 50%, it did not adopt a "litmus test," holding that such a case could *never* be made as a matter of law. *Bridge Aina Le'a, LLC v. State Land Use Comm'n*, 950 F.3d 610, 631 (9th Cir. 2020) (quoting *Colony Cove Props., Ltd. Liab. Co. v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018)). "[T]here is no strict cutoff where a plaintiff alleges a diminution of value." *Russellville Legends, LLC v. United States*, 172 Fed. Cl. 455, 470-71 (2024). To hold otherwise would violate the Supreme Court's admonition to avoid "'[t]he temptation to adopt what amount to *per se* rules[.]'" *Tahoe-Sierra*, 535 U.S. at 321, 326 & 342.

Second, and more importantly, however, the County's argument that the FAC fails to allege diminutions of at least 50% is based on an incorrect view of what the relevant economic impacts are. It focuses only on the allegations related to the losses in *equity value* caused by the Moratorium. But while those losses are substantial, "[i]n a *temporary* regulatory taking case, just compensation damages are *modified* because 'the landowner's loss takes the form of an injury to the property's potential for producing income or an expected profit,' not the loss of the property itself." [Citation.] In these circumstances, '[t]he landowner's compensable interest . . . is the return on the portion of fair market value that is lost as a result of the regulatory restriction. Accordingly, the landowner should be awarded the market rate return computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction." *Bridge Aina Le'a, LLC*, 950 F.3d at 632 n.12 (emphasis added) (quoting *Wheeler v. Pleasant Grove*, 833 F.2d 267, 271 (11th Cir. 1987)).[13]

---

[13] This is consistent with the Ninth Circuit's prior holding that though "the severity of the loss can be determined only by comparing the post-deprivation value to pre-deprivation value," the loss of "[p]rojected *income streams* can contribute to a method for determining the post-deprivation value of property[.]" *Colony Cove Props., Ltd. Liab. Co.*, 888 F.3d at 451 (emphasis added).

The application of this "modified" measure of harm in the context of a temporary regulatory takings is well-illustrated by *Bordelon v. Baldwin Cty.*, No. CA 20-0057-C, 2022 U.S. Dist. LEXIS 196442 (S.D. Ala. Oct. 28, 2022). In that case, the county's unwarranted "stop work" order delayed construction of the plaintiff's duplex for three years, costing the plaintiff approximately $600,000 of lost rental income during that period. While that sum amounted to only about 19% of the approximately $3.2 million total equity value of the subject property (*see id.* at *34-39), the district court held that it nevertheless "had profound economic impact on Plaintiffs"—sufficient to meet the first *Penn Central* prong, when considered in connection with the other factors—inasmuch as the credible testimony offered at the bench trial established that for the three years construction of their three-story duplex has been delayed, they have and will lose $599,666.00 in net rental income (*i.e.*, they will earn no rental income for this period and will lose 100% of their projected rental income)." *Id.* at *76-77. The Eleventh Circuit affirmed, 2024 U.S. App. LEXIS 1819 (11th Cir. Jan. 26, 2024), and the Supreme Court denied certiorari, 145 S. Ct. 171 (2024).

Such an analysis supports Plaintiffs' taking claims here as well, where the losses attributable to the County's Moratorium vastly exceeded 50% of the rental income the Plaintiffs were entitled to earn during the relevant three-year period.

The County also wrongly disregards the other economic impacts inflicted on Plaintiffs, such as substantial repair costs, legal fees, lost interest, lost rental increases, negative tax implications, and opportunity costs in the form of other lost investments. The courts have recognized the relevance of a number of such economic impacts. For example, in *David Hill Dev., Ltd. Liab. Co. v. City of Forest Grove*, No. 3:08-cv-266-AC, 2012 U.S. Dist. LEXIS 156028, at *102-05 (D. Or. Oct. 30, 2012), the court found a regulatory taking by factoring in market decline—the County's focus here—*plus* increased costs, opportunity costs in the form of lost investment opportunities, and other additional factors, rejecting the city's "focus[] on a single, narrow measure of compensation." And in *Bordelon*, the court considered increased

construction costs as an element of harm.

