UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| JOHN WILLIAMS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>ALAMEDA COUNTY BOARD OF SUPERVISORS, et al.,<br><br>    Defendants. | Case No. 22-cv-01274-LB<br><br>**ORDER GRANTING MOTIONS TO DISMISS**<br><br>Re: ECF Nos. 194, 196–97 |
| CALIFORNIA APARTMENT ASSOCIATION, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>BOARD OF SUPERVISORS OF THE COUNTY OF ALAMEDA, et al.,<br><br>    Defendants. | Case No. 22-cv-02705-LB<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: ECF No. 106 |

**INTRODUCTION**

In these related lawsuits, the plaintiffs are landlords and organizations representing property owners. They challenge moratoria enacted in Alameda County and Oakland prohibiting the eviction of non-paying tenants during the COVID-19 pandemic, resulting in substantial lost rent and decreased property values. The plaintiffs claim that this was a regulatory taking of their properties under *Penn Central Transportation Co. v. City of New York*, which requires balancing (1) the

ORDER – Nos. 22-cv-01274-LB, 22-cv-02705-LB

economic impact of the regulation, (2) its interference with reasonable investment-based expectations, and (3) the character of the government action. 438 U.S. 104, 124 (1978). The court held previously that by not alleging a severe economic impact in the form of reduced property values, the plaintiffs failed to plausibly plead economic impact, the first factor, but gave leave to amend.[1] The defendants move to dismiss the plaintiffs' amended complaints, arguing that the plaintiffs still fail to plausibly plead economic impact because they did not allege a sufficient reduction in property value, particularly given the moratoria's limited duration of approximately three years and the ability to sue non-paying renters for breach of contract.[2] The plaintiffs counter that they have pleaded facts that satisfy Rule 8, including the loss of millions of dollars, interference with their investment-backed expectations, and the character of the moratoria, which shifted social costs of providing housing from the government to landlords.[3]

Controlling Ninth Circuit authority establishes that the economic harm here is not a regulatory taking. *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 451 (9th Cir. 2018). The motions to dismiss are granted.

**STATEMENT**

**1. The Moratoria**

In March 2020, in response to the COVID-19 pandemic, Governor Gavin Newsom declared a state of emergency and signed an executive order that permitted local governments to temporarily limit housing providers' ability to evict for non-payment of rent due to COVID-19. The provision expired on September 30, 2020. The state legislature enacted the COVID-19 Tenant Relief Act, effective August 31, 2020, extended to September 30, 2021, which amended California's

---

[1] Order, No. 22-cv-01274-LB – ECF No. 182 at 7–8 (dismissing regulatory-takings claim); *id.* at 6, 8–11 (dismissing other federal and state claims with prejudice, including physical-takings, equal-protection, substantive due-process, Contracts clause, and state claims). Citations refer to material in the Electronic Case File (ECF); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Second Am. Compl. (SAC), No. 22-cv-01274-LB – ECF No. 189; First Am. Compl. (FAC), No. 22-cv-02705-LB – ECF No. 101; Cnty. Mot., 22-cv-01274-LB – ECF No. 194 at 15–23; Cnty. Mot., No. 22-cv-02705-LB – ECF No. 106 at 10–17; City Mot., 22-cv-01274-LB – ECF No. 196 at 9–17; Intervenor Mot., 22-cv-01274-LB – ECF No. 197.

[3] *See, e.g.*, Opp'n, No. 22-cv-01274-LB – ECF No. 199 at 7–8.

ORDER – Nos. 22-cv-01274-LB, 22-cv-02705-LB     2

unlawful-detainer statutes to protect renters from eviction if they could not pay rent for COVID-19-related reasons, so long as renters complied with financial-distress requirements. The Act allowed evictions for fault and just cause, Cal. Civ. Proc. Code § 1179.03.5(a)(3), and allowed unlawful-detainer actions for renters who did not comply with the program's requirements or if the rental-assistance application was denied, *id.* § 1179.11(a)(1)–(2), (c).[4]

Alameda County declared a state of emergency in March 2020 and enacted an ordinance on April 21, 2020, prohibiting non-payment evictions from residential units except in cases of (1) Ellis Act evictions, which allow landlords to exit the rental business, (2) government orders requiring the residence to be vacated, or (3) a resident's continued occupancy posing an imminent threat to health or safety. Alameda Cnty., Cal., Mun. Code ch. 6, § 6.120.030(F) (2020). The ordinance had a moratorium on evictions based on a "loss of income, substantial out-of-pocket medical expenses, or extraordinary child care needs . . . caused by COVID-19." It provided a defense to unlawful-detainer actions due to a "failure to timely make rent . . . payments." *Id.* § 6.120.040(A), (D). The ordinance extended the moratorium until sixty days after the Board of Supervisors proclaimed that the local health emergency had expired. *Id.* § 6.120.030(A).[5] On February 28, 2023, the day after the California State of Emergency ended, the County terminated its local public-health emergency, which meant that the moratoria expired sixty days later, on April 29, 2023. *Id.*