Finally, even if the Court were to conclude that this "economic impact" factor did not weigh in Plaintiffs' favor, to give it "exclusive significance," and dismiss "solely" on that basis, as the County urges, would also violate the Court's admonition to avoid "'[t]he temptation to adopt what amount to *per se* rules in either direction[.]'" *Tahoe-Sierra*, 535 U.S. at 327 n.23; *see also Lingle*, 544 U.S. at 540 (*Penn Central* inquiry does not turn "exclusively" on regulation's economic impact and degree of interference with legitimate property interests). An adverse finding on one *Penn Central* factor does not relieve the Court of the need to engage in a "'careful examination and weighing of all the relevant circumstances.'" *Bridge Aina Le'a, LLC, 950 F.3d at 625* (quoting *Tahoe-Sierra*, 535 U.S. at 322). *See also id. at 636-37* (engaging in a balancing of all the factors). Indeed, with respect to temporary moratoria in particular, the Court has firmly emphasized that "the answer depends upon the particular circumstances of the case." *Tahoe-Sierra*, 535 U.S. at 321.

### 2.    Plaintiffs provided sufficient detail at the pleading stage.

The County also argues (in fairly cursory fashion) that the FAC is inadequate because the allegations concerning decreases in value are too "conclusory"—for example, the FAC alleges that the Mitchells' property had a pre-deprivation value of approximately $800,000 without explaining how that number was derived. (*See* MTD at 14:6-10.)

Plaintiffs are not required to attach an appraisal report to their complaint. Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the plaintiff is entitled to relief ... [to] give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And while "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" taking into account all reasonable inferences, the Court's judicial experience, and common sense, Rule 8 "does not require 'detailed factual allegations[.]'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678

1  (2009) (quoting *Twombly*, 550 U.S. at 555-56). The plaintiff is not required to

2  establish a "probability" of prevailing at the pleading stage. *Id.*

3      This Court previously held that the FAC needs to allege specific "before-and-

4  after values." (ECF No. 95, p. 8:5-6.) It does, and that is all that is required. The

5  allegations are a far cry from the bare "unadorned, the-defendant-unlawfully-harmed-

6  me-accusation" that *Iqbal* and *Twombly* prohibit. *Iqbal*, 556 U.S. at 678 (quoting

7  *Twombly*, 550 U.S. at 545). The means of calculating and proving those before-and-

8  after values is the appropriate subject of expert reports and initial disclosures. *See*

9  Fed. R. Civ. Proc. 26(a)(1)(A)(iii) (initial disclosures requiring the calculation of

10  damages) & (2) (requiring expert reports).

11
**B.    The County's Extended Moratorium Substantially Interfered**

12  **with Plaintiffs' Reasonable Investment-Backed Expectations.**

13      The second *Penn Central* factor is "the extent to which the regulation has

14  interfered with distinct investment-backed expectations." 438 U.S. at 124. The County

15  nevertheless argues that this factor does not support a finding of a taking because the

16  rental housing market is highly-regulated, so any subjective expectations Plaintiffs

17  may have had that the regulatory environment would remain static were and are

18  unreasonable.   (MTD at 15:1-3.) But the proper "focus" of this factor "is on

19  interference with *reasonable expectations*," *Bridge Aina Le'a, LLC*, 950 F.3d at 634

20  (emphasis added), *i.e.*, "reasonable probability, *like expecting rent to be paid* … A

21  landlord buys land burdened by leaseholds in order to acquire a stream of income

22  from rents and the possibility of increased rents or resale value in the future."

23  *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (*en banc*). It also

24  includes a reasonable expectation that the landlord will be able to evict tenants who

25  are damaging the property or materially violating the lease. In this case, such basic

26  expectations were substantially frustrated, again to the tune of hundreds of

27  thousands of dollars of losses for each Plaintiff.