Oakland declared a state of emergency and enacted an ordinance prohibiting just-cause evictions for non-payment of rent unless the renter posed an imminent threat to the health or safety of other property occupants. Oakland, Cal., Mun. Code ch. 8, art. II, § 8.22.360A(1)–(10) (2022). It did not apply to Ellis Act evictions. *Id.* § 8.22.360A(11).[6] The moratorium expired on July 15, 2023, but the phase-out ordinance prohibited evictions for (1) unlawful-detainer actions served between March 9, 2020, and July 14, 2023 (unless the renter posed an imminent threat to the health or safety of other property occupants), (2) unpaid rent that became due between March 9, 2020, and

---

[4] Order, No. 22-cv-01274-LB – ECF No. 96 at 3–5.

[5] *Id.* at 7.

[6] *Id.* at 5–6.

July 14, 2023, where an inability to pay rent resulted from the pandemic (such as through a reduction in household income, increase in household expenses, loss of employment, or inability to work because of childcare or illness), and (3) just-cause evictions, including evictions for non-payment, if the grounds for eviction arose between March 9, 2020, and July 14, 2023.[7]

State law required local governments to develop programs for renters to apply for COVID-related rent relief. Alameda County and Oakland programs were oversubscribed when the lawsuits were filed and were not accepting applications.[8]

### 2. The Lawsuits and Alleged Harm

There are two related cases, *Williams*, against Alameda County and the City of Oakland, and *California Apartment*, against Alameda County. *Williams* involves a collection of fifty-eight landlords and property-management companies and eighty-seven properties. *California Apartment* involves six plaintiffs and five properties. In both cases, Alameda County submitted charts summarizing the plaintiffs' allegations about the moratoria's effect on property values.[9]

In *Williams*, for twenty-five properties, there are no specific allegations.[10] Thirty-nine properties decreased in value: thirty by less than fifty percent, four without explanation for the alleged decrease, and five based on a "gross rent multiplier" theory.[11] All plaintiffs suffered devastating losses, purchased the properties before the moratoria with the expectation that they would be fruitful investments, and could not evict their non-paying renters.[12]

---

[7] Ordinance, Ex. C to Pls. Req. for Judicial Notice, No. 22-cv-01274-LB – ECF No. 200 at 64 (p. 4), 66 (p. 6), 74 (p. 14).

[8] SAC – ECF No. 189 at 15 (¶ 82).

[9] Charts, No. 22-cv-01274-LB – ECF No. 194 at 25–28 & No. 22-cv-02705-LB – ECF No. 106 at 19.

[10] Chart, No. 22-cv-01274-LB – ECF No. 194 at 25–26 (ll. 1–5, 7–9, 12, 15–17, 20, 28–37, 40–41) (citing SAC, No. 22-cv-01274-LB – ECF No. 189 at 6–10 (¶¶ 35–36, 38, 43–49, 56, 62–63, 65–66)).

[11] *Id.* at 27–28 (ll. 49–87) (citing SAC, No. 22-cv-01274-LB – ECF No. 189 at 26–44 (¶¶ 92–119, 121, 123–32)).

[12] SAC – ECF No. 189 at 51–52 (¶¶ 147–50).

ORDER – Nos. 22-cv-01274-LB, 22-cv-02705-LB    4

In *California Apartment*, the plaintiffs allege lost equity for four of five properties (from 11.67 percent to 31.25 percent, or $100,000 to $250,000), lost rent, and thousands of dollars in repairs.[13]

The *Williams* complaint includes a declaration from an expert appraiser, who reviewed the effect of the moratoria on the properties. The moratoria affected the market value of properties in Oakland and Alameda County.[14] The market capitalization rates decreased by at least 200 to 300 basis points, depending on the individual property's characteristics. Market value of rental property is calculated by dividing the property's net operating income (income after expenses but before debt service) by the capitalization rate. The capitalization rate is a tool used by investors and analysts to convert income into value and assess investment risk. For example, if a property's net operating income is $100,000, and the capitalization rate is ten percent, then market value is $1 million ($100,000 divided by ten percent).[15] The expert used quarterly capitalization rates compiled by Situs RERC by region and tiers. Tiers reflect the quality of the asset. The appraiser viewed seven representative properties, all tier three, with a normal capitalization rate of 6.5 percent, effectively increased by two or three percentage points due to the moratoria, and determined the decrease in property values.[16]