28      Moreover, "what is relevant and important in judging reasonable expectations

is the regulatory environment at the time of the acquisition of the property." *See Bridge Aina Le'a, LLC*, 950 F.3d at 634 (internal quotation marks and citation omitted). As alleged in the FAC (¶¶ 59, 78, 94, 111, 127), none of the individual Plaintiffs' properties were even subject to "plain-vanilla" rent control at the time they acquired the land, much less an interference of the magnitude at issue here, and they could not have reasonably expected such heavy-handed interference with their rights to receive rent and evict those who did not pay. Just as "reasonable expectations" do not include "starry-eyed hope of winning the jackpot," *Guggenheim*, 638 F.3d at 1120, neither do they encompass the remote possibility that a landlord may be deprived of rent altogether, without any realistic remedy, and in particular that such a deprivation will last *three full years*.

As more than one court has recognized, "'the scope and nature of the COVID-19 pandemic, and of the public health measures necessary to combat it, have no precedent in the modern era, and [] no amount of prior regulation could have led landlords to expect anything like the blanket Moratorium.'" *GHP Mgmt. Corp. v. City of L.A.*, No. CV 21-06311 DDP (JEMx), 2022 U.S. Dist. LEXIS 209157, at *15 (C.D. Cal. Nov. 17, 2022), *aff'd*, *GHP Mgmt. Corp. v. City of L.A.*, No. 23-55013, 2024 U.S. App. LEXIS 13097 (9th Cir. May 31, 2024) (quoting *Apartment Ass'n of L.A. Cty., Inc. v. City of L.A.*, 500 F. Supp. 3d 1088, 1096 (C.D. Cal. 2020)). "Even assuming that residential tenant leasing is a heavily regulated industry, the nature of the Eviction Moratorium differs in a material way from prior government regulation of residential tenant leasing and therefore still interferes with Plaintiffs' reasonable expectations." *Farhoud v. Brown*, No. 3:20-cv-2226-JR, 2022 U.S. Dist. LEXIS 20033, at *22 (D. Or. Feb. 3, 2022).[14]

---

[14] *See also Heights Apartments, LLC v. Walz*, 30 F.4th 720, 734 (2022), *reh'g denied*, 39 F.4th 479 (8th Cir. 2022) (same); *Baptiste v. Kennealy*, 490 F. Supp. 3d 353, 390 (D. Mass. 2020) (same); *TJM 64, Inc. v. Harris*, 475 F. Supp. 3d 828, 839 (W.D. Tenn. 2020) (fact that bars and restaurants are heavily regulated, especially in the area of sanitation, did not mean that COVID-19 closure orders did not interfere with reasonable investment-backed

It is true, of course, as the County observes, that other courts have reached the opposite conclusion. *See* MTD at 15-16 (citing *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F. Supp. 3d 148 (S.D.N.Y. 2020), and *S. Cal. Rental Hous. Ass'n v. Cty. of San Diego*, 550 F. Supp. 3d 853 (S.D. Cal. 2021)). But those decisions came early in the pandemic, so even if one were to grant the premise, for the sake of argument, that landlords might have expected something as extraordinary as a complete eviction moratorium simply because the rental housing market has been subject to regulation in the past, those cases still do not stand for the proposition that Plaintiffs should have reasonably expected that moratorium to last for three full years, including 18 months after state and local moratoria had ended and the economy had long since re-opened. *See* *Heights Apartments, LLC*, 30 F.4th at 734 ("no landlord could have reasonably expected regulations *of the duration* and extent present in [Minnesota's moratorium]." (emphasis added)).[15]

The County also cites this Court's holding in denying Plaintiffs' earlier motion for summary judgment on Plaintiff's Contracts Clause claim that the Moratorium did not violate Plaintiffs' reasonable expectations "because there is a long history of regulations governing the landlord-tenant relationship and of Supreme Court cases upholding eviction moratoria." (ECF No. 106, p. 15:5-8, citing *Block v. Hirsh*, 256 U.S. 135, 154 (1921), and *Blaisdell*, 290 U.S. at 420.) However, that holding was in the context of a *facial* challenge, so did not consider the extraordinary duration of the County's Moratorium and whether Plaintiffs could have "reasonably" expected to be

---

expectations); *640 Tenth LP v. Newsom*, 78 Cal. App. 5th 840, 862-63 (2022) (same as to restaurants and bars).