Plaintiff John Williams owns a duplex in Oakland that he bought for housing security and reliable income for retirement. The renter refused to pay rent or to apply for rent relief through the rent-relief program. As a result, Mr. Williams had trouble paying his mortgage, property maintenance, and utilities.[17]

Plaintiff Robert Vogel owns a single-family home in the County. A renter lived there for about twelve years, stopped paying rent of $2,000 per month in September 2021, and moved out near the end of the moratorium, leaving the property (apparently used as a drug den) infested with rats,

---

[13] Chart, No. 22-cv-02705-LB – ECF No. 106 at 19 (citing FAC, No. 22-cv-02705-LB – ECF No. 101 at 20–35 (¶¶ 55, 73, 91, 108, 125); FAC, No. 22-cv-02705-LB – ECF No. 101 at 18–36 (¶¶ 49–132).

[14] Marchitelli Decl., Ex. A to SAC, No. 22-cv-01274-LB – ECF No. 189 at 69 (¶ 16).

[15] *Id.* at 67–68 (¶¶ 7–10), 70 (¶ 24).

[16] *Id.* at 68–70 (¶¶ 11–15, 21–25).

[17] SAC, No. 22-cv-01274-LB – ECF No. 189 at 15–17 (¶ 85).

heaped with garbage, and puddled with urine. The costs and repairs depleted Mr. Vogel's bank account and prevented him from re-financing the property.[18]

Plaintiff Sheanna Rogers owns a home in the County, which she operated as an independent living facility, with a rental unit on the lower floor. Her tenant did not pay rent for over two years, would not apply for rental assistance, and harassed Ms. Rogers' clients who lived there, forcing her to close the business. The moratoria prevented Ms. Rogers from evicting the renter, costing her hundreds of thousands of dollars and health consequences from stress.[19]

Plaintiff Jacqueline Watson-Baker owns a duplex rental home in Oakland, purchased by her mother in the 1950's. Her renter did not pay rent during the moratoria, left the property in gross disrepair (including an insect infestation, dark yellow streaks running down the walls, feces and urine in the bathroom, dog feces and garbage in the backyard, and foil on the windows). Ms. Watson-Baker considered selling the property but was advised that the renter's actions had devalued her property by almost a third.[20]

Plaintiff Michael Loeb — a 74-year-old widower — owns a rental unit in Oakland. He tried to negotiate an owner move-in, but his renter demanded more than $160,000 to vacate, causing him mental harm.[21]

Plaintiff Hannah Kirk, a single mother, owned a house in Oakland, where she lived with her two children. In 2019, a renter moved into her home, agreeing to pay $800 per month and sharing the kitchen and bathroom. On July 1, 2021, the renter stopped paying rent, refused to move out, did not cooperate with rental assistance programs or return the COVID-19 declarations that Ms. Kirk provided to her and instead accused Ms. Kirk of harassment. Ms. Kirk moved out after almost two years due to the emotional toll on her family and sold the property in September 2023.[22]

---

[18] *Id.* at 17–19 (¶ 86).
[19] *Id.* at 19–20 (¶ 87).
[20] *Id.* at 20–21 (¶ 88).
[21] *Id.* at 21–22 (¶ 89).
[22] *Id.* at 22–23 (¶ 90).

Plaintiffs Ami Shah and Avinash Jha owned a house in the County, intending it to be their primary residence but renting it for financial reasons. Their renters stopped paying rent, refused to apply for rent relief through the state and local rent-relief programs, and rented out rooms through Airbnb (as they also did with other homes). The plaintiffs could not evict the renters, who eventually moved out, leaving the plaintiffs with rental losses, legal fees, and a destroyed home (amounting to millions of dollars) and health issues.[23]

### 3. Relevant Procedural History

All parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c)(1).[24]

## GOVERNING LAW

A complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, "[a] complaint may fail to show a right to relief either by lacking a cognizable legal theory or by lacking sufficient facts alleged under a cognizable legal theory." *Woods v. U.S. Bank N.A.*, 831 F.3d 1159, 1162 (9th Cir. 2016). The court accepts as true the complaint's factual allegations and construes them in the light most favorable to the plaintiffs. *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 886–87 (9th Cir. 2018). A complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Threadbare recital of the elements of a claim, supported by mere conclusory statements, do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Takings Clause provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. It applies to state and local governments through the Fourteenth Amendment. *Murr v. Wisconsin*, 582 U.S. 383, 392–93 (2017). A taking may be categorical — such as a permanent physical invasion or a regulation that denies all economically

---

[23] *Id.* at 23–25 (¶ 91).