[15] While this Court previously held that Alameda's moratorium did not interfere with Plaintiff's reasonable expectations in denying Plaintiff's motion for summary judgment, it did so in connection with a *facial* challenge based on the contracts clause. *Williams v. Alameda Cty.*, 642 F. Supp. 3d 1001, 1023 (N.D. Cal. 2022). It, therefore, had no cause to consider the effect that the extraordinary duration of the County's moratorium had on this question. *Compare* *Home Bldg. & Loan Asso. v. Blaisdell*, 290 U.S. 398 (1934) (two-year eviction moratorium, in which lessee still had to pay reasonable rent, did not violate contracts clause) *with* *W. B. Worthen Co. v. Kavanaugh*, 295 U.S. 56 (1935) (six-year moratorium impermissible).

---

deprived of rent and their property for three years. Moreover, neither *Block* nor *Blaisdell* would have put Plaintiffs on notice that they could be deprived of rent *altogether* for an extended period. *Block* merely upheld standard rent control, where "[m]achinery [wa]s provided to secure to the landlord a reasonable rent," 256 U.S. at 157, and in *Blaisdell* the mortgagee's ability to avoid eviction depended on the payment of the "reasonable rental value" of the property. 290 U.S. at 416-18.

The County also argues that "the Moratorium limits its impact on Plaintiffs' expectations" because it "'impact[ed] only the right to evict, and not the owners' right to continue to collect rents' and '[t]he Moratorium also did not prevent Plaintiffs from suing for breach of contract or initiating Ellis Act evictions." MTD at 16. But this argument asks the Court to ignore the factual allegations of the First Amended Complaint, rather than accept them as true. As the FAC alleges, the supposed ability to try to extract blood from a stone, by collecting monetary damages from a judgment-proof tenant, "has proven—predictably—to be an 'illusory' one for the Plaintiffs herein." (FAC ¶ 27 & n.4, citing *Heights Apartments, LLC*, 30 F.4th at 729 n.7; *Ala. Ass'n of Realtors*, 594 U.S. at 765; *Baptiste*, 490 F. Supp. 3d at 383).[16]

And while this Court held, in November of 2022, that Ellis Act evictions were permitted under the County's moratorium, as the FAC alleges, (1) as owners of condominiums, three of the five Plaintiffs herein—the Mitchells, Mr. Hagerty, and the Lins—were not eligible to avail themselves of the Ellis Act (FAC ¶¶ 56, 69, 119); (2) prior to this Court's November 2022 order "the County's online guidelines advised residents that 'if you provide documentation that you have a COVID-related impact that made you unable to pay rent on time, the ordinance prohibits your eviction and *there are no exceptions*" (FAC ¶ 23); and (3) as a matter of fact, the local state courts would not process Ellis Act evictions due to the County's moratorium—the two

---

[16] That is especially the case because state law also prohibits the sale or assignment of COVID-19 rental debt, meaning that landlords cannot sell their claims to collections agencies. Cal. Civ. Code § 1788.66.

1   eligible property-owners, the Jains and the Alvarezes, tried to exercise that option but

2   were unable to get the Alameda County Superior Court to take action prior to this

3   Court's November 2022 ruling (FAC ¶¶ 23, 87, 104). Moreover, the Supreme Court

4   has squarely rejected the argument that a given regulation of a landlord's property is

5   not a taking merely because the landlord has the option of exiting the rental business.

6   *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 439 n.17 (1982); *see*

7   *also Cwynar v. City*, 90 Cal. App. 4th 637, 658 (2001) (rejecting an argument that the

8   availability of the Ellis Act avoided a taking).