[24] Consents, No. 22-cv-01274-LB – ECF Nos. 12, 14, 17, 19 & No. 22-cv-02705-LB – ECF Nos. 13, 16.

beneficial use — or regulatory, in which case courts apply the *Penn Central* framework. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538–39 (2005); *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015–19 (1992). The regulatory-takings framework applies to zoning ordinances (*Euclid v. Ambler Realty Co.*, 272 U.S. 365, 387–88 (1926)), rent-control regulations (*Yee v. City of Escondido*, 503 U.S. 519, 527 (1992)), and temporary-eviction prohibitions (*Block v. Hirsh*, 256 U.S. 135, 156 (1921)). *See Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2072 (2021) (identifying situations where the regulatory-takings framework applies); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 323 (2002) (same).

Under *Penn Central*, three factors guide the regulatory-takings inquiry: (1) the economic impact of the regulation on the property owner; (2) its interference with reasonable investment-backed expectations; and (3) the character of the government action. 438 U.S. at 124. The inquiry is "essentially ad hoc and factual." *Id.* (cleaned up). The first and second *Penn Central* factors are the primary factors. *Lingle*, 544 U.S. at 538–39; *see MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1128 (9th Cir. 2013) (the Ninth Circuit has held that the main factor is the extent to which the regulation has interfered with investment-backed expectations).

In examining whether a regulatory taking has occurred, courts must consider the property as a whole. *Penn Central*, 438 U.S. at 130–31; *Tahoe–Sierra*, 535 U.S. at 331. An allegation that a regulation has diminished the property's value or destroyed the potential for its highest and best use does not, without more, constitute a taking. *See Euclid*, 272 U.S. at 397 (regulations valid despite a seventy-five percent diminution in property value); *Hadacheck v. Los Angeles*, 239 U.S. 394, 414 (1915) (ordinance prohibiting highest and best use of land as a brickworks was valid, although it reduced the property value from $800,000 to $60,000); *William C. Haas v. City & County of San Francisco*, 605 F.2d 1117, 1121 (9th Cir. 1979) (land-use regulations were not a taking although they reduced the property value from $2,000,000 to $100,000). "[W]here the government merely regulates the use of property, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee*, 503 U.S. at 522–23.

It is appropriate to assess whether the plaintiffs have met the *Penn Central* factors at the pleadings stage. *GHP Mgmt. Corp. v. City of Los Angeles*, No. 23-55013, 2024 WL 2795190, at *2 (9th Cir. May 31, 2024) (*Colony Cove* considered the economic impact of an alleged taking after a jury trial, but its formula for determining economic impact is binding at all stages of the litigation).

## ANALYSIS

The next sections discuss the *Penn Central* factors and conclude that under controlling Ninth Circuit authority, the economic harm suffered here does not plausibly establish a regulatory taking.

**1. Economic Impact**

In *GHP Management*, in an unpublished opinion, the Ninth Circuit affirmed the district court's dismissal of a regulatory-taking claim on the ground that the mere loss of income (such as rent) was not a taking. 2024 WL 2795190, at *2 (citing *Colony Cove*, 888 F.3d at 451). Instead, "economic impact is determined by comparing the total value of the affected property before and after the government action." *Id.* (quoting *Colony Cove*, 888 F.3d at 451). *Colony Cove* cited the Federal Circuit, which noted that it was "aware of no case in which a court has found a taking where diminution in value was less than 50 percent." 888 F.3d at 451 (citing *CCA Assocs. v. United States*, 667 F.3d 1239, 1246 (Fed. Cir. 2011)). Moreover, "[a]lthough no litmus test determines whether a taking occurred, we start from the premise that the *Penn Central* factors seek to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Id.* (quoting *Lingle*, 544 U.S. at 539, and noting that the Ninth Circuit has "observed that diminution in property value because of governmental regulation ranging from 75% to 92.5% does not constitute a taking"); *see Russellville Legends, LLC v. United States*, 172 Fed. Cl. 455, 470 (Fed. Cl. 2024) (a diminution of fifty-five percent is at the "low end of spectrum").