9       **C.    The Character of the Governmental Action Also Supports the**
10           **Conclusion that the Moratorium Effected a Taking.**

11      The *Penn Central* court did not comprehensively define the "character" factor

12  except to note that "[a] 'taking' may more readily be found when the interference with

13  property can be characterized as a physical invasion by government, see, *e. g., United*

14  *States* v. *Causby*, 328 U.S. 256 (1946), than when interference arises from some public

15  program adjusting the benefits and burdens of economic life to promote the common

16  good." 438 U.S. 124. Plaintiffs are mindful, of course, that this Court has previously

17  held that the Moratorium did not effect an *actual* physical taking, construing *Yee v.*

18  *City of Escondido* to foreclose that claim. (Plaintiffs would note that, since this Court's

19  ruling, a second federal court of appeal—the Federal Circuit—has reached the

20  opposite conclusion, holding that *Yee* does *not* foreclose categorical, physical takings

21  claims against COVID-related eviction moratoria for the nonpayment of rent. *See*

22  *Darby Dev. Co., Inc. v. United States*, 112 F.4th 1017, 1035-37 (Fed. Cir. 2024), *reh'g*

23  *en banc denied*, 2025 U.S. App. LEXIS 13907 (Fed. Cir. June 6, 2025). That's in

24  addition to the Eighth Circuit in *Heights Apartments*. No other circuit court, including

25  the Ninth Circuit, has issued a published, precedential opinion to the contrary.)[17]

26

27      [17] The interaction of this Court's prior ruling and the *Darby* decision creates an anomalous
28  circumstance in which landlords living in some California counties may have takings claims
    against the federal government based on its moratorium, while landlords subject to Alameda
    County's far more draconian moratorium can get no relief.

However, as *Penn Central*'s citation to <u>*United States v. Causby*</u> makes clear, this factor does not require an *actual* physical invasion.[18] Indeed, by definition if there were an actual physical invasion, *Penn Central* wouldn't apply. The question, then, is whether the regulatory action is "'too much *like* a physical taking,'"[19] such that the County's action is "functionally *equivalent* to the classic taking." <u>*Guggenheim*, 638 F.3d at 1120</u> (quoting <u>*Lingle*, 544 U.S. at 539</u>).

In this case, whether or not the Moratorium formally effected a physical taking or not, it certainly functioned "like" one. For the duration of the County's Moratorium Plaintiffs were effectively deprived of all of the elements of property ownership. During that period, the Moratorium damaged property owners' "right to possess the occupied space himself, and also [the] power to exclude the occupier from possession and use of the space," <u>*Loretto*, 458 U.S. at 435</u>; it denied an owner the "power to control the use of the property" and obtain a "profit" from it, <u>*id.* at 436</u>; and "[f]inally, even though the owner may retain the bare legal right to dispose of the occupied space by transfer or sale," the extended, indefinite occupation of that space by a non-paying holdover who cannot be evicted for failing to pay rent "will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property," <u>*id.*</u>—which the FAC alleges did, in fact, happen here. In short, the Moratorium impaired every strand in the owners' bundle of property rights. *Cf.* <u>*Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 442 (8th Cir. 2007)</u> (no regulatory taking where only a single strand in the bundle of rights was impaired, but the owners "still 'ha[d] the right to possess, lease and sell'" the property).

---

[18] In *Causby*, the Court held that low-flying military planes effected a taking of a chicken farmer's land, despite the fact that they did not physically enter the land, because it destroyed the owner's enjoyment thereof. <u>328 U.S. at 266</u>.

[19] <u>*Coates v. Hall*, 512 F. Supp. 2d 770, 786 n.8 (W.D. Tex. 2007)</u> (quoting <u>*Sheffield Dev. Co. v. City of Glenn Heights*, 140 S.W.3d 660, 671 (Tex. 2004)</u>). *See also* <u>*Am. 5, LLC v. Twp. of Monroe*, No. 24-cv-11313, 2025 U.S. Dist. LEXIS 53960, at *14 (E.D. Mich. Mar. 24, 2025)</u> (courts ask whether the government's action was "more like" a physical taking or an adjustment of economic burdens and benefits).

In connection with this prong, courts must also assess whether the relevant regulation "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," *Armstrong v. United States,* *364 U.S. 40, 49 (1960),* and it is no answer to say that the regulation served a public purpose—the Takings Clause "presupposes" that is the case. *Lingle*, 544 U.S. at 543.