Nine properties allegedly meet the fifty-percent threshold, but the plaintiffs did not respond to the defendants' arguments that their gross-rent multiplier fails to account for the temporary nature

of the moratoria, thus conceding the argument.[25] The plaintiffs instead rely on their expert's assessment of the moratoria's effect on property values. Assuming that methodology is valid, the value of rental property is estimated by dividing a property's net operating income by a hypothetical capitalization rate, ordinarily 6.5 percent, but increased by two or three percentage points due to the moratoria. Assuming a capitalization rate of 9.5 percent, the resulting estimated decrease in property value is 31.6 percent.[26] The plaintiffs did not allege a basis for the decrease in value of three properties (from 52.99 percent to 55.16 percent).[27] Presumably the decreases — like the others in the complaint — are based on the gross-rent multiplier. If they were not, they are too low to constitute a taking. *See Russellville Legends*, 172 Fed. Cl. at 470.

The plaintiffs do not plausibly plead economic impact under the first *Penn Central* factor.[28]

**2. Investment-Backed Expectations**

The plaintiffs assert that they invested in their rental properties with the expectation that they would have enforceable lease agreements that would not be upended by regulatory action like the moratoria.[29] Property owners operate in a regulated field and cannot reasonably expect freedom from

---

[25] *See supra* Statement; Mots., No. 22-cv-01274-LB – ECF No. 194 at 15–18 & ECF No. 197 at 5–7; *Narang v. Gerber Life Ins. Co.*, No. 18-CV-04500-LHK, 2018 WL 6728004, at *4 (N.D. Cal. Dec. 21, 2018) (collecting cases holding that the failure to oppose a dispositive motion is a concession that it should be granted). In their opposition, the plaintiffs relied only on their expert's declaration.

[26] *See supra* Statement; SAC, No. 22-cv-01274-LB – ECF No. 189 at 47 (¶ 139) (value of $2,871,302.46 without the moratoria and $1,964,575.37 with the moratoria), 50–51 (¶ 146) ($4,254,151.08 (listed in the County's motion as $4,255,074.15) versus $2,910,734.95); *see* Mot., No. 22-cv-01274-LB – ECF No. 194 at 19–20 & n.7 (describing calculations). Another property allegedly decreased in value by 119.7 percent, from $810,380 at the outset of the pandemic to negative $159,723.08. The numbers do not make sense because the property sold in 2024 for $1,217,500. Grant Deed, Ex. A to Req. for Judicial Notice, No. 22-cv-01274-LB – ECF No. 195-1 at 2; *see* Alameda County Auditor-Controller Clerk-Recorder, *Real Property Sales & Transfer*, https://auditor.alamedacountyca.gov/clerk-recorder-real-property-tax/. The plaintiffs did not dispute this.

[27] Seven of the nine properties have decreases that are too low, including these three. Chart, No. 22-cv-01274-LB – ECF No. 194 at 25–26 (ll. 79–85); SAC, No. 22-cv-01274-LB – ECF No. 189 at 31–44 (¶¶ 106 (52.99 percent), 108 (55.16 percent), 110 (53.70 percent), 130 (57.98 percent), 125 (61.86 percent), 127 (67.18 percent), & 131 (50.40 percent)).

[28] The earlier order has a fuller analysis of the plaintiffs' argument that they need not allege more at the pleadings stage. Order, No. 22-cv-01274-LB – ECF No. 182 at 8.

[29] Opp'n, No. 22-cv-01274-LB – ECF No. 199 at 27.

landlord-tenant regulation. *See Rancho de Calistoga v. City of Calistoga*, 800 F.3d 1083, 1091 (9th Cir. 2015). The temporary nature of the moratoria and the availability of back-rent recovery mitigate any interference. As the court's earlier summary-judgment order recounts, these issues — while substantial — do not impair the landlords' reasonable investment-backed expectations.[30]

### 3. The Character of the Government Action

"A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Colony Cove*, 888 F.3d at 454 (citing *Penn Central*, 438 U.S. at 124). The moratoria did not effect a physical taking[31] and instead are regulations that affect "property interests through some public program adjusting the benefits and burdens of economic life." *Lingle*, 544 U.S. at 539 (cleaned up); *Colony Cove*, 888 F.3d at 454.

## CONCLUSION

The court previously denied the plaintiffs summary judgment and granted the defendants' motions to dismiss, disposing of all claims with prejudice except the regulatory-taking claim.[32] The court now grants the motion to dismiss the remaining regulatory-taking claim with prejudice. The court will separately enter judgment in the defendants' favor.

**IT IS SO ORDERED.**

Dated: August 29, 2025

_____
LAUREL BEELER
United States Magistrate Judge

---

[30] Order, No. 22-cv-01274-LB – ECF No. 96 at 24–26 (analyzing these concerns).
[31] *Id.* at 13–21.
[32] *Id.*; Order, No. 22-cv-01274-LB – ECF No. 182.

ORDER – Nos. 22-cv-01274-LB, 22-cv-02705-LB     11