For one thing, the federal government, State of California, and the County all implicitly acknowledged, by establishing rent relief programs, that simply forcing landlords to bear the financial burdens of the pandemic alone was unreasonable. But those rent-relief programs were woefully inadequate, so, as a practical matter, landlords like the Plaintiffs herein ended up bearing public burdens that should have been borne by the public as a whole.

And beyond that, the County insisted on maintaining its Moratorium long, long after—18 months after—the federal and state moratoria had ended, vaccinations were available, and the economy had long since be reopened. In the latter half of the Moratorium, justifying the burden on Plaintiffs' property rights with reference to the pandemic rings hollow. As the U.S. District Court for the District of Columbia has observed, "[w]hen a crisis stops being temporary, and as days and weeks turn to months and years, the slack in the leash eventually runs out. 'While the law may take periodic naps during a pandemic, [courts] will not let it sleep through one.'" *Capitol Hill Baptist Church v. Bowser, 496 F. Supp. 3d 284, 297 (D.D.C. 2020)* (quoting *Roberts v. Neace, 958 F.3d 409, 414-15 (6th Cir. 2020)* (per curiam)).

### D.    The Extraordinary Duration of the County's Moratorium Further Supports the Conclusion That It Effected a Taking.

Related to the preceding point, as noted above, when it comes to a temporary takings claim, "the duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." *Tahoe-Sierra*, 535 U.S. at 342. In particular, the Supreme Court has held that "[m]ere fluctuations in value during the process of governmental decisionmaking, *absent extraordinary delay*,

1  are 'incidents of ownership. They cannot be considered as a 'taking' in the

2  constitutional sense[.]'" *Id.* at 332 (quoting *Agins v. Tiburon*, 447 U.S. 255, 263 n.9

3  (1980)) (emphasis added). However, "an extraordinary delay in decision-making may

4  constitute a taking," *Cooley v. United States*, 324 F.3d 1297, 1306-07 (Fed. Cir. 2003).

5      "The question of whether a delay is extraordinary is not a simple matter of the

6  number of months or years taken by the Government to make its decision however."

7  *Bass Enterprises Production Co. v. United States*, 381 F.3d 1360, 1366 (Fed. Cir. 2004)

8  (citing *Tahoe-Sierra*, 535 U.S. at 333, 337-38).[20] "'Instead of such an easy guidepost,

9  courts must evaluate a number of factors to determine whether the delay is

10 extraordinary,' including the reasons for the delay and whether the delay is

11 proportionate to the nature of the government process." *David Hill Dev., Ltd. Liab.*

12 *Co.*, 2012 U.S. Dist. LEXIS 156028, at *59-60 (quoting *Bass Enterprises*, 381 F.3d at

13 1366). It is a fact-intensive question. *Reeforce, Inc. v. United States*, No. 11-884L,

14 2012 U.S. Claims LEXIS 2256, at *18 (Fed. Cl. Dec. 11, 2012). But delays shorter

15 than those imposed by the County's Moratorium—indeed, of as little as a year—have

16 been found to be takings in other cases, based on their specific circumstances. *See*

17 *David Hill Dev., Ltd. Liab. Co.*, 2012 U.S. Dist. LEXIS 156028, at *59 (declining to

18 overturn jury's determination that a year-long delay was "extraordinary" under the

19 circumstances); *Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 162 (W.D.N.Y.

20 2006) (denying a preliminary injunction, but ordering a town to either end its

21 moratorium with 90 days or render a decision on the plaintiff's hardship application,

22 because "to pass constitutional muster, a moratorium must be of reasonable duration"

23 and "[u]nder the circumstances here, it does seem curious and suspicious that a two-

24 year period is needed to adopt a zoning plan for wind turbines."). *See also Tahoe-*

25 *Sierra*, 535 U.S. at 341 ("It may well be true that any moratorium that lasts for more

26

27 ───────────────
   [20] While in *Tahoe-Sierra* the Court concluded that a 32-month development moratorium
28 did not constitute a *categorical* taking and deferred to the trial court's (unappealed)
   determination that the delay was reasonable under the circumstances of that case, it did not
   decide whether a there was a regulatory taking, because the plaintiffs disclaimed that basis.

than one year should be viewed with special skepticism.").

The FAC alleges an extraordinary delay here:

[T]he delay that the Moratorium imposed on the use of Plaintiff's property was "extraordinary" under the circumstances. The COUNTY's COVID-19 Moratorium was one of the longest-running in the Nation, and one of the most restrictive. It was in place more than twice as long as the federal eviction moratorium (to the extent that moratorium was applicable in California in light of AB 3088). State law only barred eviction for complete nonpayment of rent for six months (March 2020 to August 2020) and it only barred eviction where the tenant paid at least some of the rent for 13 more months (September 2020 to September 2021), for a total of 19 months in all. The COUNTY's Moratorium barred eviction of any tenant for virtually any reason for 37 months—again, twice as long. An additional circumstance enhancing the "extraordinariness" is the breadth of the COUNTY's Moratorium as opposed to state law. State law only prohibited the eviction of tenants who attested under penalty of perjury that they had suffered "COVID-19-related financial distress"; after the first six months it required that tenants make at least partial payment; and it permitted evictions on other "for cause" grounds, such as damaging the property (*i.e.,* waste or nuisance), breach of the lease, etc. The COUNTY's Moratorium, by contrast, did not contain these protections for property-owners.

In particular, the continued maintenance of the Moratorium after September 2021 was extraordinary. By that time, vaccines were widely available, businesses and schools were re-opened, the federal eviction moratorium had expired, and the State's partial moratorium under AB 3088—which was already more permissive than the County's—had begun phasing out. By that time, demand for rent relief funds was already beginning to exceed supply, so the harm to property owners continued to grow. And the unemployment rate in Alameda County, which peaked at 14.8% in April 2020, had fallen to 5.2% by September 2021—less than a point higher than in March 2020 (4.4%)—and it continued to fall, matching the March 2020 rate by November of that year. Yet the COUNTY BOARD still persisted in maintaining the Moratorium for another year-and-a-half. The Moratorium may have initially begun as a response to COVID-19, particularly in the early months when residents were ordered to "shelter-in-place" and most businesses were closed, but the continued maintenance of it when virtually all of the other restrictions were long-since repealed belies the notion that the "extraordinary delay" in question can be justified on that basis. In circumstances involving "an acute risk to public health … judicial scrutiny may recede to its lowest ebb, leaving room for an energetic response by the political branches to the many uncertainties

accompanying the onset of a public health crisis. But when a crisis stops being temporary, and as days and weeks turn to months and years, the slack in the leash eventually runs out. 'While the law may take periodic naps during a pandemic, we will not let it sleep through one.'" *Capitol Hill Baptist Church v. Bowser*, 496 F. Supp. 3d 284, 297 (D.D.C. 2020) (quoting *Roberts v. Neace*, 958 F.3d 409, 414-15 (6th Cir. 2020) (per curiam)).

(FAC ¶¶ 44-45; footnotes omitted.)

This factor, too, weighs strongly in Plaintiffs' favor.

### E.    Balance of Factors.

Individually, each of the foregoing factors weighs in favor of finding a regulatory taking. Thus, the balance of factors necessarily does, too.

## V.    CONCLUSION.

For the foregoing reasons, Defendants' motion to dismiss (ECF No. 106) should be denied. In any event, if the Court were to grant the motion as to this claim, Plaintiffs ask that the Court grant leave to amend.

Respectfully submitted,

Dated: July 14, 2025                NIELSEN MERKSAMER LLP

By:    _____
       Christopher E. Skinnell

*Attorneys for Plaintiffs*
CALIFORNIA APARTMENT
ASSOCIATION, STEPHEN LIN,
RAKESH and TRIPTI JAIN, ALISON
MITCHELL, MICHAEL HAGERTY, &
H. ALEX and DANNIE ALVAREZ